# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**FILED**

**NOV 1 9 2002**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

JEFFREY BARHAM
3217 Connecticut Avenue #57
Washington, DC 20008,

MARY CANALES
12 Green Dolphin Drive
South Burlington, VT 05403,

WILLIAM DURHAM
4323 River Road, NW #1
Washington, DC 20016,

NOAH FALK
1727 Massachusetts Avenue, NW
Apartment 502
Washington, DC 20036,

JORGE GARCIA-SPITZ
126A N. Bedford Street
Arlington, VA 22201,

MARK ALLAN JACKSON
1418 G Street, SE, Apt. B
Washington, DC 20003,

CASEY LEGLER
1401 N Street, NW
Apartment 604
Washington, DC 20005,

CHARLCIE LEGLER
126A N. Bedford Street
Arlington, VA 22201,

MICHAEL LEHACH
723 Massachusetts Avenue, NE
Washington, DC 20002,



CASE NUMBER  1:02CV02283

JUDGE: Gladys Kessler

DECK TYPE: Civil Rights (non-employment

DATE STAMP: 11/19/2002

*ECF*

1

BRIAN MCATEER
    by and through his guardians
    Loretta and Sean McAteer
3812 Wilberta Street
Olney, MD 20832,

SALLY A. NORTON
9 Clinton Place
Fairport, NY 14450,

JOHN PASSACANTANDO
702 H Street, NW
Washington, DC 20001,

JOSEPH PHELAN
402 Classon
Basement Apartment
Brooklyn, NY 11238

NICOLE PRICHARD
3300 16th Street, NW
Apartment 415
Washington, DC 20010

MORGAN RESS
112 Lincoln Avenue
Apartment 415
Bronx, NY 10454,

LAURY SALIGMAN
1330 New Hampshire Ave., NW
Apt 723
Washington, DC 20036

MACDONALD SCOTT
3 Rutland Street
Apartment 1
Brooklyn, NY 11225,

MILES SWANSON
4414 Hatfield Lane
Washington, DC 20007,

2

JERI WOHLBERG
10 Henry Street
Burlington, VT 05401,

LESLEY WOOD
3 Rutland Street
Apartment 1
Brooklyn, NY 11225,

SAMANTHA YOUNG
1401 N Street, NW
Apartment 604
Washington, DC 20005,

STEPHEN ZIMMERMAN
1549 4th Street, NW
Washington, DC 20001,

       Plaintiffs,

          v.

CHIEF CHARLES H. RAMSEY
in his individual capacity
and in his official capacity as
Chief of Police
Metropolitan Police Department
300 Indiana Avenue, NW
Washington, DC 20020,

DISTRICT OF COLUMBIA
441 4th Street, NW
Washington, DC 20001,

D.C. METROPOLITAN POLICE DEPARTMENT
441 4th Street, N.W.
Washington, D.C. 20001,

ANTHONY WILLIAMS
in his individual capacity
and in his official capacity as
Mayor
District of Columbia
441 4th Street, NW

3

Washington, DC 20001,

GALE A. NORTON
in her official capacity as
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240,

JOHN ASHCROFT
in his official capacity as
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

UNITED STATES OF AMERICA

UNIDENTIFIED OFFICERS, SUPERVISORS
AND LAW ENFORCEMENT AGENCIES,
in their individual and official capacities

      Defendants.

---

## COMPLAINT
### (First Amendment, Fourth Amendment, Fourteenth Amendment; False Arrest and Imprisonment; Conversion; Negligence)

### OVERVIEW

1.    On September 27, 2002, the D.C. Metropolitan Police Department in joint action with

federal law enforcement agencies (and unidentified other local or federal agencies) once

again deployed its Civil Disturbance Units to disrupt political protest in the Nation's

Capital; and to punish with unlawful detention and false arrest those who engaged in

lawful civil dissent on this first day of a weekend of planned demonstrations, as well as

those interested non-protesters or political sympathizers who approached the

demonstrations to hear the political message or engage in political discussion.

2.     The F.B.I. used these mass arrests as a mass intelligence gathering operation. Working in conjunction with federal law enforcement agencies, including the F.B.I., the D.C. police department compelled identification information from those it falsely arrested as a condition of the arrest, confinement and release. The F.B.I. and other local and federal law enforcement agencies collected intelligence and identification information on lawful political activists, their activities, and others who associated with or were in proximately to the demonstrations.

3.     This lawsuit challenges what have become systematized mechanisms of government disruption of free speech and assembly to criminalize dissent, and in particular the tactics, deployment, and use of Civil Disturbance Units by the D.C. Metropolitan Police Department acting in conjunction with federal and other law enforcement authorities, against peaceful protesters. These units, as a matter of practice and policy, employ unconstitutional tactics to disturb, disrupt, infringe upon and criminalize constitutionally protected speech and assembly.

4.     This complaint is the most recent in a series of lawsuits with a shared factual allegation: That the D.C. Metropolitan Police Department's Civil Disturbance Units maintain and execute unconstitutional tactics to disrupt lawful protest and assembly including specifically the routine use of mobile police lines to interfere with freedom of association, assembly, speech and free movement; and the use of administrative detention, false imprisonment and false arrest tactics in which the CDUs will trap protesters (and others in physical proximity) on all sides, seize, detain and arrest those trapped/seized in the absence of probable cause. These actions are accomplished through

5

the use of paramilitary force and threat of force in order to deprive, interfere with, and deter the exercise of constitutionally protected rights

5.    The earliest filed now-pending case alleging the existence of these unconstitutional disruption strategies and tactics is <u>International Action Center, et al. v. USA, et al.</u>, CA 01-00072, which arose out of the deployment of these tactics during the Bush Inauguration demonstrations in January, 2001. The existence of these tactics was also alleged in the subsequently filed litigation <u>50 Years is Enough, et al. v. District of Columbia, et al.</u>, CA 01-00811, which arose out of the deployment of these tactics during the April, 2000 International Monetary Fund protests.

6.    At each of these demonstrations, the D.C. MPD actions have been coordinated and executed in conjunction with the Federal Bureau of Investigation, among other U.S. agencies.

7.    The conduct challenged herein is neither aberrational nor the consequence of overzealous but well intentioned law enforcement. It was the implementation of a pre-designed plan to engage in unconstitutional preemptive arrests intended to round-up political activists and lock them up in the absence of probable cause. U.S. Capitol Police Chief Terrance Gainer testified - - before the protests - - that he and D.C. police had discussed preemptive action against protesters.

8.    When one plaintiff asked why she was being arrested and whether she could please go free, one officer candidly explained that she was being arrested because she was displaying political "propaganda." Others were let out apparently based on their perceived loyalty to the government. The *Washington Post* reported that police lines

6

yielded for at least one detainee when he displayed a Department of Justice identification card.

9.    This complaint additionally alleges that police treat and process those (falsely) arrested in connection with targeted mass political activity differently from those who are arrested for other minor offenses. Plaintiffs were subjected to more harsh treatment in custody and were hogtied wrist-to-ankle for hours. They were subjected to intentional sleep deprivation and were not released in a matter of hours as would normally be the case, but were held into the night and overnight, for up to 30 hours. The purpose of these arrests was not to enforce laws, but to take protesters off of the streets on the first day of a weekend of planned political events.

10.   The District of Columbia maintains a policy, practice and/or custom of denying to those arrested in targeted mass political round-ups the option to be released and "post and trial." This option allows an arrestee to be quickly released from jail or custody by posting collateral and receiving a trial date on which to challenge the legality of the arrest. The MPD is advising persons caught in targeted mass political sweeps that they must remain in jail or police custody for an extended period of time or may secure release only by "post and *forfeit*," which means the arrestee forfeits the collateral and does not receive the opportunity to challenge the legality of the arrest. This disparate treatment, disallowing the post and trial option in the case of political round-ups, denies those arrestees equal protection under the law, and also subjects those who wish to challenge the legality of their arrest to greater pre-arraignment jail or police custody simply because they seek to exercise their constitutional right to defend against an unlawful arrest.

7

11.    Federal agencies coordinate with the MPD in connection with mass political arrests for, among other reasons, using the arrests to collect photographs, fingerprints and other information about political activists and their associations. The Federal Bureau of Investigation, among other unidentified federal agencies, collects such data and places it in information databases and, on information and belief, disseminates and makes such personal information available to other entities.

12.    Those who are forcibly arrested and deprived of their liberty suffer great fear, harm, and personal injury. The stigma of having been arrested carries on beyond the immediate personal and physical consequences of the deprivation of liberty. The collection and dissemination of personal information and political associations effects an invasion and loss of privacy, as well as a profound loss of Constitutional right to be protected when engaging in or associating with First Amendment protected activity.

13.    These round-ups and mass arrests of political activists are anathema to democracy. It is not merely remarkable that such round-ups happen repeatedly in Washington, D.C., but that policy makers emphatically ratify such blatantly unconstitutional tactics.

14.    "Ain't it a thing of beauty," Chief Ramsey stated on September 27, 2002, as he reviewed the officers about to mass arrest hundreds in Pershing Park, "to see our folks up there ready to go."

15.    These challenged police actions create a substantial chilling effect and deterrent to future First Amendment protected activity as the exercise of one's political rights in Washington, D.C. now carries with it the risk of arrest, of being wrongfully subject to the criminal process of the state, of being threatened with physical harm by the police, being

bound with handcuffs, having one's identification and political activities be collected and

recorded - - for no reason other than having political associations that have been targeted

by the federal government or by the local chief of police or mayor.

16.   This complaint seeks, in addition to monetary compensation, injunctive relief enjoining

defendants from engaging in the challenged conduct in the future.

**JURISDICTION AND VENUE**

17.   This Court has jurisdiction to hear this complaint pursuant to 28 U.S.C. § 1331 (federal

question), 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction), and 28 U.S.C. § 1367

(supplemental jurisdiction).

18.   Venue is appropriately vested in this Court pursuant to 28 U.S.C. § 1391, as the District

of Columbia is a judicial district in which all defendants reside, and, independently

because a substantial part of the acts or omissions giving rise to the claims herein

occurred in the District of Columbia.

**PARTIES**

19.   Plaintiff JEFFREY BARHAM is a law student at the George Washington University

School of Law and a resident of the District of Columbia. On September 27, 2002, Mr.

BARHAM, in his capacity as a National Lawyers Guild Legal Observer, was peaceably

and lawfully observing political demonstrations in the vicinity of Vermont Ave. and K

Street when, without notice or warning, police surrounded him with pop up police lines,

boxed him in, closed off all avenues of exit, and falsely detained and arrested Mr.

BARHAM in the absence of probable cause.

20.   Plaintiff MARY CANALES is a Registered Nurse, and a resident of the state of

Vermont. On September 27, 2002, Dr. CANALES was in Washington, D.C. to attend a

9

nursing conference. Dr. CANALES saw a political assembly in Pershing Park and entered the park to associate with the demonstrators and to see if there was a speaker to listen to. Dr. CANALES was peaceably and lawfully standing in the park when, without notice or warning, police surrounded her and the park with pop up police lines, boxed her in, closed off all avenues of exit, and falsely detained and arrested her in the absence of probable cause.

21.    Plaintiff WILLIAM DURHAM is a law student at Georgetown University Law Center and resident of the District of Columbia. On September 27, 2002, Mr. DURHAM was peaceably and lawfully protesting in Pershing Park when, without notice or warning, police surrounded him and the park with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

22.    Plaintiff NOAH FALK is a law student at the George Washington University Law School and a resident of the District of Columbia. On September 27, 2002, Mr. FALK, in his capacity as a National Lawyers Guild Legal Observer, was peaceably and lawfully observing political demonstrations in Pershing Park when, without notice or warning, police surrounded him with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

23.    Plaintiff JORGE GARCIA-SPITZ is a cook at Il Radicchio in Arlington, VA, and a resident of Virginia. On September 27, 2002, Mr. GARCIA-SPITZ lawfully rode his bicycle with about sixty other cyclists to convey, by way of example, his support for, and the effectiveness of non-fossil fuel based modes of transportation. In the vicinity of Pershing Park, Mr. GARCIA-SPITZ was confronted by a police line that had popped up

10

obstructing his movement, he was ordered off of his bike and into Pershing Park where, without notice or warning, police surrounded him with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

24.     Plaintiff MARK JACKSON is an independent contractor with the Underground Railroad and Freedom Center, and works with a curator at the American History Museum. He is also an adjunct professor at the George Washington University, and a resident of the District of Columbia. On September 27, 2002 Mr. JACKSON walked over to Pershing Park where there was a political assembly. When he tried to move on to work, Mr. JACKSON realized that without notice or warning, police had surrounded him with pop up police lines, boxed him in, and closed off all avenues of exit. He was falsely detained and arrested in the absence of probable cause.

25.     Plaintiff CASEY LEGLER is a resident of Washington, DC. On September 27, 2002, Ms. LEGLER lawfully rode her bicycle with about sixty other cyclists to convey, by way of example, her support for, and the effectiveness of non-fossil fuel based modes of transportation. In the vicinity of Pershing Park, Ms. LEGLER was confronted by a police line that had popped up obstructing her movement, she was ordered off of her bike and into Pershing Park where, without notice or warning, police surrounded her with pop up police lines, boxed her in, closed off all avenues of exit, and falsely detained and arrested her in the absence of probable cause.

26.     Plaintiff CHARLCIE LEGLER is a student at George Mason University and waitress at the Tabard Inn and a resident of Virginia. On September 27, 2002, Ms. LEGLER

lawfully rode her bicycle with about sixty other cyclists to convey, by way of example,

her support for, and the effectiveness of non-fossil fuel based modes of transportation. In

the vicinity of Pershing Park, Ms. LEGLER was confronted by a police line that had

popped up obstructing her movement, she was ordered off of her bike and into Pershing

Park where, without notice or warning, police surrounded her with pop up police lines,

boxed her in, closed off all avenues of exit, and falsely detained and arrested her in the

absence of probable cause.

27.     Plaintiff MICHAEL LEHACH is a law student at the Georgetown University Law Center

and a resident of the District of Columbia. On September 27, 2002, Mr. LEHACH, in his

capacity as a National Lawyers Guild Legal Observer, was peaceably and lawfully

observing political demonstrations in the vicinity of Vermont Ave. and K Street when,

without notice or warning, police surrounded him with pop up police lines, boxed him in,

closed off all avenues of exit, and falsely detained and arrested Mr. LEHACH in the

absence of probable cause.

28.     Plaintiff BRIAN McATEER is a high school student, a reporter for the Independent

Media Center, and a resident of Maryland. He was lawfully videotaping political activity

near the intersection of Vermont Avenue and K Streets, NW on the morning of

September 27, 2002 when, without notice or warning, police surrounded him with pop up

police lines, boxed him in, closed off all avenues of exit, and falsely detained and

arrested Mr. McATEER in the absence of probable cause.  As has happened to other

independent media reporters with recurring frequency at demonstrations in Washington,

D.C., his video camera and tape were seized by the D.C. MPD and confiscated while in

the custody of the MPD.

29.    Plaintiff SALLY NORTON is a Registered Nurse, an Assistant Professor at the

University of Rochester School of Nursing, and a resident of the State of New York.  On

September 27, 2002, Dr. NORTON was in Washington, D.C. to attend a nursing

conference. Dr. NORTON saw a political assembly in Pershing Park and entered the park

to associate with the demonstrators and to see if there was a speaker to listen to. Dr.

NORTON was peaceably and lawfully standing in the park when, without notice or

warning, police surrounded her and the park with pop up police lines, boxed her in,

closed off all avenues of exit, and falsely detained and arrested her in the absence of

probable cause.

30.    Plaintiff JOHN PASSACANTANDO is the Executive Director of Greenpeace and is a

resident of the District of Columbia. Mr. PASSACANTANDO was peaceably and

lawfully bicycling to work on September 27, 2002 when he entered Pershing Park to

observe the political activity there. Thereafter, the police surrounded him and the park

with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained

and arrested him in the absence of probable cause.

31.    Plaintiff JOSEPH PHELAN is a student at Hunter College and a resident of the state of

New York.  On September 27, 2002, Mr. PHELAN was peaceably and lawfully

protesting in Pershing Park when, without notice or warning, police surrounded him and

the park with pop up police lines, boxed him in, closed off all avenues of exit, and falsely

detained and arrested him in the absence of probable cause.

32.    Plaintiff NICOLE PRICHARD is an administrative assistant at the Arca Foundation and

13

a resident of the District of Columbia. On September 27, 2002, Ms. PRICHARD was

riding her bicycle around Washington DC when she found herself amidst the group of

bicycling protesters. She was forced by the police department into Pershing Park. She

was peaceably and lawfully standing in Pershing Park when, without notice or warning,

police surrounded her and the park with pop up police lines, boxed her in, closed off all

avenues of exit; and falsely detained and arrested her in the absence of probable cause.

Her bicycle lock was destroyed and her bicycle was confiscated by the MPD.

33.   Plaintiff MORGAN RESS is a photographer associated with ABC No Rio, an artists'

space in New York City, and a resident of the State of New York. On September 27,

2002, he was present in Washington, D.C. to participate in political demonstrations by

photographing those events with the intention of later sharing these political images with

others. Plaintiff RESS was peaceably and lawfully standing in Pershing Park when,

without notice or warning, police surrounded him and the park with pop up police lines,

boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the

absence of probable cause.

34.   Plaintiff LAURY SALIGMAN is an employee of Conservation International and a

resident of the District of Columbia. On the morning of September 27, 2002, she had

been riding her bicycle as part of her routine bicycle race fitness training. She was

peaceably and lawfully pausing to rest from her training and observing nearby protesters

when, without notice or warning, a police line began forming near her. As she tried to

exit the block, the police violently pushed her and knocked her off of her bicycle and

then arrested her.

14

35. Plaintiff MACDONALD SCOTT is a Canadian citizen and resident of the State of New York, where he is employed as Membership Coordinator for the National Lawyers Guild. On September 27, 2002, Mr. SCOTT was peaceably and lawfully protesting in Pershing Park when, without notice or warning, police surrounded him and the park with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested him in the absence of probable cause.

36. Plaintiff MILES SWANSON is a law student at the University of the District of Columbia David A. Clarke School of Law, and a resident of the District of Columbia. On September 27, 2002, Mr. SWANSON, in his capacity as a National Lawyers Guild Legal Observer, was peaceably and lawfully observing political demonstrations in the vicinity of Vermont Ave. and K Street when, without notice or warning, police surrounded him with pop up police lines, boxed him in, closed off all avenues of exit, and falsely detained and arrested Mr. SWANSON in the absence of probable cause.

37. Plaintiff JERI WOHLBERG is a graduate student in a family nurse practitioner program in Vermont, and is also a resident of that state. On September 27, 2002, Ms. WOHLBERG was in Washington, D.C. to attend a nursing conference. From her hotel, Ms. WOHLBERG saw and heard the political assembly in Pershing Park, and went across the street to the Park to participate. Ms. WOHLBERG was peaceably and lawfully standing in the public park when, without notice or warning, police surrounded her and the park with pop up police lines, boxed her in, closed off all avenues of exit, and falsely detained and arrested her in the absence of probable cause.

38. Plaintiff LESLEY WOOD is a Canadian citizen and resident of the State of New York,

15

where she is a doctoral candidate at Columbia University. On September 27, 2002, Ms.
WOOD was peaceably and lawfully protesting in Pershing Park when, without notice or
warning, police surrounded her and the park with pop up police lines, boxed her in,
closed off all avenues of exit, and falsely detained and arrested her in the absence of
probable cause.

39.    Plaintiff SAMANTHA YOUNG is a chef at the Tabard Inn and a resident of Virginia. On
September 27, 2002, Ms. YOUNG lawfully rode her bicycle with about sixty other
cyclists to convey, by way of example, her support for, and the effectiveness of non-fossil
fuel based modes of transportation. In the vicinity of Pershing Park, Ms. YOUNG was
confronted by a police line that had popped up obstructing her movement, she was
ordered off of her bike and into Pershing Park where, without notice or warning, police
surrounded her with pop up police lines, boxed her in, closed off all avenues of exit, and
falsely detained and arrested her in the absence of probable cause.

40.    Plaintiff STEPHEN ZIMMERMAN is a law student at the George Washington
University Law School and is a resident of the District of Columbia. On September 27,
2002, Mr. ZIMMERMAN, in his capacity as a National Lawyers Guild Legal Observer,
was peaceably and lawfully observing political demonstrations in Pershing Park when,
without notice or warning, police surrounded him with pop up police lines, boxed him in,
closed off all avenues of exit, and falsely detained and arrested him in the absence of
probable cause.

41.    Defendant CHARLES H. RAMSEY is Chief of the District of Columbia Metropolitan
Police Department. He is a policy maker for the District of Columbia and the D.C.

16

Metropolitan Police Department. Chief RAMSEY was physically present at the site of

the mass arrests and political roundups and, on information and belief, planned in

advance and gave the orders at the scene for officers to engage in the conduct challenged

herein. Mr. RAMSEY is sued in both his official and individual capacity.

42. Defendant ANTHONY WILLIAMS is the Mayor of the District of Columbia and a

policy maker for the District. Mr. WILLIAMS has approved and ratified the

unconstitutional conduct challenged herein. He is sued in both his official and individual

capacity.

43. Defendant DISTRICT OF COLUMBIA is a municipal corporation and constitutes the

local government of Washington, D.C.

44. Defendant D.C. METROPOLITAN POLICE DEPARTMENT has law enforcement

authority within the District of Columbia and engaged in the conduct challenged herein.

45. Defendant GALE A. NORTON is head of the Department of the Interior, the federal

agency encompassing the U.S. Park Police and the National Park Service, which

maintains jurisdiction over certain parks and land located within the District of Columbia

including Pershing Park, and is alleged to have engaged in joint action with the other

defendants in the acts challenged herein.

46. Defendant JOHN ASHCROFT is U.S. Attorney General and head of the Department of

Justice, the federal agency encompassing the Federal Bureau of Investigation, which is

alleged to have engaged in joint action with the other defendants in the acts challenged

herein, including but not limited to, for the purpose of collecting and disseminating

intelligence information related to the plaintiffs' and demonstrators' political actions and

17

associations.

47.   Defendant UNITED STATES OF AMERICA encompasses all federal agencies that had

any role in the violations alleged herein.

48.   Defendant UNIDENTIFIED OFFICERS, SUPERVISORS AND LAW

ENFORCEMENT AGENCIES are individuals who, and agencies which, engaged in

joint action with the named defendants to deprive plaintiffs of their clearly established

constitutional rights. The as yet unidentified defendants engaged in the mass arrests and

political roundups notwithstanding the absence of probable cause or lawful justification.

The officers and their responsible supervisory chain of command are sued in their

individual and official capacities.

### STANDARDS REFLECTED IN THE MPD MASS DEMONSTRATION HANDBOOK

49.   As a matter of policy, practice and custom, the MPD in joint action with federal and other

agencies, intentionally disrupts and disperses certain targeted mass political assembly and

demonstrations in the absence of cause or justification.

50.   As a matter of practice, custom, and informal policy the MPD routinely violates its own

established standards and engages in constitutionally impermissible mass arrests and

political round-ups of targeted political demonstrators and activists engaged in mass

assembly and political activity and others associating with them.

51.    The MPD has issued the "Metropolitan Police Department Handbook for the

Management of Mass Demonstrations" (hereinafter the "Mass Demonstration

Handbook"). According to the MPD, the Mass Demonstration Handbook is the standard

operational guide for dealing with mass demonstrations, and the handbook establishes

what the MPD claims to be proper standards, procedures and MPD obligations in that

18

context.

52.   ·According to the MPD Mass Demonstration Handbook, where police intend to disperse a

crowd engaging in a political demonstration, the field commander shall instruct unit

commanders "to issue warnings to the crowd to disperse."

53.   The MPD Mass Demonstration Handbook requires as follows:

[A] [1]   The issuance of warnings shall be of such amplification and repetition as to be heard by the entire assemblage.

[2]   Issuances shall be made by the unit commander from stationary vantage points which are observable to the crowd, or to a large number of participants.

[3]   Additional warnings, where necessary, shall be given from police vehicles, equipped with public address systems, moving around the crowd.

[4]   The warning shall consist of an announcement citing the offenses or violations which are being committed by participants and a request or order, whichever is applicable, that the crowd disperse. Whenever possible, this warning shall be written out prior to announcement, to ensure clarity and accuracy, and consistency, if the warning is repeated.

[5]   The entire warning process shall be documented by means of an audio-visual recording, if available.

[B]   As a first means of dispersing a crowd under static conditions, the unit commander shall attempt to verbally persuade the crowd to disperse of its own accord by announced available exit routes.

[C][1]   If, after a reasonable time following the initial warning, the crowd refuses to disperse, the unit commander shall issue a final warning ordering the participants to disperse or be subject to arrest.

[2]   If, after a reasonable amount of time following the final warning, the crowd continues in its refusal to disperse, the unit commander shall direct that violators be arrested.

54.   None of the plaintiffs were afforded benefit or protection of the standards described

above in the MPD-issued Mass Demonstration Handbook. The MPD violated these

standards with respect to plaintiffs and hundreds of others.

## THE DEFENDANTS' PLAN FOR
## POLITICAL ROUNDUPS AND "PREEMPTIVE" ARRESTS

55.   The MPD and other defendants had advance knowledge that there was planned a

weekend of political demonstration activity beginning on Friday, September 27, 2002.

56. Federal and local law enforcement agencies discussed and planned in advance a strategy of "preemptive" action against protesters, as was reported in the Saturday, September 21, 2002 *Washington Post*.

57. Capitol Police Chief Terrance W. Gainer participated in these discussions with D.C. and federal law enforcement officials. Treating the protesters as presumptively criminal, and indicating a willingness to act absent probable cause, Gainer explained, "I don't know why we have to wait until after they've inflicted damage."

58. The local and federal plan was, in fact, implemented on September 27, 2002. As evidenced by its implementation, the plan consisted of political round-ups at multiple locations and mass arrests of hundreds of peaceful protesters and any others in their vicinity with no regard as to whether such persons were, in fact, breaking any law.

59. On September 27, 2002 District officials made it a crime to be a protester in Washington, D.C., and a crime for others to come near to hear the protesters' message or to join in.

**FACTS RELATED TO THE ROUND-UPS NEAR FRANKLIN SQUARE PARK**

60. On the morning of September 27, 2002 a political assembly of approximately 200 - 300 persons gathered in the area of Franklin Square Park.

61. By approximately 6 - 7 a.m. there was a substantial police presence in the area because of the anticipated assemblage.

62. Plaintiff McATEER, who was age seventeen at the time, came to the area as an independent journalist. McATEER was intending to videotape the anticipated political events for publication through the Independent Media Center or other press outlets.

63. McATEER had not even reached Franklin Park when he was detained by an MPD officer, who demanded to know "Are you going to the protest?" The officer searched

20

McATEER's backpack before ultimately releasing him. There was no cause for searching McATEER's belongings, and he expressly stated that he did not consent to the search of his belongings.

64.    Plaintiff SALIGMAN is a bicycle racer. She had been riding her bicycle as part of her routine racing and fitness training. At the end of her training ride when she saw some demonstrators who were peaceably walking onto the block together, she paused her bike for the purpose of observing their political activities. Without notice or warning, a police line popped up. Observing this line forming, Ms. SALIGMAN decided to move on so she could shower and go to work. Without any warning, without even an order to "move back," a police officer violently pushed her and knocked her off of her bicycle. The police grabbed her by the scruff of her neck and said "we're taking you in," and arrested her.

65.    Plaintiffs BARHAM, LEHACH and SWANSON went to the Franklin Park area in their capacities as National Lawyers Guild Legal Observers. Such legal observers are routinely at the site of political assemblages and demonstrations for the purpose of observing events, including police misconduct.

66.    Plaintiffs BARHAM, LEHACH and SWANSON were clearly identified as Legal Observers and each wore a high-visibility green flourescent baseball cap and a green identification tag that identified each as a Legal Observer.

67.    On this morning, a group of protesters moved from Franklin Park along K Street and one block north along Vermont Avenue.

68.    The MPD erected a police line at the intersection of Vermont and L Streets, blocking

northbound passage.

69.   The MPD then erected a police line at the intersection of Vermont and K Streets,

      blocking southbound passage.

70.   Movement eastbound and westbound was also blocked by police and/or buildings.

71.   Police used force and/or threat of force to impede movement outside of this area.

72.   The area within the police lines became a detention zone, within which scores of

      demonstrators, observers, and bystanders were thus seized and arrested within the

      meaning of the 4th Amendment to the Constitution of the United States, without probable

      cause.

73.   Plaintiffs BARHAM, LEHACH, MCATEER and SWANSON were boxed-in by the

      police lines and had no avenue to exit the scene.

74.   The police issued no directives other than to "move back" - a directive that was often

      issued simultaneously with a blow from a baton.

75.   Riot police used their batons offensively and aggressively, yelling at protesters to "move

      back." Police crammed the detainees into a smaller and smaller area, closing their

      perimeter with force and violence. This created an atmosphere of increasing fear,

      provocation and tension.

76.   At one point, a storefront window broke and shattered when the police, wielding their

      batons offensively, pushed a trapped and tightly compressed group of arrestees into the

      window. The police had ignored the arrestees' pleas to stop the compression.

77.   At no time did plaintiffs BARHAM, LEHACH, McATEER or SWANSON fail to obey a

      police order.

22

78.  After surrounding plaintiffs BARHAM, LEHACH, McATEER and SWANSON with

police lines, the police then without probable cause or lawful justification, arrested

BARHAM, LEHACH, McATEER and SWANSON along with hundreds of others,

mostly political activists and demonstrators.

79.  An MPD officer approached Plaintiff BARHAM, who was wearing legal observer

identification. The officer asked if BARHAM was a law student and then threatened

BARHAM that his arrest should prevent him from being admitted to the bar.

80.  At no point did any MPD officer do any of the following, as is required by the MPD

Mass Demonstration Handbook:

a.  issue a warning for the political demonstration or for others in proximity to the
political assemblage to disperse;

b.  issue any warnings to disperse through the use of amplification and with such
repetition for the entire assemblage to hear;

c.  issue any warning to disperse from stationary vantage points observable to the
crowd or to a large number of participants;

d.  issue additional warnings given from police vehicles, equipped with public
address systems, moving about the crowd.

e.  make an announcement citing the offenses or violations which were allegedly
being committed and issue a request or order that individuals disperse.

81.  The MPD *prevented* dispersal through the actual and threatened use of force, and through

unyielding police lines.

82.  At no time was there probable cause to arrest plaintiffs BARHAM, LEHACH,

McATEER, SALIGMAN or SWANSON.

83.  This unconstitutional mass arrest and round-up was directed and approved by D.C. and

MPD policy makers. MPD policy makers and high-ranking officials present during the

mass arrest included Chief of Police Charles Ramsey, Sgt. Joseph Gentile, and Lt. Jeffrey Herold, among others.

## FACTS RELATING TO THE ROUND-UPS OF PERSONS LAWFULLY RIDING BICYCLES IN SUPPORT OF ALTERNATIVES TO FOSSIL FUEL USAGE

84.   On September 27, 2002 approximately sixty to seventy persons met at Union Station for the purpose of engaging in a lawful bicycle ride and to demonstrate, by way of example, their support for alternatives to oil and gasoline consumption and the pollution caused by such fuels.

85.   By law and regulation, bicycles are allowed to traverse the roadways in the District of Columbia.

86.   At approximately 8:30 a.m. on September 27, 2002 plaintiffs JORGE GARCIA-SPITZ, CASEY LEGLER, CHARLCIE LEGLER and SAMANTHA YOUNG met at Union Station.

87.   It was the intention of plaintiffs GARCIA-SPITZ, LEGLER, LEGLER and YOUNG to embark upon this lawful bicycle ride from Union Station over to the Freedom Plaza area, where they understood a political demonstration was to take place, and from there to go their separate ways, to work or school or elsewhere.

88.   The police were aware of this well publicized bike ride, and they maintained a substantial presence in the vicinity of Union Station.

89.   At approximately 8:30 a.m., the bicyclists began their ride. None of the law enforcement officers directed the bike riders to not ride their bikes, and the police did not obstruct the start of this lawful and political endeavor.

24

90.  As soon as the bike ride started, however, mobile police lines popped up - - consisting of officers on bicycles and on motorcycles and in motor vehicles - - surrounding these plaintiffs and the bicyclists on all sides.

91.  By virtue of their police lines, the police controlled the movement of the bicyclists. When police wanted to stop the bicyclists, the front line of officers would wave and direct that those following behind them should stop. Those who sought to leave the bike ride by exiting through the side mobile police lines would be prevented from doing so. In this regard, the bicyclists were already seized by the police as they were riding in a mobile detention zone. However, the presence of the mobile police lines was interpreted by some as an escort and it did not interfere with plaintiffs GARCIA-SPITZ, LEGLER, LEGLER and YOUNG's original and lawful intention to traverse the roadways peaceably and lawfully upon their bikes.

92.  The bicyclists obeyed all traffic laws during this bike ride, including obeying all directives from the police.

93.  There was no attempt by the police to obstruct the bike ride as it proceeded, nor did the police suggest that there was even any problem. Some of the cyclists even misinterpreted the police escort as a measure of support or success.

94.  As the bike ride entered its final leg near the Freedom Plaza and Pershing Park area the cyclists were confronted by a stationary police line in their way.

95.  The police forced the bicyclists into Pershing Park which is across from Freedom Plaza and which held about 300 demonstrators at that time. The police ordered them off of their bicycles. The cyclists complied, as this was about where they intended to terminate their

ride, and many initially thought there was nothing wrong.

96.    However, a few minutes later when plaintiffs CASEY LEGLER and her partner

SAMANTHA YOUNG attempted to leave Pershing Park because they had to go to work

later that day, they were told by the police that "no one is allowed to leave the park."

97.    The police had surrounded these plaintiffs and the park, using police lines that had

popped up on all sides, and refused to let anyone leave the park.

98.    One officer told CASEY LEGLER and YOUNG that they were not allowed to leave

because their bikes were displaying "propaganda." The officer told them that they could

leave if they removed the propaganda, which consisted in part of a sign displaying a

women's symbol. They complied with the officer's request removing their First

Amendment protected materials. The officer took their signs and destroyed them, and

then continued to refuse to let them leave.

99.    CASEY LEGLER and YOUNG approached an MPD Lieutenant and asked why they

were not being allowed to leave and if they were being arrested.

100.   The Lieutenant advised that "At this point in time Ma'am, we are just following orders."

101.   The defendants refused to allow plaintiffs GARCIA-SPITZ, LEGLER, LEGLER and

YOUNG to disperse or leave the park and subsequently falsely arrested each in the

manner described below.

**FACTS RELATING TO THE ROUND-UPS OF PERSONS IN PERSHING PARK**

102.   Demonstrators began gathering in parkland near the intersection of 14th Street and

Pennsylvania Avenue, NW, between approximately 8:00 - 9:00 a.m. on September 27,

2002.

103.   Demonstrators had planned to engage to protest in Freedom Plaza, which is adjacent to

26

Pershing Park. However, police officers directed demonstrators into Pershing Park and the political assemblage gathered there.

104.    Pershing Park is a public forum under the jurisdiction of the United States Department of the Interior, National Park Service.

105.    Plaintiffs MARY CANALES and SALLY NORTON are each registered nurses who were in Washington, D.C. for the purpose of attending a nursing conference, "Advancing Nursing Practice Excellence: State of the Science," which was being held at the Marriott Hotel that is near Pershing Park.

106.    Drs. CANALES and NORTON decided to leave the Marriott Hotel to get breakfast, which they did at approximately 8:30 a.m. They were aware, from news reports, that there were demonstrations anticipated in Washington, D.C. that day, and they saw that demonstrators were gathered at Pershing Park. After picking up coffee, they entered the park in order to listen to any political speakers that might be giving a speech there.

107.    There was an evident police presence, but no indication to Doctors CANALES or NORTON that there was a problem. They passed by the police and entered without event.

108.    At about the same time, plaintiff JERI WOHLBERG, a graduate student in nursing who was presenting research at the conference at the Marriott, decided that she wanted to participate in the demonstration in Pershing Park. She knew of the demonstration from the media coverage and wished to support its political message. She could hear and see the demonstration from the Marriott. She, too, entered the park passing by the police who were not indicating any imminent police round-up or similar problem. Ms. WOHLBERG

27

met up with plaintiffs CANALES and NORTON in the park.

109. Plaintiffs WOHLBERG, CANALES and NORTON all observed what was occurring in Pershing park at that time, just before the mass arrest and political round-up: dancing, singing and assembly. Some people were rhythmically beating drums. Many protesters held signs protesting corporate globalization and greed. Other signs advocated for peace, against war in Iraq, and bore messages such as "bread not bombs." Clearly it was a gathering of individuals engaging in political speech, assembly and camaraderie.

110. At a time between 9:00 a.m. and 9:30 a.m., the bicyclists were forced into the Park, and shortly thereafter police lines were erected without any notice or warning. Many of those surrounded had no immediate awareness that they had been trapped and seized.

111. A session of the nursing conference was set to begin at 9:45 a.m. CANALES, NORTON and WOHLBERG found, however, that they had been surrounded by these police lines that had silently popped up on all sides. They found unyielding police lines in every direction, with many officers in intimidating, black, full riot gear. They attempted to leave and asked permission to leave of no less than five separate officers. They explained they had to attend the conference, and displayed their conference tote bags.

112. This was similar to the experiences that other plaintiffs who happened also to be in the park were having.

113. Plaintiff WILLIAM DURHAM went to Pershing Park as a protester. He arrived at the park, and observed a drum circle there with people cheering and chanting. Soon thereafter, he and others realized that police lines had popped up on all sides. The police refused to allow DURHAM to leave.

28

114. Plaintiff NOAH FALK is a law student at the George Washington University School of

Law. He was in Pershing Park in his capacity as a National Lawyers Guild Legal

Observer, and was clearly identifiable as such based on the flourescent green Legal

Observer cap and green badge he was displaying. FALK was lawfully standing in the

park when he found himself surrounded by police lines.

115. Plaintiff MARK JACKSON is an independent contractor with the Underground Railroad

and Freedom Center, and works with a curator at the American History Museum. He was

not protesting, but had walked over to the park and planned to head to work when he

found himself surrounded by police lines that had quietly popped up. He asked to be

allowed past the police line, but the police refused him passage, explaining "we can't let

you out."

116. Plaintiff JOHN PASSACANTANDO had been riding his bicycle to work that morning to

avoid what had been predicted to be difficult traffic. He stopped near Pershing Park to

observe the protest. Thereafter he, too, found himself surrounded by police lines on all

sides with police refusing to let him leave. PASSACANTANDO asked no less than a

dozen officers at different locations to be allowed to leave and go on his way, but he was

told repeatedly that he was not allowed to leave. A number of the officers advised that

they were acting under "orders."

117. Plaintiff JOSEPH PHELAN is a student at Hunter College in New York, and was present

in Pershing Park to participate in the protests. When he sought to leave the park, MPD

officers told him he could not leave. He asked one officer "Am I being detained" and

was told "no." When he then said, "So we can leave," the officer stated "If you try to

29

leave, you'll be arrested."

118.    Plaintiff NICOLE PRICHARD was riding her bicycle around the City when she found

herself amidst the group of protesters on bicycles. She was almost immediately

thereafter forced into Pershing Park, where she found herself surrounded by police lines

on all sides and, when she sought to leave, was told by an MPD officer "no one goes in

and no one goes out unless on that [mass arrest] bus."

119.    Plaintiff MORGAN RESS is an artist who works with ABC No Rio, an artist space on

the lower east side of Manhattan, NY. RESS was in Pershing Park as a demonstrator and

as a photographer and artist. He heard the sound of protest drums in the park, entered the

park, and soon found that the police had formed lines around the park. He asked multiple

officers if he could please leave, and each refused to let him go. Some officers were

silent, others told him to go to another police line. When he did so he would either be

directed to go to yet another police line or would be met with silence. One officer

explained, "Our orders are no one leaves the park."

120.    Plaintiff MACDONALD SCOTT is employed as the Membership Coordinator for the

National Lawyers Guild in New York City. He was peacefully protesting in the park

when he found himself surrounded on all sides by police lines. He requested of at least

five police officers that they allow him to leave the park, and each time was refused.

121.    Plaintiff LESLEY WOOD is a doctoral candidate at Columbia University. She was

peacefully protesting in Pershing Park when without notice or warning the police formed

lines around the park. She requested of at least five police officers that they allow her to

leave the park, and each time was refused.

122. Plaintiff STEPHEN ZIMMERMAN is a law student at George Washington University
Law School and was a National Lawyers Guild Legal Observer present in Pershing Park
when police surrounded the park. He tried to leave, but was not allowed.

123. At no time did any of plaintiffs CANALES, DURHAM, FALK, GARCIA-SPITZ,
JACKSON, LEGLER, LEGLER, NORTON, PASSACANTANDO, PHELAN,
PRICHARD, RESS, SCOTT, WOHLBERG, WOOD, YOUNG, or ZIMMERMAN fail to
obey a police order.

124. The police actions in the vicinity of Pershing Park were executed by MPD police, U.S.
Park Police under the jurisdiction of the Department of the Interior, and other as-yet-
unidentified law enforcement agencies and officers.

125. After surrounding plaintiffs CANALES, DURHAM, FALK, GARCIA-SPITZ,
JACKSON, LEGLER, LEGLER, NORTON, PASSACANTANDO, PHELAN,
PRICHARD, RESS, SCOTT, WOHLBERG, WOOD, YOUNG and ZIMMERMAN with
police lines, the police then without probable cause or lawful justification, arrested each
of them along with hundreds of others, mostly political activists and demonstrators.

126. At no point did any MPD officer do any of the following, as is required by the MPD
Mass Demonstration Handbook:

   a.    issue a warning for the political demonstration or for others in proximity to the
         political assemblage to disperse;

   b.    issue any warnings to disperse through the use of amplification and with such
         repetition for the entire assemblage to hear;

   c.    issue any warning to disperse from stationary vantage points observable to the
         crowd or to a large number of participants;

   d.    issue additional warnings given from police vehicles, equipped with public

31

address systems, moving about the crowd.

    e.     make an announcement citing the offenses or violations which were allegedly being committed and issue a request or order that individuals disperse.

127.    The MPD and other police *prevented* dispersal through the actual and threatened use of force, and through unyielding police lines.

128.    At no time was there probable cause to arrest any of plaintiffs CANALES, DURHAM, FALK, GARCIA-SPITZ, JACKSON, LEGLER, LEGLER, NORTON, PASSACANTANDO, PHELAN, PRICHARD, RESS, SCOTT, WOHLBERG, WOOD, YOUNG or ZIMMERMAN.

129.    The police used pop up police lines to unlawfully seize and detain hundreds of political activists and those who associated with them or were within physical proximity of their political assemblage. The police then executed a new phase of the police plan.

130.    Riot police used their batons offensively and aggressively, yelling at protesters to "move in, move in!" and telling them "You cannot leave, move, move!" Police crammed the detainees into a smaller and smaller area, closing their perimeter with force and violence. This created an atmosphere of increasing fear, provocation and tension.

131.    It appeared to some that the police were trying to provoke a violent reaction from those they were abusing.

132.    Protesters responded by yelling at each other "Do what they say!" and "Cover your head!"

133.    Police continued pushing protesters with violence and force. At points the perimeter was collapsing inward with such a fierce pace that different officers were ordering people to move in different directions.

134.   All of the plaintiffs obeyed the police's unlawful orders.

135.   The arrestees were tightly compacted in the Southwest corner of the Park.

136.   Small groups of MPD officers began a process of crossing the police line, grabbing an individual, dragging that individual to the outside of the police line, violently throwing him or her face down to the ground, using three of four officers to exert force upon the non-resisting arrestee, handcuffing him or her, and placing him or her on a bus.

137.   This happened to the first four or five people in a row, until the most violent officers were restrained by other officers and told to calm down.

## FACTS COMMON TO THE PROCESSING OF PLAINTIFFS

138.   The plastic handcuffs placed on many individuals were excessively tight. All plaintiffs experienced pain, and many experienced swelling and numbness from the handcuffs.

139.   Arrested individuals were held on busses for many hours, with their hands handcuffed behind their backs.

140.   Sequential busloads of arrested individuals were eventually taken off the bus and brought into the gymnasium of the Institute for Police Science at Blue Plains. They were then shackled and hog-tied with their right wrists handcuffed to their left ankles. Some were left in this position for many hours.

141.   Inside the gymnasium, law enforcement officials photographed the individuals arrested. Photographs were taken of some arrestees that were in addition to their "mug shots." Some demonstrators with political statements on their clothing were singled out and photographed with greater scrutiny.

142.   The Department of Justice and the Federal Bureau of Investigation, whose agents

33

sometimes displayed FBI identification, participated in this mass collection of data. This data has been recorded and collected in databases, record-keeping or other information systems and, on information and belief, has also been disseminated or made available to unknown agencies and entities.

143.    The MPD maintains a policy, practice or custom of treating persons arrested in connection with mass political arrests differently than others who have been arrested for similar minor offenses.

144.    The MPD maintains a policy, practice and custom of preventive detention for targeted persons or groups engaged in political activity. By way of example, documents secured through subpoena in International Action Center, et al. v. U.S.A., et al. include production notes for an MPD training video related to mass demonstrations, in which the section on "Police Tactics and Issues" includes "Tactics - Locking up the troublemakers on the first night."

145.    The MPD maintains a policy, practice and custom of holding targeted political arrestees who have been (falsely) charged only with minor offenses for extended periods of time, in order to take them off of the streets and prevent them from engaging in further political dissent on subsequent days of demonstration, and to induce fatigue through sleep deprivation. By way of example, documents secured through subpoena in International Action Center, et al. v. United States of America, et al. include production notes for an MPD training video related to mass demonstrations, in which the section on "Police Tactics and Issues" includes "Tactics - Sleep deprivation tactics."

146.    The MPD ordinarily allows qualified persons to "post and trial" - - which means that the

arrestee can post collateral in order to secure prompt release and can return for a future

trial date on which the arrestee may challenge the legality of her arrest.

147.    However, similarly situated persons as part of a mass political arrests or roundups are

refused this option, to "post and trial." Instead, it is the policy, practice and/or custom of

the MPD that targeted political arrestees are offered only the option to "post and *forfeit*"

collateral. Police advise targeted political arrestees that, should they opt to challenge the

legality of their arrest, they will not be released for an extended period of days. The

period of threatened additional confinement and jail ranges arbitrarily from between two

days to a week or more.

148.    Plaintiffs were confined by defendants into the middle of the night or until the following

day, for approximate periods of time ranging from no less than 14 hours to over 30 hours.

### Unconstitutional Policies of the MPD

149.    The MPD, and those federal agencies which act jointly with the MPD and its "Civil

Disturbance Units," maintain the policy, practice and/or custom of abusing their state

authority to disturb and disrupt targeted civil political assembly and mass demonstrations.

150.    The CDUs also accomplish their disruption strategy through their established practice

and policy of preventive detention of political activists, in which the CDUs will trap,

seize and arrest groups of protesters by closing off all avenues of exit with riot gear clad

police.

151.    The MPD and its CDUs maintain the policy, practice and/or custom of deploying police

lines where circumstances do not justify such deployment and for the purpose of

disrupting First Amendment protected assembly, speech and petition activities.

152.    These riot squads use force and the threat of force to enforce this preventive detention, in which they arrest and hold detainees for a significant period of time. Absent intervening circumstances, the detainees will be placed on mass arrest busses and held for significant periods of time, typically overnight.

153.    Preventive detention signifies that individuals are being arrested not for engaging in illegal activity but for engaging in political activity, and constitutes a severe violation of First and Fourth Amendment rights when applied against political demonstrators.

154.    The use of disruption and disturbance tactics by the MPD is an established custom, policy and practice of the MPD, as evidenced by the repeated use, the approval of, and the acquiescence in the use of such tactics by policy making officials of the District of Columbia.

155.    DC policy maker Mayor Anthony Williams has stated his approval of the MPD's tactics, referring to arrest tactics of the MPD, as executed on April 15, 2000 (and repeated on Inauguration Day) as "preventative" and "proactive." Preventive detention and false arrest, whether referred to as "preventative arrest" or "proactive arrest," when applied to a targeted group of persons seeking to exercise constitutionally protected rights, in the absence of probable cause, is unconstitutional.

156.    MPD policy makers approve of these tactics, which they have used repeatedly, and which are the subject of pending litigation related to their use on Inauguration Day (*International Action Center et al. v. United States et al.*, 01-CV-72) and on April 15, 2000 (*Fifty Years Is Enough et al. v. District of Columbia et al.*, 01-CV-811).

157.    On September 27, 2002, the CDUs and other MPD officers were deployed for these

unconstitutional purposes.

158.    On September 27, 2002, the Department of the Interior deployed U.S. Park Police to act jointly with the MPD in carrying out this unconstitutional disruption strategy. Additional other individual officers and outside agencies which have yet to be identified also engaged in the same joint action.

159.    The MPD maintains the policy, practice and/or custom of processing and treating disparately those persons arrested for minor offenses in connection with political mass arrests or round-ups. The disparate processing and treatment includes confinement for extended period of time including often overnight for alleged minor offenses, and the failure to offer political mass arrestees the post and trial option.

160.    The above-referenced policies and customs demonstrated a deliberate indifference on the part of policymakers of the District of Columbia to the constitutional rights of protesters in the Nation's Capital, as well as all those who would associate with such protesters or report on them as media.

161.    The actions of the above-referenced defendants violated the following clearly established and well settled federal constitutional rights:

a.    Freedom from the unreasonable seizure of one's person;

b.    Freedom from government disruption of, interference with, or retaliation for, engagement in free speech, assembly, association, petition and free press activities.

162.    The challenged actions and omissions constitute deliberate indifference on the part of the District of Columbia, the federal defendants and other defendants to the constitutional rights of protesters in the Nation's Capital.

163.    As a direct and proximate result of the acts or omissions of the defendants identified in

this complaint and the other unidentified agents and agencies acting jointly, each of the

plaintiffs has suffered monetary and non-monetary harm including deprivation of

constitutional rights under the First, Fourth and Fourteenth Amendments to the U.S.

Constitution, loss of liberty, as well as physical harm, emotional pain and suffering.

### Ongoing Injury to Plaintiffs

164.    Plaintiffs all suffer continued adverse and deterrent effects from the above-referenced

conduct.

165.    Defendants' illegal conduct subjects protesters and observers and all those who associate

with protesters to unconstitutional obstacles to the exercise of their rights. There is an

intended, ongoing and continued deterrent effect caused by defendant's conduct, in that

protesters and others must face the reasonable fear that merely by assembling and

exercising their right to free speech (or to listen to speech), they will risk being subject to

the unlawful tactics of the MPD and federal law enforcement, the risk of false

imprisonment and false arrest and preventive detention, as well as the exposure to force

and the threatened use of force by officers working with the mobile police lines.

166.    Plaintiffs intend to, in the future, engage in or associate with First Amendment protected

activities in Washington, D.C. and seek injunctive relief to prevent future

unconstitutional disruption.

## CLAIMS

### COUNT I
### False Arrests at Vermont Avenue
**(First Amendment; Fourth Amendment; False Imprisonment; Fourteenth Amendment)**

38

167.   Paragraphs 1 - 166 are incorporated by reference as if set forth herein.

168.   Defendants' actions in deploying law enforcement units to disrupt First Amendment

protected activity and subjecting plaintiffs BARHAM, LEHACH, McATEER,

SALIGMAN AND SWANSON to false imprisonment and arrest violated the Fourth

Amendment rights of those individuals seized, constituted false imprisonment under

District of Columbia law, and violated the First and Fourteenth Amendment rights of

each of the aforementioned plaintiffs.

## COUNT II
### False Arrests at Pershing Park
**(First Amendment; Fourth Amendment; False Imprisonment; Fourteenth Amendment)**

169.   Paragraphs 1 - 166 are incorporated by reference as if set forth herein.

170.   Defendants' actions in deploying law enforcement units to disrupt First Amendment

protected activity and subjecting plaintiffs CANALES, DURHAM, FALK, JACKSON,

GARCIA-SPITZ, CASEY LEGLER, CHARLCIE LEGLER, NORTON,

PASSACANTANDO, PHELAN, PRICHARD, RESS, SCOTT, WOHLBERG, WOOD,

YOUNG and ZIMMERMAN to false imprisonment and arrest violated the Fourth

Amendment rights of those individuals seized, constituted false imprisonment under

District of Columbia law, and violated the First and Fourteenth Amendment rights of

each of the aforementioned plaintiffs.

## COUNT III
**(Equal Protection Clause; Due Process Clause; First Amendment; Fourth Amendment)**

171.   Paragraphs 1 - 166 are incorporated by reference as if set forth herein.

172.   Defendants' actions in processing and treating differently those adult persons, including

all adult plaintiffs, who are arrested for minor offenses in connection with mass political

arrests violate the Equal Protection Clause, the Due Process Clause, and the First, Fourth

and Fourteenth Amendment rights of those so deprived.

## COUNT IV
### (conversion; trespass to chattel)

173. Paragraphs 1 - 166 are incorporated by reference as if set forth herein.

174. Upon arresting plaintiff McATEER, defendant District of Columbia seized plaintiff's

video camera and related items and never returned the video camera and related items

and converted them to its own use.

175. Upon arresting plaintiff SCOTT, defendant District of Columbia destroyed plaintiff's

backpack by cutting through the arm straps, thereby converting it to its own use.

176. Plaintiffs CHARLCIE LEGLER and GARCIA-SPITZ had lawfully locked their bicycles

outside of Pershing Park prior to entering and their subsequent arrest.  Defendant District

of Columbia destroyed their bicycle locks and damaged their bicycles in the subsequent

seizure of their bicycles, converting the bicycle locks to its own use and committing a

trespass to the bicycles.

## Count V
### (negligence and negligent supervision)

177. Paragraphs 1 - 166 are incorporated by reference as if set forth herein.

178. The as-yet-unidentified individual officers and supervisors involved in these unlawful

arrests had the duty to exercise reasonable care in the conduct towards plaintiffs.

179. The individual supervisors, including Chief Ramsey and his downward chain-of-

command had the duty to exercise appropriate command authority in their supervision of

their subordinates.

180.   Individual officers and supervisors were negligent in the exercise of these duties of care

owed to plaintiffs.

181.   As a direct and proximate cause of these defendants' negligence, plaintiffs suffered the

harms complained of herein.

**PRAYER FOR RELIEF**

182.   WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the
following relief:

A.   Entry of a declaratory judgment that the disruption and preventive arrest
tactics of the MPD and its Civil Disturbance Units and law enforcement
authorities constitute violations of the First and Fourth Amendments;

B.   Entry of a permanent injunction to enjoin and prohibit defendants from
executing the unlawful disruption and preventive arrest tactics as are
employed by the MPD and its Civil Disturbance Units and law
enforcement authorities in conjunction with federal law enforcement
including but not limited to the unconstitutional use of pop-up police lines
and the unconstitutional boxing-in tactic;

C.   Entry of a permanent injunction mandating that the MPD offer the "post
and trial" option to those persons arrested for minor offenses in connection
with mass political arrests as are offered to non-political arrestees, and
ordering the MPD to provide in writing to all mass protest arrestees a clear
and accurate statement of their rights to release, and ordering the MPD to
make periodic reports to plaintiffs and the Court documenting that this
injunction is being abided by;

D.   Entry of a permanent injunction barring the MPD from subjecting to a
more harsh and/or longer period of processing and confinement to those
persons arrested for minor offenses in conjunction with mass political
arrests, and ordering the MPD to maintain written documentation as to the
period of confinement before release of all mass protest arrestees, as
compared to all arrestees;

E.   Entry of a permanent injunction barring the MPD from threatening or
actually jailing for longer periods those persons arrested in connection
with mass political arrests who wish to challenge the legality of their
arrest by seeking a trial date (as distinguished from those who choose to
forfeit collateral);

41

F.  Entry of an order that all arrest records, including all photographs, fingerprints and other identification or descriptive information regarding plaintiffs be sealed; that disclosure be made in writing to plaintiffs and the Court as to all entities and agencies to which such material has been disseminated and by whom gathered; and that all records disseminated be collected and sealed, including all copies of such disseminated records that may have been subject to further dissemination by others;

G.  Entry of a permanent injunction barring the Department of Justice, including the Federal Bureau of Investigation, and other federal agencies from taking or accessing identification and other information compelled by political arrests by local law enforcement authorities;

H.  Compensatory damages against the District of Columbia and the unknown named police departments for violations of federal rights pursuant to 42 U.S.C. § 1983, in an amount appropriate to the proof adduced at trial;

I.  Compensatory damages against the District of Columbia, for violations of common law rights, pursuant to *respondeat superior*, in an amount appropriate to the proof adduced at trial;

J.  Compensatory damages and punitive damages against Ramsey, Williams, and the unknown named police officers sued in their individual capacities for violations of federal rights, pursuant to 42 U.S.C. § 1983 (if they are D.C. or state actors or in joint action with state or D.C. actors) or pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u> (if they are federal agents or in joint action with federal agents) in an amount appropriate to the proof adduced at trial;

K.  Compensatory damages against the federal defendants sued in their individual capacities, pursuant to <u>Bivens v. Six Unknown Agents</u>, 403 U.S. 388 (1971), in an amount appropriate to the proof adduced at trial;

L.  Compensation by the responsible party for the value of property that was damaged or destroyed or converted;

M.  Compensation by the responsible parties for negligence and negligent supervision;

N.  An award of plaintiffs' reasonable attorneys' fees, costs and expenses; and

O.  Such other and further relief, including all appropriate equitable relief, as to the Court may seem just and proper.

42

Respectfully submitted,

Carl Messineo (#450033)
Mara Verheyden-Hilliard (#430031)
Zachary Wolfe (#463548)
PARTNERSHIP FOR CIVIL JUSTICE, INC.
NATIONAL LAWYERS GUILD
    MASS DEFENSE COMMITTEE
1901 Pennsylvania Avenue, NW
Suite 607
Washington, DC 20006
(202) 530-5630
(202) 530-5634 - facsimile

*Counsel for Plaintiffs*

TRIAL BY JURY

43