IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JEFFREY  BARHAM, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civ. No. 02-2283 (EGS) |
| v. | ) | |
| | ) | |
| CHIEF CHARLES H. RAMSEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

DECLARATION OF JAMES W. RICE, II

I, James W. Rice, II, hereby state and declare as follows:

1.      I have been employed as a Special Agent by the Federal Bureau of Investigation

("FBI" or "Bureau") since 1988.  My present assignment is Supervisory Special Agent ("SSA")

in the FBI's Washington Field Office ("WFO"), supervising the National Capitol Response Squad

("NCRS").  I have held this position since September, 1999.  I am responsible for the special

operations capabilities of the WFO including, but not limited to, counter-terrorism preparedness

for special events.  Prior to my assignment to the NCRS, I served as the supervisor of the WFO

Joint Terrorism Task Force.  The contents of this declaration are based on my personal

knowledge and upon my review and consideration of documents and information made available

to me in my official capacity, including information provided to me by Special Agents and other

employees of the FBI.

2.      I understand that Jeffrey Barham has filed suit in the United States District Court

for the District of Columbia regarding arrests made in Pershing Park by law enforcement

authorities during the World Bank/International Monetary Fund ("WB/IMF") meeting in

Washington, D.C. in September, 2002.  I submit this declaration to advise the Court of the FBI's

responsibilities in connection with the WB/IMF meeting and the actions taken by FBI personnel

during that meeting.

3.       Prior to the Fall, 2002 WB/IMF meeting, law enforcement officials were aware

that previous meetings of world economic leaders, including the WB/IMF, had resulted in violent

confrontations and rioting.  For example, rioting that occurred during the September, 1999 WTO

meeting in Seattle, Washington  resulted in approximately $17,000,000.00 in damages.  Rioting

also occurred during the IMF meeting in Washington, DC in the Spring of 2000, during which

some 1,300 arrests were made.  During the Summit of the Americas in Quebec, Canada in April,

2001, some 90 separate fires were reportedly set by demonstrators who repeatedly attacked law

enforcement officers, injuring approximately 160 officers.  During protests at both the European

Union/Economic Forum meeting in Gothenburg, Sweden in June, 2001 and the G-8 meeting in

Genoa, Italy in July, 2001, law enforcement officers were required to use deadly force to protect

themselves from attacking rioters.  Law enforcement authorities were also aware of the

possibility of a terrorist attack or other violence during the conference, which took place barely a

year after the devastating terrorist attacks of September 11, 2001.

4.        Based on the history of these types of events, anticipated large crowds and the

possibility of a terrorist attack, the FBI's Washington Field Office ("WFO") opened a Counter-

Terrorism/Special Events case concerning the WB/IMF conference.  FBI jurisdiction was based

on Presidential Decision Directive 39 ("PDD-39"), signed June 21, 1995, which established  the

Department of Justice ("DOJ"), as further delegated to the FBI, as the lead federal agency

responsible for threats or acts of terrorism within the United States.  FBI jurisdiction was also

based on PDD-62, dated May 22, 1998, which also designated the FBI as the lead federal agency

for crisis management in connection with a Weapon of Mass Destruction ("WMD") incident.[1]

FBI jurisdiction was further based on 28 C.F.R. § 0.85a(l), which designates the FBI to exercise

lead agency responsibilities with respect to terrorist acts within the United States.  WFO's role

with respect to the WB/IMF protests was: (1) the prevention, response and investigation of any

terrorist-related incidents that affected the WB/IMF meeting or participants; (2) the investigation

of any crimes against federal property or assaults upon foreign officials (such as WB/IMF

attendees) or federal employees; (3) intelligence gathering related to the event; and (4) liaison

and assistance, as requested, to local law enforcement and fire-rescue personnel.

     5.     Prior to the WB/IMF conference, WFO personnel participated in meetings with

other law enforcement agencies whose investigative or protective jurisdiction was implicated by

the conference, including the MPD, the United States Marshal's Service, the United States Park

Police, the United States Capitol Police, and the United States Attorney's Office.  Such advance

public safety planning is routine, since Washington, D.C. is the site of frequent special events

and demonstrations, often drawing large crowds.  The FBI's focus during these meetings was not

on crowd control or traffic regulation, but was instead on more severe situations that might

require FBI response.  For example, contingency plans were formulated to respond to a variety of

scenarios, including, but not limited to, Weapons of Mass Destruction ("WMD") incidents (either

chemical or biological), bombing incidents, assaults on WB/IMF attendees designated by the

---

[1]  While both PDD 39 and PDD 62 are classified documents, I have been informed that
non-classified summaries of PDDs 39 and 62 are publicly available at DOJ's Office of Justice
Programs ("OJP") website, www.ojp.usdoj.gov/odp/docs.

State Department as official guests of the United States, vandalism to federal buildings and/or monuments, and large-scale rioting.

6.     During these meetings, there was no discussion between the various law enforcement entities involved regarding making or otherwise participating in illegal arrests of demonstrators, and no agreement that any law enforcement agency would make any illegal arrests. FBI personnel did not urge that any illegal arrests be made by any agency to facilitate FBI intelligence-gathering. Nor was there any discussion or agreement between law enforcement agencies to conduct legal arrests in an illegal manner in order to facilitate intelligence-gathering or for any other purpose. To the extent that arrests of large numbers of individuals were discussed as a contingency, the FBI's role in such scenarios was limited to providing operational support in the event of wide-spread violence and technical support to post-arrest processing by the MPD.

7.     During the course of the actual WB/IMF event, FBI personnel were assigned to various tasks with respect to the WB/IMF demonstrations. For example, personnel assigned to the FBI's Joint Terrorism Task Force ("JTTF") engaged in intelligence gathering through crowd surveillance for terrorist or criminal activity. Intelligence gathered by the FBI was shared, as appropriate, with other law enforcement agencies when those agencies' investigative or protective jurisdiction was implicated. This sharing of intelligence was made pursuant to, and as authorized by, the Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigation. However, the JTTF personnel did not participate in crowd control and did not participate in, or play any role in, any of the arrests of WB/IMF protestors made by the Metropolitan Police Department ("MPD").

8.      At the request of the MPD, additional FBI personnel were assigned to work directly with MPD intelligence teams and were supervised by MPD personnel.  The duties of the FBI personnel assigned to MPD intelligence teams included monitoring crowd movement and surveillance for possible terrorist or criminal activity.  As was the case with FBI personnel assigned to the JTTF teams, FBI personnel assigned to the MPD intelligence teams did not participate in crowd control and did not participate in any of the arrests of WB/IMF protestors made by the MPD.      9.      At the request of the MPD, the FBI provided portable fingerprint processing equipment and approximately ten (10) support employees from the Criminal Justice Information System ("CJIS") Division at FBIHQ to operate that equipment, in order to assist the MPD with prisoner identification.  This FBI support to local law enforcement officials in the District of Columbia is authorized by 28 U.S.C. § 533.

10.      I am informed that individuals arrested by the MPD during the WB/IMF protests were transported to the D.C. Police Academy for post-arrest processing.  The FBI did not transport, and had no role in the transportation of, arrestees to the D.C. Police Academy.  The arrested individuals were fingerprinted by MPD personnel, who forwarded the fingerprint cards to FBI CJIS personnel stationed in the Academy gymnasium, who then scanned the fingerprint cards into the FBI's Integrated Automated Fingerprint Identification System ("IAFIS"), in order to verify the identities of the arrestees.  These actions by CJIS personnel  were authorized by 28 U.S.C. § 534, which authorizes FBI employees to "acquire, collect, classify and preserve [] criminal identification" records and by 28 C.F.R. § 0.85(b), which authorizes the acquisition and

collection of fingerprints and identification records.  The FBI played no role in the post-arrest processing of WB/IMF demonstrators other than operating the fingerprint card scanning equipment and had no direct contact with any arrestee.  In particular, FBI personnel did not question or otherwise interrogate any arrestee.

11.     I am informed that the FBI CJIS personnel wore FBI identification while they performed their duties, so that this identification could have been observed by arrestees located in the gymnasium.  However,  as I previously explained, the CJIS personnel did not fingerprint any arrestee, but merely scanned fingerprint cards provided by the MPD into the IAFIS database and had no direct contact with any arrestee.

12.     I have been further informed that the plaintiffs allege in their First Amended Complaint at paragraph 47 that the FBI engaged in joint action with other law enforcement agencies "for the purpose of collecting and disseminating intelligence information related to the plaintiffs' and demonstrators political actions and associations."  As I have previously explained, intelligence-gathering  was not the primary purpose for the FBI's activities with respect to the WB/IMF meeting.  Rather, the FBI's primary goal was to prevent and/or effectively respond to any terrorist or WMD incident that occurred during the meeting.  Intelligence-gathering was merely a necessary tool used to accomplish that lawful purpose.  Moreover, during the Fall, 2002 WB/IMF meeting, FBI intelligence-gathering regarding the WB/IMF demonstrations was limited to surveillance, by direct observation, of crowd activity for terrorist or criminal activity.

13.     I am aware that plaintiffs appear to allege that the FBI either had advance knowledge of MPD's activities to allegedly unconstitutionally disrupt the WB/IMF protests, or that the FBI itself participated in activities to unconstitutionally disrupt the WB/IMF protests.

The FBI had no knowledge of any alleged unconstitutional activity regarding the WB/IMF

protests planned or carried out by the MPD.  Moreover, the FBI itself did not engage in any

activity to disrupt WB/IMF demonstrations.  As I have previously stated, FBI personnel did not

have any crowd control responsibilities with respect to the WB/IMF protests and made no arrests

or otherwise attempted to interfere with or disrupt WB/IMF demonstrations.  FBI personnel

assigned to this matter had no basis or authority to question MPD officers regarding the basis for

their arrests of individuals during the WB/IMF conference, since the FBI personnel did not

participate in those arrests and those arrests were made for violation of local, rather than federal,

law.

       14.    To the extent that plaintiffs' allegations regarding collection of information by the

FBI pertain to the addition of their fingerprint information to the IAFIS database by CJIS

personnel following plaintiffs' arrests by law enforcement officers, those actions by CJIS

personnel were authorized by statute, as I previously explained.  It should also be noted that, by

having their fingerprints added to the IAFIS database,  plaintiffs were treated no differently than

anyone else arrested and fingerprinted by local law enforcement authorities who then submitted

those fingerprint cards to the FBI .  Any allegation that FBI personnel participated in a conspiracy

with other law enforcement agencies to have MPD engage in mass arrests of protestors to

facilitate an FBI intelligence-gathering operation, or that the FBI's primary role in this matter was

to gather intelligence about protestors or arrestees, is therefore without foundation and false.

       Pursuant to 28 U.S.C. § 1746, I declare, under penalty of perjury, that the foregoing is

true and correct.  Executed on April _____, 2003.

_____

James W. Rice II
Supervisory Special Agent
Federal Bureau of Investigation