UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEFFREY BARHAM, et al.,                    )
                                           )
            Plaintiffs                     )
                                           )
      v.                                   )      Civil No. 02-2283 EGS
                                           )
CHARLES H. RAMSEY, et al.,                 )
                                           )
            Defendants.                    )
_____)

DECLARATION OF RICHARD MURPHY

I, Richard Murphy, pursuant to 28 U.S.C. § 1746, declare as follows:

1.  I am a Major with the United States Park Police and I have been an officer with the
Park Police for more than twenty-six years.

2.  I now command the Park Police's New York Field Office, which patrols and enforces
the laws on the Federal parkland and waters at the Statue of Liberty National Monument and
Gateway National Recreation Area, which encompasses 26,000 acres.

3.  Before then, from February 2002 to January 2003, I was a Captain and assigned at
first as the Assistant Commander and then Acting Commander of the Park Police Special Forces
Branch, which is responsible for Park Police crowd control at major demonstrations, special
events, and other planned and unplanned events on Federal parkland within the National Park
Service's National Capital Region.  The Park Police Special Forces Branch also assists other
Park Police units and parks throughout the National Park System in the event of law enforcement
emergencies as well as the Park Police Patrol Branch.

4.  The National Park Service's National Capital Region consists of the Federal parkland
located primarily in the Washington metropolitan area.  This includes 50,000 acres of Federal

parkland in the District of Columbia, Maryland, Virginia, and West Virginia.

5.  The National Capital Region includes 8,500 acres of Federal parkland comprising almost 24% of the District of Columbia.  It includes not only the National Mall, Rock Creek Park, Lafayette Park, the White House sidewalk, and Pershing Park but also scores of smaller parks located throughout the city.

6.  The Park Police is a Federal law enforcement organization within the National Park Service, U.S. Department of the Interior.  The Park Police law enforcement authority is principally based on three Federal laws which are generally geographically based.    These three statutes are 16 U.S.C. § 1a-6(b), wherein 41 Federal Register 44876 (October 13, 1976) designated the Park Police Officers and Commissioned Park Rangers as possessing law enforcement authority throughout the National Park System;  D.C.Code Ann. § 5-207 (2001), which provides that the Park Police has law enforcement authority "on and within roads, parks, parkways, and other federal reservations in the environs of the District of Columbia;" and D.C.Code Ann. § 5-201 (2001), which provides that the Park Police *has* the same law enforcement authority as the Metropolitan Police Department in the District of Columbia.

7.  The Metropolitan Police Department, which has law enforcement authority in the District of Columbia, has a large police force with over 3,500 officers.

8.  The Metropolitan Police Department is not supervised or controlled by the U.S. Department of the Interior, the Park Service, or the Park Police.  Likewise, the Metropolitan Police Department does not supervise or control the U.S. Department of the Interior, the Park Service, or the Park Police.

9.  The Park Police, which has a wide range of law enforcement responsibilities within the National Park Service's National Capital Region, currently has approximately 586 uniformed

officers, with approximately 437 of them stationed in the National Park Service's National Capital Region.  The remaining Park Police officers are stationed primarily at the San Francisco Field Office and the New York Field Office.

10.  Given its limited manpower in the Washington Metropolitan Area, the Park Police primarily focuses its law enforcement efforts within the Federal park areas.  Nevertheless, because the Park Police effectively possess overlapping city-wide law enforcement authority with the Metropolitan Police Department, Park Police officers who witness criminal offenses outside federal park areas do make arrests.

11.  The Park Police also occasionally provides law enforcement assistance to the Metropolitan Police Department and other Federal law enforcement agencies in the District of Columbia.   For example, to help address increasing criminal activities,  in 1994 the Park Police helped patrol the Fifth District of the Metropolitan Police Department.  Park Police assistance, however, is traditionally done on a case-by-case basis that follows a request for assistance, and after the Park Police determines whether it has sufficiently available police resources for the Federal park areas that it primarily focuses on.

12.  If the Park Police has sufficiently available police resources, we also provide backup assistance to other police agencies.  Such backup assistance *covers* a wide range of activities and situations, from ensuring that a requesting officer is not attacked while conducting an arrest or search, closing city streets following motor vehicle accidents, providing police lines, preserving crime and accident scenes, to chasing suspects identified by the requesting officer.  In such situations, backup officers depend on the requesting officer's full knowledge of the situation and reasonably expect that the requesting officer is justified in undertaking such arrests and searches that may occur.

13.   The ability of the Park Police, as well any other trained and responsible police agency, to provide inter-agency police backup is critical in the District of Columbia, a city with no less than thirty-two Federal law enforcement agencies, all of whom must be able to address a wide range of criminal activities, which since September 11, 2001, includes preparing for and responding to potential terrorist activities.   Indeed, providing prompt police backup is a critical law enforcement function that could involve life or death situations, and requires timely and appropriate actions by the responding officers to help protect the requesting officer and to ensure public safety.

14.   As most people may recall, the 1999 protests during the World Trade Organization meetings in Seattle substantially disrupted the meetings and the city itself.   The protests resulted in property damage and the blocking of public streets, as well as many arrests.   **Exhibit 1** is a copy of several media reports regarding the 1999 Seattle demonstrations.

15.   The 2000 World Bank-IMF meetings in Washington, D.C., also involved efforts to disrupt the meetings and the city.   It culminated on April 17, 2000, when approximately 600 people were arrested.   *After* being physically prevented from forcing themselves through the Metropolitan Police Department's police lines that protected the World Bank-IMF, *the* demonstrators agreed to an orderly sequence of civil disobedience that resulted in what the Washington Post described as their "voluntary arrests."   **Exhibit 2** is a copy of several media reports regarding the 2000 World Bank-IMF demonstrations.

16.   In planning for the demonstrations during the 2002 World Bank-IMF meetings, the Park Police in working with other agencies, recognized and considered the problems caused by disruptive demonstrations at the World Trade Organization meeting, other anti-globalization protests, and the past World Bank-IMF demonstrations in Washington, D.C.

17.  Our public safety planning for the 2002 World Bank-IMF meetings and demonstrations generally centered on our protection of the White House complex and Federal parkland.   Cooperation and coordination between police agencies were critical, however, because police resources were stretched to cover various security areas, a large range of potential targets located throughout the metropolitan area, as well as to perform essential police services in the rest of the city and Federal parkland.

18.  In the several planning meetings we had with Metropolitan Police Department and other Federal law enforcement agencies for the 2002 World Bank-IMF meetings, I discussed that the Park Police would primarily focus its efforts on protecting the White House complex and Federal parkland.  At these meetings I also discussed with Metropolitan Police Department and other Federal law enforcement agencies the placement of protective fencing on parkland as well as where Park Police officers  generally would be stationed.  Officer placement was discussed because, if available, we planned to provide law enforcement assistance to a requesting police agency.   At no time was there ever any discussion--much less any agreement--that any agency or officer would make an arrest without probable cause or would improperly disrupt, disturb, or infringe upon any demonstrators' lawful activities.

19.  Indeed, the Park Police planning for and its operations during the 2002 World Bank-IMF meetings were not intended or designed to disrupt, disturb, or infringe upon any demonstrators' lawful activities.  Rather, the National Park Service and the Park Police intended and planned to ensure both public safety and facilitate lawful demonstrations, just as it does during the thousands of lawful demonstrations that successfully occur on parkland under National Park Service regulations and permits each year.

20.  In police backup situations in which the Park Police participate, backup Park Police

5

officers depend on the requesting officer's full knowledge of the situation and reasonably expect that the requesting officer is justified in seeking the backup assistance and is justified in undertaking any arrests and searches that may occur.   Indeed, in public safety situations that are rapidly evolving and where the outside agency officer's request for police backup assistance appears reasonable, the Park Police do not normally "second-guess" the outside agency requesting officer.   This is especially true for a public safety situation like that occurred at Pershing Park, where as I detail herein, the request for police backup assistance *which* appeared reasonable and came from very high-ranking officials of the Metropolitan Police Department, who informed me that members of the group to be contained had already caused property damage in one commercial area.

21.   Consistent with long-standing practice, the decision to make an arrest rests on the arresting police agency.   Indeed, as I detail herein, the Pershing Park mass arrests of September 27 were decided upon, and conducted, entirely by the Metropolitan Police Department, without consulting either the National Park Service or the Park Police.

22.   The Park Police's Operational Plan General Overview for the 2002 World Bank-IMF meetings, which is attached as **Exhibit 3,** summarized what we expected, including that:

> [V]arious groups are trying to organize a direct action against the city starting on Friday, September 27 with an attempt to disrupt rush hour traffic to include the use of improvised devices, i.e., sleeping dragons, disabled vehicles and attacking targeted businesses. As in the past, "Critical Mass" (bicycle groups) will be attempting to disrupt traffic on Friday as well. On Saturday, the demonstrators will attempt to quarantine the IMF/WB complex, and on Sunday protests will continue near the IMF/WB complex.
>
> As with any mass demonstrations, there will be those who are more radical and destructive than others, and they will use the crowd to hide their actions. The Metropolitan Police Department advises that they are expecting anywhere from 10,000 to 30,000 demonstrators to be in the city for the IMF/WB meetings.

6

23.   In anticipation of disruptive demonstrations during the 2002 World Bank-IMF meetings, we undertook extensive planning.  As detailed in the Park Police Operational Plan General Overview, and consistent with our long-standing policy, we identified the Park Police as "the primary agency responsible" for Federal parkland in Washington, D.C.   Recognizing that demonstrators may engage in conduct that did not violate the law, we also identified objectives to include maintaining security around the White House complex, protecting citizens and visitors, assuring safety of Park Police personnel, safeguarding the Park Service's monuments and memorials, and assuring that the World Bank-IMF meetings occur without disruption.

24.   The Park Police has had extensive experience in dealing with demonstrations, where large numbers of demonstrators occasionally violate the law which results in mass arrests. The Park Police policies are found in the Park Police General Order 2103 on Arrest Procedures (9/30/99) and General Order 2108 on Mass Arrest Procedures (5/23/97), and are attached as **Exhibit 4.**   And while "[n]othing in this Manual is intended to create an enforceable legal right or private right of action..... [v]iolations of General Orders may be a basis for Force personnel action."

25.  As General Order 2103.02 details, when a Park Police officer makes an arrest, it is Park Police policy that:

> The arrest and detention of a person shall be accomplished in an expeditious, legal, professional, and safe manner using only the amount of force necessary to accomplish the task.  Further, such actions shall conform to all legal and administrative requirements of the Force and the applicable requirements of the jurisdiction in which the arrest occurs.  Once an individual is arrested, it is Force policy to ensure that he/she is detained under proper supervision, in a humane manner, and in an environment that will not unnecessarily impair his/her health or subject him/her to physical abuse, verbal abuse, or unreasonable discomfort.

26.  And as General Order 2108.03A details, if the Park Police determine violations have

7

occurred in a mass arrest situation, Park Police officers are directed to provide three separate warnings that the violators "are in violation of a specific law and will be arrested if they do not disperse or cease their illegal activity."   This procedure is not used, however, if there is a "violent or emergency situations, or for individual acts of crime when arrests should be made as quickly as possible . . . "

27.   Equally important, the Park Police has no "trap-and-arrest" policy/practice and did not participate with Metropolitan Police Department in any  "trap-and-arrests" on September 27, 2002.

28.   For non-Federal parkland in the District, other jurisdictions are responsible for regulating demonstration activities.  The District of Columbia is responsible for most of the rest of the city, while the grounds of the United States Capitol are under the jurisdiction and control of the United States Capitol Police Board.

29.   For Federal parkland, the National Park Service's regulations for the National Capital Region provide a regulatory framework which traditionally accommodates a full range of demonstration activities addressing a wide range of issues.  Codified at 36 C.F.R. § 7.96(g), these  regulations were developed to balance important First Amendment rights with the Park Service's statutory mandate.

30.   Pursuant to National Park Service regulations found at 36 C.F.R. § 7.96(g)(2), demonstrations and special events may be held by permit.  Under 36 C.F.R. § 7.96(g)(2)(I), there is an exemption from the permit requirement for demonstrations involving 25 persons or fewer, "provided that the other conditions required for the issuance of a permit are met and provided further that the group is not merely an extension of another group already availing itself under this provision or will not unreasonably interfere with other demonstrations or special events."

8

31.  A group planning a demonstration or special event may obtain a permit from the National Park Service in order to ensure access and a forum to express their views on Federal parkland.  Consistent with National Park Service regulations, the National Park Service endeavors to ensure that each permitted group or individual is able to express their views free from unreasonable interference or intrusion from other groups or individuals.  Indeed, thousands of demonstrations and special events regularly occur on Federal parkland in Washington D.C. under the NPS's regulatory framework

32.  In that regard, the National Park Service annually hosts more than 3,000 demonstrations and special events on Federal parkland in Washington, D.C., the overwhelming number of which successfully occur without incident.  Demonstrations take many forms, some of which express passionate and contrasting views, and range from the lone picketer to large-scale public assemblies and parades.   For major events as well as for small events that have a security concern, the Park Police regularly engages in advance public safety planning.

33.  Examples of past public safety planning include preparing for the annual Fourth of July Celebration and March For Life demonstrations.   Other examples of advance public safety planning include preparing for demonstrations protesting the 1999 NATO 50th Anniversary Summit, the 1993 dedication ceremony for the Holocaust Memorial Museum, as well as for the 1997 Promise Keepers "Stand In the Gap" and the 1995 "Million Man March" demonstrations, both of which brought hundreds of thousands of participants.   For all such events, coordination with the Metropolitan Police Department and other Federal law enforcement agencies is normal.

34.  For the  2002 World Bank-IMF meetings, the National Park Service received four applications from two groups seeking to demonstrate at assorted park areas.  The Park Service

and Park Police had numerous meetings with applicants, where they worked to address public

safety and health concerns and a myriad of other details necessary for any large demonstration.

Following these discussions and refinements regarding the scope of the demonstrations and

consistent with National Park Service regulations, the Park Service partially granted and denied

these applications.

35.  Found as **Exhibit 5**, on September 23, 2002 the National Park Service issued permits

authorizing Mobilization For Global Justice the use of the Sylvan Theater, Whitman Park,

Bolivar Park, McPherson Square, Farragut Square, Pershing Park, and use of Rock Creek Park at

Connecticut and Calvert.   For security reasons, however, the Park Service revoked the

application seeking the use of Rawlins Park, Lafayette Park, the White House sidewalk, E Street

between 15th and 17th Streets.

36.  There were two critical security reasons–which were of great concern for the Park

Police as it planned for the protection of the White House complex as well as for the 2002 World

Bank-IMF meetings–that were detailed in the Park Service's denial letter.

37.  The first security concern was for the protection of the White House complex, where

at the request of the United States Secret Service, following the terrorist attacks of September 11,

2001, the Park Service extended its no-permit policy for certain park areas around the White

House complex.  The second security concern was to provide necessary security and access for

the World Bank-IMF meetings and to protect the public

38.  Documentation regarding both of these security concerns was also provided as

attachments in the Park Service's denial letter.

39.  As to the first security concern--the protection of the White House complex--the

Park Service provided a copy of its Record of Determination dated August 19, 2002 and the

Secret Service's request dated August 14, 2002, which stated in part that:

> Intelligence sources and investigative reports continue to indicate that the White House complex may be the target of continued terrorist activity. The Secret Service continues to maintain the position that groups in Lafayette Park and the White House sidewalk area will be difficult for law enforcement officials to evacuate, that the presence of a large group could unintentionally provide cover activity such that a terrorist could approach the complex without attracting attention, and that large groups in close proximity to the White House could present inviting targets for terrorist activity.

40. As to the second security concern--providing necessary security and access for the World Bank-IMF meetings and to protect the public--the Park Service also provided a copy of its Record of Determination dated September 23, 2002 and the Metropolitan Police Department's request to me dated September 20, 2002. It details some of the complexities and difficulties faced by police agencies in providing adequate safety for the World Bank-IMF delegates, demonstrators, and the public, such that certain park areas had to be closed for public safety reasons. As the Metropolitan Police Department's letter to me explained:

> We have been advised that over 8,000 representatives from foreign countries will be attending the [World Bank-IMF] meetings. The IMF/WB buildings have been designated foreign missions during the course of the meetings. In addition, delegates will be using DAR Constitution Hall for IMF/WB meetings. These meetings have generated large-scale demonstrations in this city and elsewhere, and, unfortunately, some violence has erupted in the past (including at least one death, personal injuries and extensive property damage).

> The [Metropolitan Police] Department does not have sufficient resources to provide protection at the meeting locations, as well as at other locations in the city that may have been targeted for protests or disruptions. Even with the assistance of federal law enforcement agencies and law enforcement agencies from outside the District of Columbia, the [Metropolitan Police] Department is not able to ensure that the meeting attendees, demonstrators and the general public would be adequately protected if the listed park areas are not closed during the meetings.

41. Park Service's Record of Determination dated September 23, 2002 also stated in part that:

The World Bank-IMF Fall Meetings are bringing a gathering of more than 8,000 national and international dignitaries to Washington, D.C.  It is also bringing a large range of demonstrations to protest the meetings.  These demonstrations include groups planning to engage in a "mass march and rally and/or the direct action/quarantine" of the World Bank-IMF joint meetings, which includes trying to keep officials from getting to the meeting sites located at the World Bank and IMF buildings and Constitution Hall, or through disruptions there or at other locations in the city.  In the past, such acts have disrupted the 1999 World Trade Organization meeting in Seattle, which physically blocked public streets, stopped delegates from entering meetings, and caused property damage.

The United States Park Police, Metropolitan Police Department and the United States Secret Service as well as other law enforcement agencies will be mobilizing thousands of officers.  Police resources, however, will be stretched to cover various security areas, a large range of potential targets located throughout the metropolitan area, as well as perform essential police services in the rest of the city.

The park closures of Reservation 30, Rawlins Park, and a western portion of the Ellipse come at the attached request of the Metropolitan Police Department, in coordination with the United States Park Police, to provide necessary security and access for the World Bank-IMF meetings and to protect the public.  The District of Columbia will also be closing adjacent public sidewalks and streets under their jurisdiction surrounding the World Bank, IMF and Constitution Hall.

Many other park areas, which are adjacent to the World Bank, IMF, and Constitution Hall, will remain open to the public and demonstrations.  These open park areas include Reservation 31 located north of Pennsylvania Avenue between 19th and 18th Streets and across from the World Bank and IMF buildings, Reservations 28 and 29 located astride Pennsylvania Avenue between 20th and 21st Streets, Simon Bolivar Park located at 18th Street and Virginia Avenue, the open portions of the Ellipse which is just south of the White House and across from Constitution Hall, the Washington Monuments grounds, and the National Mall.  These open park areas have been successfully used in the past.  People are also free to contact the District of Columbia or the United States Capitol Police regarding the use of public spaces under their jurisdiction.

These temporary park closures are necessary to provide for security and public safety for the World Bank-IMF Fall Meetings and the public.  Part of an overall security zone, the park closures are similar to park closures that occurred during the World Bank-IMF meetings of April 15-17, 2000--during which almost 1,300 protestors were arrested--except that this time Reservation 31 will remain open and, with Constitution Hall now being used,  Rawlins Park and a western portion of the Ellipse will be closed.

42.  Found as **Exhibit 6**, on September 23, 2002 the National Park Service also issued permits authorizing Fifty Years Is Enough Network to demonstrate at Reservation 31–located across Pennsylvania Avenue from the World Bank-IMF Headquarters–as well as designated areas of the Ellipse and Sylvan Theater on September 28.   For security reasons, however, the National Park Service revoked the application seeking the use of Reservation 30-- located south of Pennsylvania Avenue between 19th and 18th Streets and next to the World Bank-IMF Headquarters.  One of the enclosures was the Park Service's Record of Determination dated September 23, 2002,  and the Metropolitan Police Department's request to me dated September 20, 2002 that I have earlier recounted.

43.  As to the first factual incident at issue in the lawsuit, the alleged "trap-and-arrests"--it was Metropolitan Police Department who decided to make the arrests and who actually conducted the mass arrests which included the arrest of plaintiffs.  Indeed, all of the arrests at issue in this lawsuit were entirely the result of the decision of the Metropolitan Police Department, a decision that occurred without consulting either the National Park Service or the Park Police.   And as I will further detail, the only Park Police involvement was to respond to what appeared to be a reasonable request by the Metropolitan Police Department for backup assistance in the form of a partial and limited static police line.

44.  As to the second factual incident at issue in the lawsuit, the alleged unlawful "confinement and release conditions," it was the Metropolitan Police Department who transported  all of the persons they arrested.  Neither the National Park Service nor the Park Police were involved in the transport, confinement,  processing, or release of any of the persons who the Metropolitan Police Department arrested.   I am also unaware that any Federal agency or employee was involved in the transport,  confinement, processing, and release conditions

13

complained about in the lawsuit.

45.   During the 2002 World Bank-IMF demonstrations I was the Commander of the Park

Police Special Detail.  On September 27,  I was with a Park Police detail assigned to protect the

White House complex in Lafayette Park, when I heard from radio transmissions that non-

permitted demonstrators had caused property damage to businesses near Franklin Park.  When I

heard that some of this group was marching toward Pershing Park area, I drove to the area.

When I arrived, Metropolitan Police Department officers had a police line on the west side of

Pershing Park with a large group already inside Pershing Park.

46.   Insofar as the Metropolitan Police Department had dealt with and followed this

group, and had far more officers present than the Park Police, I considered that they were the

police agency that would be responsible to deal with this group.   In that regard, a Metropolitan

Police Department official requested the assistance of the Park Police to help stop the group

from exiting back onto the street.  I was informed that members of the group had damaged

property elsewhere in the city.   Metropolitan Police Department Commander Kathy Lanier

explained to me that the group had caused property damage in one commercial area and that they

did not think the group should be allowed to travel to another commercial area to cause

additional property damage.

47.   Acting in good faith to a request from the Metropolitan Police Department  to

preserve a fluid situation which I saw as reasonable, I directed officers assigned to the Park

Police detail to establish a partial and limited static police line on the north and south street sides

of Pershing Park.

48.   Metropolitan Police Department officers secured the other sides and then began

moving into the park.  Metropolitan Police Department Assistant Chief Peter Newsham asked

14

me whether the group had a park permit and whether that could be the basis for the group's arrest.  I observed that the group had far more than 25 participants.  I explained, however, that while no group had a Park Service permit for the park, that the Park Police would make no arrests, explaining that it our Park Police procedure was to first warn individuals that they were violation and allow them to come into voluntary compliance.  The Park Police was not asked to issue any such warnings nor did they, as the Park Police did not decide to arrest any of the individuals in Pershing Park, nor did they make any such arrests.

49.  Metropolitan Police Department Assistant Chief Newsham told me that if the group left the park they would be arrested by Metropolitan Police Department for parading without a permit; and if the group tried to force themselves through police lines that they would be arrested by Metropolitan Police Department for crossing police lines.

50.  Some time afterwards, Assistant Chief Newsham told me that the group would be arrested by Metropolitan Police Department for failure to obey a lawful police order. While I did not hear any Metropolitan Police Department warnings, it is possible that warnings may have been  given earlier before my arrival or out of my hearing range.

51.  Metropolitan Police Department's decision to make these mass arrests was a decision made entirely by Metropolitan Police Department officials and without consulting either the Park Service or the Park Police.  Further, it was Metropolitan Police Department--and neither the Park Service nor the Park Police--who conducted the resulting arrests.

52.  Indeed, the subsequent Metropolitan Police Department investigation confirmed that it was Assistant Chief Peter Newsham who decided to order the arrests.  The investigation also confirmed that the decision to make the arrests were based on illegal conduct observed prior to entering Pershing Park.

15

53.   Because of the park's hilly terrain, however, I declined Metropolitan Police Department Command Assistant Chief Brian Jordan's request that Park Police horse-mounted officers enter the park to move the group.  Rather, it was Metropolitan Police Department officers who moved the group within Pershing Park into an ever-smaller area, and who then seized, flex-cuffed, and escorted them to Metropolitan Police Department-controlled buses.

54.   The Park Police only other role--again at the Metropolitan Police Department's request which I believed was reasonable–was to maintain a limited and partial police static line as some of the arrestees who had been earlier flex-cuffed were escorted by Metropolitan Police Department officers into buses called into the area by the Metropolitan Police Department.

55.   When the arrests began, I advised Park Police radio communication that the Metropolitan Police Department were making arrests and of the Park Police's limited assistance. Specifically, my radio communication message, which I since had the opportunity to review, stated verbatim:

> For stations information at this time, arrests are beginning to be made by Metropolitan Police in Pershing Park.   We are to assist in the securing of the perimeter while they are making arrests.

56.   The arrestees were transported by Metropolitan Police Department-controlled buses.

57.   Metropolitan Police Department also seized all of arrestees property that had been left in the park.

58.   The only person arrested by the Park Police was someone who is neither a named plaintiff in any lawsuit nor was in Pershing Park.   The arrested person was warned three times by the Park Police, and failed to obey a police officer by crossing our police line located on the south side curb of Pennsylvania Avenue and 15th Street.  **Exhibit 8** is a copy of the police reports regarding this incident, with the identity of the arrestee redacted to protect his privacy

16

rights.

59.   I understand that Metropolitan Police Department Chief Ramsey *shortly thereafter*
publically explained their mass arrests.  As  recounted in the <u>Washington Post</u>, page A14 dated
September 28, a number of non-permitted bicycle demonstrators who rode from Union Station,
had also been stopped by Metropolitan Police Department at Pershing Park.  Found at **Exhibit 7**
along with other media reports, the <u>Post</u> recounts that:

> [Metropolitan Police Department Chief] Ramsey said all the demonstrators
> arrested had broken the law, either by blocking the sidewalk, blocking the street
> or parading without a permit.  He said that the group had blocked Pennsylvania
> Avenue NW and had not obeyed officers' orders to stop.  "They put themselves in
> a position to be arrested," he said.

60.   Three Metropolitan Police Department documents regarding their subsequent
investigation into the Pershing Park arrests were provided to the United States District Court as
well as to the parties to the four ongoing lawsuits regarding the Pershing Park arrests on
September 12, 2003, and were filed with the Court on the same day.  These Metropolitan Police
Department investigative documents confirm that the Pershing Park arrests were decided entirely
by the Metropolitan Police Department and that the Park Police performed a limited role at what
appeared to be a reasonable request by Metropolitan Police Department Assistant Chief Peter
Newsham.   It also confirmed that the arrestees' transport, confinement, processing, and release
conditions  were entirely the product of the Metropolitan Police Department.

61.   Indeed, the Metropolitan Police Department's Office of Professional Responsibility
memorandum to the Chief dated January 25, 2003, confirmed that it was Assistant Chief
Newsham who gave the order to make the arrests.  The memorandum also summarized its
interview of Assistant Chief Newsham:

... [who] explained that his assignment during the World Bank/IMF

17

demonstrations on Friday, September 27, 2002, was Zone IV, which included Pershing Park.  Assistant Chief Newsham related that hundreds of demonstrators were converging from different directions and moving toward Pershing Park. Assistant Chief Newsham related that he personally observed demonstrators turning over newspaper stands and ignoring officers' orders to get out of the street and onto the sidewalks.

Assistant Chief Newsham was asked if any warning were given to the demonstrators prior to the mass arrest at Pershing Park, and replied that the conduct of the demonstrators was such that they were clearly violating traffic laws in a dangerous manner.  Assistant Chief Newsham related that some of the demonstrators were warned by officers along their route to get onto the sidewalk and out of the street, however the demonstrators ignored the warnings.  Assistant Chief Newsham further explained that was not practical to give everyone a warning or to make sure that every person received a warning at the point where all of the protestors converged at Pershing Park.  Assistant Chief Newsham related that the demonstrators were arrested for disorderly conduct and failure to obey officer's orders for violations that occurred prior to their entering Pershing Park.

62.  In conclusion, as to the first factual incident at issue in the lawsuit, the alleged "trap-and-arrests"--it was Metropolitan Police Department who decided to make the arrests and who actually conducted the mass arrests--which included the arrest of plaintiffs.  The arrests at issue were entirely the result of the decision of the Metropolitan Police Department, a decision that occurred without consulting either the National Park Service or the Park Police.  The only Park Police involvement was to respond to what appeared to be a reasonable request by the Metropolitan Police Department for backup assistance in the form of a partial and limited static police line.

63.  As to the second factual incident at issue in the lawsuit, the alleged unlawful "confinement and release conditions," and as confirmed in the  Metropolitan Police Department investigative documents, it was the Metropolitan Police Department who was involved in the transport, confinement, processing, and release conditions of the arrestees.  Neither the National Park Service nor the Park Police were involved in the transport, confinement,  processing, or

18

release of any of the persons who the Metropolitan Police Department arrested.   I am also unaware that any Federal agency or employee was involved in the transport,  confinement, processing, and release conditions complained about in the lawsuit.

64.   In sum, the Park Police planning for and its operations during the 2002 World Bank-IMF meetings were not intended to disrupt, disturb, or infringe upon any demonstrators' lawful activities.  Rather, the National Park Service and the Park Police intended to ensure both public safety and facilitate lawful demonstrations, just as it does during the thousands of lawful demonstrations that successfully occur on parkland under National Park Service regulations and permits each year.

65.   Further, while the Park Police was aware that lawful permitted demonstrations were planned during the 2002 World Bank-IMF meetings, we were also aware of unlawful disruptive conduct at past anti-globalization demonstrations such as during the 1999 Seattle World Trade Organization meeting and the 2000 World Bank-IMF meetings.   Therefore, Park Police planning and operations were intended and focused on entirely lawful and appropriate public safety and security goals: to ensure the protection of the White House complex, the protection of Federal parkland's monuments and memorials, assure that the World Bank-IMF meetings occurred without disruption, the protection of citizens and visitors, and assure the safety of Park Police personnel.

66.  Finally, after consultation with the National Park Service's Claims Specialist, I understand that no plaintiff in these lawsuits have filed an administrative tort claim under the Federal Tort Claim Act.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 15th day of October, 2003.

_____

RICHARD MURPHY