# Oakland Tribune

### State monitored war protesters
**Intelligence agency does not distinguish between terrorism and peace activism**
By Ian Hoffman
Sean Holstege and Josh Richman
STAFF WRITERS

**Sunday, May 18, 2003** - Days before firing wooden slugs at anti-war protesters, Oakland police were warned of potential violence at the Port of Oakland by California's anti-terrorism intelligence center, which admits blurring the line between terrorism and political dissent.

The April 2 bulletin from the California Anti-Terrorism Information Center (CATIC) arguably offered more innuendo than actual evidence of protesters' intent to "shut down" the port and possibly act violently.

CATIC spokesman Mike Van Winkle said such evidence wasn't needed to issue warnings on war protesters.

"You can make an easy kind of a link that, if you have a protest group protesting a war where the cause that's being fought against is international terrorism, you might have terrorism at that (protest)," said Van Winkle, of the state Justice Department. "You can almost argue that a protest against that is a terrorist act."

In fact, CATIC -- touted as a national model for intelligence sharing and a centerpiece of Gov. Gray Davis and Attorney General Bill Lockyer's 2002 re-election bids -- has quietly gathered and analyzed information on activists of various stripes almost since its creation.

"They've done it since Day One," said a Bay Area counterterrorism official.

Mark Schlosberg, director of police policy practices for the ACLU-Northern California, called Van Winkle's remarks "just shocking.

"First of all, it's disturbing that protest information is being gathered and distributed out of a counterterrorism center," he said.

"But to equate protesting against a war with terrorist activity, if in fact that's what's being done, is contrary to American values. And I would hope there are guidelines in place to prevent that being done."

CATIC's analysts in Sacramento monitor terror alerts from federal agencies and sift through local police tips. CATIC regards itself as a hub.

CATIC's collections and advisories run the gamut. Some counterterrorism officials regard the center's midday notices of Critical Mass cycling brigades and police funerals as little more than a clipping service. Center analysts compile dossiers on "extremist" environmental, animal-rights and white supremacist groups. They pass along national terror intelligence, including a recent FBI alert on turning industrial hydrogen cyanide or chlorine into weapons.

The center draws $6.7 million a year in state funds to prevent terrorism. Analysts must obey one federal rule to limit the intelligence they gather, analyze and disseminate: It must have a criminal predicate, a "reasonable suspicion" that criminal acts will be committed.

"If there's no criminal predicate we would not issue the information on anyone. That's the rules and we abide by that," said CATIC director Ed Manavian.

Yet causing a traffic jam can be enough to trigger a CATIC analysis and bulletin. At the Port of Oakland, where trucks would be blocked from reaching shippers such as APL, a protest target, that logic might have been more compelling, Manavian and Van Winkle suggested.

"If we receive information that 10,000 folks are going to a street corner and going to block it, that's breaking a law," Manavian said. "That's the kind of information that we're going to relay."

Said Van Winkle: "I've heard terrorism described as anything that is violent or has an economic impact, and shutting down a port certainly would have some economic impact. Terrorism isn't just bombs going off and killing people."

Both men say CATIC merely supplies information, but it's up to police to decide what to do with it.

Still, a warning of potential violence from the state's anti-terror nerve center, staffed with personnel from the FBI, Defense Intelligence Agency and other federal, state and local agencies, carries a strong imprimatur of danger.

"It has extra weight," said San Francisco Deputy Police Chief Rick Bruce, who leads the department's special operations division and is in charge of both counterterrorism and planning for protests.

Said the ACLU's Schlosberg: "That sends a message about what the nature of a protest would be and what the response should be. Whether that caused the response or not, I don't know."

The state's anti-terror center also operates without a clear definition of terrorism. Asked for one, Van Winkle replied: "I'm not sure where to go with that. But as a state organization, we have this information and we're going to share it."

'Nontraditional extremists'

The center's analysts are building files on what he called "nontraditional criminal extremist groups," such as the Earth Liberation Front and the Animal Liberation Front.

"Some of the groups we're keeping intelligence on are those groups that mainstream people might not consider involved in violent activity," Van Winkle said. "How can releasing all these monkeys with viruses not put people in danger? And the reality is, some of the planned peaceful protests around the country have turned violent."

On April 7, the Port of Oakland was the site of a clash that the New York Times called "the most violent between protesters and authorities anywhere in the country since the start of the war in Iraq."

Intelligence records released under open-government laws reveal the thinking of CATIC and Oakland intelligence officials in the days leading up to the protest. An ANG Newspapers examination shows the agencies blended solid facts, innuendo and inaccurate information about anti-war protesters expected at the port.

Taken together, this information painted a monolithic portrait of violent activists. They could be armed with metal bolts, rocks and Molotov cocktails. They were secretly in cahoots with the longshoremen's union -- and, analysts believed, they were bent on shutting down the nation's fourth largest shipping port, high on the state's list of terrorist targets.

"What alerted us was the discovery of Molotov cocktails" the day after a March 20 anti-war protest in San Francisco, CATIC's Manavian said. "Nobody's really saying where did those Molotov cocktails come from and why were they there? Again, you have people in those protests who meant to cause violence. And that's part of our analysis."

That portrait is at odds with videotapes and transcripts of radio transmissions of the event, which do not reflect protesters throwing objects at police or engaging in civil disobedience until 20 minutes after police opened fire. But police radio chatter repeatedly focused on protesters in black masks.

'Black Bloc'

Anarchists in black masks were prominent in an April 1 e-mail that an Oakland PD intelligence unit supervisor, Derwin Longmire, sent to police commanders. He highlighted the role of the "Black Bloc," known for black clothing and face scarves, in a recap of the most confrontational portions of San Francisco's pre-war demonstrations, when police arrested around 2,000 people. Longmire described how "Black Blocers" confronted police, smashed a patrol car window and struggled with an officer for his gun.

"I do anticipate a sizable number (of Blocers at the port) because of the amount of promotion that the 7th of April has received," he wrote.

Later on April 1, an Arcata man was arrested on federal charges of possessing an explosive after being captured on a surveillance videotape during the March 20 protests stashing a Molotov cocktail near a hotel.

"Some of these people have no interest in anything except anarchy. The police are trying to analyze who those people are," said former FBI agent Rick Smith.

On April 2, after CATIC collected press and police accounts of the Molotov cocktail arrest, veteran state criminal intelligence analyst Mike Mendenhall, working for CATIC's Group Analysis Unit in Sacramento, transmitted a warning over the California Law Enforcement Telecommunications System, bearing the subject line, "National Day of Action Includes Northern California Targets."

Mendenhall drew on the Web site of Direct Action to Stop the War, the organizing umbrella for several anti-war groups. He quoted the site as calling for protesters to "shut down the war merchants."

Yet Mendenhall neglected to mention Direct Action's specific instruction to port protesters: "This is not a civil disobedience action ... our goal is to maintain the picket line not to get arrested."

CATIC's analyst made special note of a "blockades training" by the Ruckus Society, identified as a "protest organization group" that conducts "protest tactics training for events such as the 1999 World Trade Organization Conference in Seattle, Wash., and the 2001 Biotechnology Industry Organization Conference in San Diego."

'Battle in Seattle'

At the "Battle in Seattle," 50,000 protesters filled the city's downtown and overwhelmed police who fired tear gas and rubber bullets for three days. There were some 600 arrests and $3 million in property damage.

Mendenhall also failed to mention in his April 2 advisory that the Oakland-based Ruckus Society specifically shuns violence and states its mission as "nonviolent direct action" repeatedly on its Web site.

Ruckus Society director John Sellers said he's not surprised to see his nonprofit show up on an advisory from an anti-terrorism intelligence center.

"This is what all of us have been talking about since right after 9/11," he said. "It's outrageous that they're concerning themselves with classically nonviolent activism, nonviolent citizens practicing their First Amendment right to free speech."

It "shines light on the kind of (U.S. Attorney General John) Ashcroft mentality that's seizing this country," he said. "Anyone internal with a dissenting view is lumped in with the people who drove the planes into the towers, which couldn't be further from the truth."

The potential for violence, said CATIC director Manavian, was an inference drawn from Ruckus Society's participation in the 1999 Seattle protests.

"Was there any violence up there? Was there any malicious damage to private property? And I think all those situations I just described are criminal predicate. Those are crimes. I think if you were a business owner on this route you would expect law enforcement to protect you against that," he said.

Ruckus Society's Sellers had a taste of this in 1999, when his group trained WTO protesters for exclusively nonviolent actions. Yet a senior Seattle police commander told him beforehand that federal agents warned that several police officers could be put out of commission or killed.

Sellers believes this false information provoked a severe police reaction when some self-proclaimed anarchists -- neither trained by nor affiliated with the Ruckus Society -- committed acts of vandalism.

In an April 4 e-mail, Oakland's Longmire alerted senior police officers that a former leader of Earth Liberation Front "is now espousing anti-war tactics" such as "Black Bloc techniques."

Longmire described ELF as "a terrorist group listed by the FBI" and "active in the destruction of more than $43 million in property damage."

"We should be aware of this mindset for our upcoming masses," Longmire wrote in his e-mail. One recipient, Oakland Police Capt. Rod Yee, gave the go-ahead April 7 for officers to open fire with less-lethal ammunition on protesters.

Longmire also gathered and shared with Oakland officers a collection of e-mails and Web postings by leaders of the International Longshore and Warehouse Union and acquaintances in the anti-war movement. The postings suggest ILWU leaders planned to use the protests to demand arbitration at the port gates and delay going to work.

Some civil-liberties advocates already are drawing parallels between CATIC's intelligence gathering on anti-war groups and COINTELPRO, a grab-bag term for the systematic targeting of "subversive" and "extremist" groups by the FBI, CIA, military intelligence and the National Security Agency from the 1950s to 1971.

FBI agents infiltrated and disrupted nonviolent protest groups such as the women's liberation movement, Martin Luther King Jr.'s Southern Christian Leadership Council and the anti-Vietnam War movement.

The comparison of CATIC and COINTELPRO is far from apt: There's no evidence that CATIC's Group Analysis Unit infiltrated anyone. Its analysts used a computer mouse, sizing-up protesters primarily by surfing Web pages.

Events such as Seattle's WTO riots give CATIC a rationale for scrutinizing any of the groups involved, said noted Emory University civil-rights historian David J. Garrow. "The problem is if you can gather information on them, that inescapably bleeds over into everyone with them."

Broadening roles

Terrorist attacks on U.S. soil are rare. Some anti-terror experts have wondered when new terror-fighting agencies would begin justifying their existence by broadening their roles.

"It is safe to say there is an enormous temptation to expand surveillance and information gathering. And unless there is an effective system of checks and balances sooner or later this kind of surveillance is going to get out of control," said Steven Aftergood, head of the Project on Government Secrecy at the Federation of American Scientists.

"This particular example is quite disturbing because it erodes the obvious distinction between terrorism and dissent," he said.

In Oakland's case, it led to gathering e-mails about the longshoremen's union, the ILWU's stance on war in Iraq and on the upcoming peace protest.

"How did those postings come into the hands of the Oakland Police Department? It does raise questions about the monitoring of political activity," said the ACLU's Schlosberg. "That's why we think it's important that there be guidelines to local and state law enforcement for this kind of surveillance of religious and political activities because often you don't see the results until years later. We're still finding out what happened in the 1960s."