UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYMING CHANG, et al. | ) |
| Plaintiffs | ) |
| v. | ) Civ. Act. No. 1:02CV0210 (EGS) |
| UNITED STATES OF AMERICA, | ) |
| and | ) |
| THE DISTRICT OF COLUMBIA, et al. | ) |
| Defendants. | ) |

## DECLARATION OF RICHARD MURPHY

I, Richard Murphy, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a Major with the United States Park Police and I have been an officer with the Park Police for more than twenty-six years.

2. I now command the Park Police's New York Field Office, which patrols and enforces the laws on the Federal parkland and waters at the Statue of Liberty National Monument and Gateway National Recreation Area, which encompasses 26,000 acres.

3. Before then, from February 2002 to January 2003, I was a Captain and assigned at first as the Assistant Commander and then Acting Commander of the Park Police Special Forces Branch, which is responsible for Park Police crowd control at major demonstrations, special events, and other planned and unplanned events on Federal parkland within the National Park Service's National Capital Region. The Park Police Special Forces Branch also assists other Park

1

Park Police units and parks throughout the National Park System in the event of law enforcement emergencies as well as the Park Police Patrol Branch.

4. The National Park Service's National Capital Region consists of the Federal parkland located primarily in the Washington metropolitan area. This includes 50,000 acres of Federal parkland in the District of Columbia, Maryland, Virginia, and West Virginia.

5. The National Capital Region includes 8,500 acres of Federal parkland comprising almost 24% of the District of Columbia. It includes not only the National Mall, Rock Creek Park, Lafayette Park, the White House sidewalk, and Pershing Park as well as scores of smaller parks located throughout the city.

6. The Park Police is a Federal law enforcement organization within the National Park Service, U.S. Department of the Interior. The Park Police law enforcement authority is principally based on three Federal laws which are generally geographically based. These three statutes are 16 U.S.C. § 1a-6(b), wherein 41 Federal Register 44876 (October 13, 1976) designated the Park Police Officers and Commissioned Park Rangers as possessing law enforcement authority throughout the National Park System; D.C.Code Ann. § 5-207 (2001), which provides that the Park Police has law enforcement authority "on and within roads, parks, parkways, and other federal reservations in the environs of the District of Columbia;" and D.C.Code Ann. § 5-201 (2001), which provides that the Park Police have the same law enforcement authority as the Metropolitan Police Department in the District of Columbia.

7. The Metropolitan Police Department, which has law enforcement authority in the District of Columbia, has a large police force with over 3,500 officers.

8. The Metropolitan Police Department is not supervised or controlled by the U.S.

2

Department of the Interior, the Park Service, or the Park Police. Likewise, the Metropolitan Police Department does not supervise or control the U.S. Department of the Interior, the Park Service, or the Park Police.

9. The Park Police, which has a wide range of law enforcement responsibilities within the National Park Service's National Capital Region, currently has approximately 586 uniformed officers, with approximately 437 of them stationed in the National Park Service's National Capital Region. The remaining Park Police officers are stationed primarily at the San Francisco Field Office and the New York Field Office.

10. Given its limited manpower in the Washington Metropolitan Area, the Park Police primarily focuses its law enforcement efforts within the Federal park areas. Nevertheless, because the Park Police effectively possess overlapping city-wide law enforcement authority with the Metropolitan Police Department, Park Police officers who witness criminal offenses outside park areas do make arrests.

11. The Park Police does occasionally assist the Metropolitan Police Department and other Federal law enforcement agencies in the District of Columbia. For example, to help address with increasing criminal activities, in 1994 the Park Police helped patrol the Fifth District of the Metropolitan Police Department. Park Police assistance, however, is traditionally done on a case-by-case basis that follows a request for assistance, and after the Park Police determines whether it has sufficiently available police resources for the Federal park areas that it primarily focuses on.

12. If the Park Police has sufficiently available police resources, we also provide backup assistance to other police agencies. Such backup assistance cover a wide range of activities and

3

situations, from ensuring that a requesting officer is not attacked while conducting an arrest or search, closing city streets following motor vehicle accidents, providing police lines, preserving crime and accident scenes, to chasing suspects identified by the requesting officer. In such situations, backup officers depend on the requesting officer's full knowledge of the situation and expect that the requesting officer is justified in undertaking such arrests and searches that may occur.

13. The ability of the Park Police as well any other trained and responsible police agency, to provide inter-agency police backup is critical in the District of Columbia, a city with no less than thirty-two Federal law enforcement agencies, all of whom must be able to address a wide range of criminal activities, and, especially since September 11, 2001, including preparing for and responding to potential terrorist activities. Indeed, providing prompt police backup is a critical law enforcement function, that could involve life or death situations, and requires timely and appropriate actions by the responding officers to help protect the requesting officer and to ensure public safety.

14. As most people may recall, the 1999 protests during the World Trade Organization meetings in Seattle substantially disrupted the meetings and the city itself. The protests resulted in property damage and the blocking of public streets, as well as many arrests. Exhibit 1 is a copy of several media reports regarding the 1999 Seattle demonstrations.

15. The 2000 World Bank-IMF meetings in Washington, D.C., also involved efforts to disrupt the meetings and the city. It culminated on April 17, 2000, when approximately 600 people were arrested, when after being physically prevented from forcing themselves through the Metropolitan Police Department's police lines that protected the World Bank-IMF,

4

demonstrators agreed to an orderly sequence of civil disobedience that resulted in what the Washington Post described as their "voluntary arrests." Exhibit 2 is a copy of several media reports regarding the 2000 World Bank-IMF demonstrations.

16. In planning for the demonstrations during the 2002 World Bank-IMF meetings, the Park Police in working with other agencies, recognized and considered the problems caused by disruptive demonstrations at the World Trade Organization meeting, other anti-globalization protests, and the past World Bank-IMF demonstrations in Washington, DC.

17. The Park Police's Operational Plan General Overview, which is attached as Exhibit 3, summarized what we expected during the 2002 World Bank-IMF meetings, including that:

> [V]arious groups are trying to organize a direct action against the city starting on Friday, September 27 with an attempt to disrupt rush hour traffic to include the use of improvised devices, i.e., sleeping dragons, disabled vehicles and attacking targeted businesses. As in the past, "Critical Mass" (bicycle groups) will be attempting to disrupt traffic on Friday as well. On Saturday, the demonstrators will attempt to quarantine the IMF/WB complex, and on Sunday protests will continue near the IMF/WB complex.
>
> As with any mass demonstrations, there will be those who are more radical and destructive than others, and they will use the crowd to hide their actions. The Metropolitan Police Department advises that they are expecting anywhere from 10,000 to 30,000 demonstrators to be in the city for the IMF/WB meetings.

18. In anticipation of disruptive demonstrations during the 2002 World Bank-IMF meetings, we undertook extensive planning. As detailed in the Park Police Operational Plan General Overview, and consistent with our long-standing policy, we identified the Park Police as "the primary agency responsible" for Federal parkland in Washington, D.C. Recognizing that demonstrators may engage in conduct that did not violate the law, we also identified objectives to include maintaining security around the White House complex, protecting citizens and visitors,

5

assuring safety of Park Police personnel, safeguarding the Park Service's monuments and memorials, and assuring that the World Bank-IMF meetings occur without disruption.

19. While the Park Police primarily focused its efforts on Federal parkland, we were also ready to provide assistance to the Metropolitan Police Department.

20. Cooperation and coordination between police agencies were critical, because police resources were stretched to cover various security areas, a large range of potential targets located throughout the metropolitan area, as well as to perform essential police services in the rest of the city and Federal parkland.

21. Indeed, consistent with long-standing practice, and if Park Police resources were available, the Park Police was prepared to provide assistance to other requesting police agencies. Consistent with long-standing practice, a decision to make an arrest always rests on the arresting police agency.

22. Equally important, the Park Police has no "trap-and-arrest" policy/practice and did not participate with Metropolitan Police Department in any such "trap-and-arrests" on September 27, 2002.

23. The Park Police has had extensive experience in dealing with demonstrations, where large numbers of demonstrators occasionally violate the law which results in mass arrests. The Park Police policies are found in the Park Police General Order 2103 on Arrest Procedures (9/30/99) and General Order 2108 on Mass Arrest Procedures (5/23/97), and are attached as Exhibit 4. And while "[n]othing in this Manual is intended to create an enforceable legal right or private right of action..... [v]iolations of General Orders may be a basis for Force personnel action."

24. As General Order 2103.02 details, when a Park Police officer makes an arrest, it is Park Police policy that:

> The arrest and detention of a person shall be accomplished in an expeditious, legal, professional, and safe manner using only the amount of force necessary to accomplish the task. Further, such actions shall conform to all legal and administrative requirements of the Force and the applicable requirements of the jurisdiction in which the arrest occurs. Once an individual is arrested, it is Force policy to ensure that he/she is detained under proper supervision, in a humane manner, and in an environment that will not unnecessarily impair his/her health or subject him/her to physical abuse, verbal abuse, or unreasonable discomfort.

25. And as General Order 2108.03A details, if the Park Police determine violations have occurred in a mass arrest situation, Park Police officers are directed to provide three separate warnings that the violators "are in violation of a specific law and will be arrested if they do not disperse or cease their illegal activity." This procedure is not used, however, if there is a "violent or emergency situations, or for individual acts of crime when arrests should be made as quickly as possible . . ."

26. For non-Federal parkland in the District, other jurisdictions are responsible for regulating demonstration activities. The District of Columbia is responsible for most of the rest of the city, while the grounds of the United States Capitol are under the jurisdiction and control of the United States Capitol Police Board.

27. For Federal parkland, the National Park Service's regulations for the National Capital Region provide a regulatory framework which traditionally accommodates a full and rich range of demonstration activities addressing a wide range of issues. Codified at 36 C.F.R. § 7.96(g), these regulations were developed to balance important First Amendment rights with the Park Service's statutory mandate.

7

28. Pursuant to National Park Service regulations found at 36 C.F.R. § 7.96(g)(2), demonstrations and special events may be held by permit. Under 36 C.F.R. § 7.96(g)(2)(I), there is an exemption from the permit requirement for demonstrations involving 25 persons or fewer, "provided that the other conditions required for the issuance of a permit are met and provided further that the group is not merely an extension of another group already availing itself under this provision or will not unreasonably interfere with other demonstrations or special events."

29. A group planning a demonstration or special event may obtain a permit from the National Park Service in order to ensure access and a forum to express their views on Federal parkland. Consistent with National Park Service regulations, the National Park Service endeavors to ensure that each permitted group or individual is able to express their views free from unreasonable interference or intrusion from other groups or individuals. Indeed, thousands of demonstrations and special events regularly occur on Federal parkland in Washington D.C. under the NPS's regulatory framework

30. In that regard, the National Park Service received four applications from two groups seeking to demonstrate at assorted park areas to protest the 2002 World Bank-IMF meetings. The Park Service and Park Police had numerous meetings with applicants, where they worked to address public safety and health concerns and a myriad of other details necessary for any large demonstration. Following these discussions and refinements regarding the scope of the demonstrations and consistent with National Park Service regulations, the Park Service partially granted and denied these applications.

31. Found as Exhibit 5, on September 23, 2002 the National Park Service issued permits authorizing Mobilization For Global Justice the use of the Sylvan Theater, Whitman Park,

8

Bolivar Park, McPherson Square, Farragut Square, Pershing Park, and use of Rock Creek Park at Connecticut and Calvert. For security reasons, however, the Park Service revoked the application seeking the use of Rawlins Park, Lafayette Park, the White House sidewalk, E Street between 15th and 17th Streets.

32. There were two critical security reasons–which were of great concern for the Park Police as it planned for the protection of the White House complex as well as for the 2002 World Bank-IMF meetings–that were detailed in the Park Service's denial letter.

33. The first security concern was for the protection of the White House complex, where at the request of the United States Secret Service, following the unprecedented terrorist attacks of September 11, 2001, the Park Service extended its no-permit policy for certain park areas around the White House complex. The second security concern was to provide necessary security and access for the World Bank-IMF meetings and to protect the public

34. Documentation regarding both of these security concerns was also provided as attachments in the Park Service's denial letter.

35. As to the first security concern–the protection of the White House complex–the Park Service provided a copy of its Record of Determination dated August 19, 2002 and the Secret Service's request dated August 14, 2002, which stated in part that:

> Intelligence sources and investigative reports continue to indicate that the White House complex may be the target of continued terrorist activity. The Secret Service continues to maintain the position that groups in Lafayette Park and the White House sidewalk area will be difficult for law enforcement officials to evacuate, that the presence of a large group could unintentionally provide cover activity such that a terrorist could approach the complex without attracting attention, and that large groups in close proximity to the White House could present inviting targets for terrorist activity.

9

36. As to the second security concern--providing necessary security and access for the World Bank-IMF meetings and to protect the public--the Park Service also provided a copy of its Record of Determination dated September 23, 2002 and the Metropolitan Police Department's request to me dated September 20, 2002. It details some of the complexities and difficulties faced by police agencies in providing adequate safety for the World Bank-IMF delegates, demonstrators, and the public, such that certain park areas had to be closed for public safety reasons. As the Metropolitan Police Department's letter to me explained:

> We have been advised that over 8,000 representatives from foreign countries will be attending the [World Bank-IMF] meetings. The IMF/WB buildings have been designated foreign missions during the course of the meetings. In addition, delegates will be using DAR Constitution Hall for IMF/WB meetings. These meetings have generated large-scale demonstrations in this city and elsewhere, and, unfortunately, some violence has erupted in the past (including at least one death, personal injuries and extensive property damage).
>
> The [Metropolitan Police] Department does not have sufficient resources to provide protection at the meeting locations, as well as at other locations in the city that may have been targeted for protests or disruptions. Even with the assistance of federal law enforcement agencies and law enforcement agencies from outside the District of Columbia, the [Metropolitan Police] Department is not able to ensure that the meeting attendees, demonstrators and the general public would be adequately protected if the listed park areas are not closed during the meetings.

37. Park Service's Record of Determination dated September 23, 2002 also stated in part that:

> The World Bank-IMF Fall Meetings are bringing a gathering of more than 8,000 national and international dignitaries to Washington, D.C. It is also bringing a large range of demonstrations to protest the meetings. These demonstrations include groups planning to engage in a "mass march and rally and/or the direct action/quarantine" of the World Bank-IMF joint meetings, which includes trying to keep officials from getting to the meeting sites located at the World Bank and IMF buildings and Constitution Hall, or through disruptions there or at other locations in the city. In the past, such acts have disrupted the 1999 World Trade Organization meeting in Seattle, which physically blocked public streets, stopped

10

delegates from entering meetings, and caused property damage.

The United States Park Police, Metropolitan Police Department and the United States Secret Service as well as other law enforcement agencies will be mobilizing thousands of officers. Police resources, however, will be stretched to cover various security areas, a large range of potential targets located throughout the metropolitan area, as well as perform essential police services in the rest of the city.

The park closures of Reservation 30, Rawlins Park, and a western portion of the Ellipse come at the attached request of the Metropolitan Police Department, in coordination with the United States Park Police, to provide necessary security and access for the World Bank-IMF meetings and to protect the public. The District of Columbia will also be closing adjacent public sidewalks and streets under their jurisdiction surrounding the World Bank, IMF and Constitution Hall.

Many other park areas, which are adjacent to the World Bank, IMF, and Constitution Hall, will remain open to the public and demonstrations. These open park areas include Reservation 31 located north of Pennsylvania Avenue between 19th and 18th Streets and across from the World Bank and IMF buildings, Reservations 28 and 29 located astride Pennsylvania Avenue between 20th and 21st Streets, Simon Bolivar Park located at 18th Street and Virginia Avenue, the open portions of the Ellipse which is just south of the White House and across from Constitution Hall, the Washington Monuments grounds, and the National Mall. These open park areas have been successfully used in the past. People are also free to contact the District of Columbia or the United States Capitol Police regarding the use of public spaces under their jurisdiction.

These temporary park closures are necessary to provide for security and public safety for the World Bank-IMF Fall Meetings and the public. Part of an overall security zone, the park closures are similar to park closures that occurred during the World Bank-IMF meetings of April 15-17, 2000—during which almost 1,300 protestors were arrested—except that this time Reservation 31 will remain open and, with Constitution Hall now being used, Rawlins Park and a western portion of the Ellipse will be closed.

38. Found as Exhibit 6, on September 23, 2002 the National Park Service also issued permits authorizing Fifty Years Is Enough Network to demonstrate at Reservation 31—located across Pennsylvania Avenue from the World Bank-IMF Headquarters—as well as designated areas of the Ellipse and Sylvan Theater on September 28. For security reasons, however, the

11

National Park Service revoked the application seeking the use of Reservation 30-- located south of Pennsylvania Avenue between 19th and 18th Streets and next to the World Bank-IMF Headquarters. One of the enclosures was the Park Service's Record of Determination dated September 23, 2002, and the Metropolitan Police Department's request to me dated September 20, 2002 that I have earlier recounted.

39. As to the first factual incident at issue in the lawsuit, the alleged "trap-and-arrests"--it was Metropolitan Police Department who decided to make the arrests and who actually conducted the mass arrests which included the arrest of plaintiffs. Indeed, all of the arrests at issue in this lawsuit were entirely the result of the decision of the Metropolitan Police Department, a decision that occurred without consulting either the National Park Service or the Park Police. Indeed, consistent with long-standing practice, the decision to make any arrest rests on the arresting police agency. And as I will further detail, the only Park Police involvement was to respond to the request for backup assistance by the Metropolitan Police Department and, at their request, to provide a partial and limited static police line.

40. As to the second factual incident at issue in the lawsuit, the alleged unlawful "confinement and release conditions," it was the Metropolitan Police Department who transported all of the persons they arrested. Neither the National Park Service nor the Park Police were involved in the transport, confinement, processing, or release of any of the persons who the Metropolitan Police Department arrested. I am also unaware that any Federal agency or employee was involved in the transport, confinement, processing, and release conditions complained about in the lawsuit. Traditionally when the Metropolitan Police Department makes arrests, they conduct prisoner transport, confinement, processing, and release.

41. During the 2002 World Bank-IMF demonstrations I was the Commander of the Park Police Special Detail. On September 27, I was with a Park Police detail assigned to protect the White House complex in Lafayette Park, when I heard from radio transmissions that non-permitted demonstrators had caused property damage to businesses near Franklin Park. When I heard that some of this group was marching toward Pershing Park area, I drove to the area. When I arrived, Metropolitan Police Department officers had a police line on the west side of Pershing Park with a large group already inside Pershing Park.

42. Insofar as the Metropolitan Police Department had dealt with and followed this group, and had far more officers present than the Park Police, I considered that they were the police agency that would be responsible to deal with this group. In that regard, a Metropolitan Police Department official requested the assistance of the Park Police to help stop the group from exiting back onto the street. I was informed that members of the group had damaged property elsewhere. Metropolitan Police Department Commander Kathy Lanier explained to me that the group had caused property damage in one commercial area and that they did not think the group should be allowed to travel to another commercial area to cause additional property damage.

43. Acting in good faith to a request from the Metropolitan Police Department to preserve a fluid situation which I saw as reasonable, I directed officers assigned to the Park Police detail to establish a partial and limited static police line on the north and south street sides of Pershing Park. Consistent with long-standing practice, if there was a decision to make arrests, the responsibility rested on the arresting police agency.

44. Metropolitan Police Department officers secured the other sides and then began moving into the park. Metropolitan Police Department Assistant Chief Peter Newsham asked me

13

whether the group had a park permit and whether that could be the basis for the group's arrest. I observed that the group had far more than 25 participants. I explained, however, that while no group had a Park Service permit for the park, that the Park Police would make no arrests, explaining that it our Park Police procedure was to first warn individuals that they were violation and allow them to come into voluntary compliance.

45. Metropolitan Police Department Assistant Chief Newsham told me that if the group left the park they would be arrested by Metropolitan Police Department for parading without a permit; and if the group tried to force themselves through police lines that they would be arrested by Metropolitan Police Department for crossing police lines.

46. Some time afterwards, Assistant Chief Newsham told me that the group would be arrested by Metropolitan Police Department for failure to obey a lawful police order. While I did not hear any Metropolitan Police Department warnings, it is possible that warnings may have been given earlier before my arrival or out of my hearing range.

47. Metropolitan Police Department's decision to make these mass arrests was a decision made entirely by Metropolitan Police Department officials and without consulting either the Park Service or the Park Police. Further, it was Metropolitan Police Department--and neither the Park Service nor the Park Police--who conducted the resulting arrests.

48. Indeed, because of the park's hilly terrain, I declined Metropolitan Police Department Command Assistant Chief Brian Jordan's request that Park Police horse-mounted officers enter the park to move the group. Rather, it was Metropolitan Police Department officers who moved the group within Pershing Park into an ever-smaller area, and who then seized, flex-cuffed, and escorted them to Metropolitan Police Department-controlled buses.

14

49. The Park Police only other role was—again at the Metropolitan Police Department's request—to maintain a limited and partial police static line as some of the arrestees who had been earlier flex-cuffed were escorted by Metropolitan Police Department officers into buses called into the area by the Metropolitan Police Department.

50. The arrestees were transported by Metropolitan Police Department-controlled buses.

51. Metropolitan Police Department also seized all of arrestees property that had been left in the park.

52. I understand that the Metropolitan Police Department Chief Ramsey later publically explained their mass arrests. As recounted in the Washington Post, page A14 dated September 28, a number of non-permitted bicycle demonstrators who rode from Union Station, had also been stopped by Metropolitan Police Department at Pershing Park. Found at Exhibit 7 along with other media reports, the Post recounts that:

> [Metropolitan Police Department Chief] Ramsey said all the demonstrators arrested had broken the law, either by blocking the sidewalk, blocking the street or parading without a permit. He said that the group had blocked Pennsylvania Avenue NW and had not obeyed officers' orders to stop. "They put themselves in a position to be arrested," he said.

53. The Park Police did make one arrest of a person—who is not one of the named plaintiffs in this lawsuit—who after being warned three times by the Park Police, failed to obey a police officer by crossing our police line located on the south side curb of Pennsylvania Avenue and 15th Street. Exhibit 8 is a copy of the police reports regarding this incident, with the identity of the arrestee redacted to protect his privacy rights.

54. In conclusion, as to the first factual incident at issue in the lawsuit, the alleged

"trap-and-arrests"--it was Metropolitan Police Department who decided to make the arrests and who actually conducted the mass arrests--which included the arrest of plaintiffs. The arrests at issue were entirely the result of the decision of the Metropolitan Police Department, a decision that occurred without consulting either the National Park Service or the Park Police. The only Park Police involvement was to respond to the request for backup assistance by the Metropolitan Police Department and, at their request, to only provide a partial and limited static police line.

55. As to the second factual incident at issue in the lawsuit, the alleged unlawful "confinement and release conditions," it was the Metropolitan Police Department who transported all of the persons they arrested. Neither the National Park Service nor the Park Police were involved in the transport, confinement, processing, or release of any of the persons who the Metropolitan Police Department arrested. I am also unaware that any Federal agency or employee was involved in the transport, confinement, processing, and release conditions complained about in the lawsuit. Indeed, traditionally when the Metropolitan Police Department makes arrests they conduct such prisoner transport, confinement, processing, and release.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 15th day of January, 2003.

*(signature)*
RICHARD MURPHY