# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JEFFREY BARHAM, ET AL.      :
     Plaintiffs              :
                             :
     v.                     :      Civil Action No. 02-CV-2283 (EGS)
                             :
CHIEF CHARLES H. RAMSEY, ET AL.  :
     Defendants           :
                             :
_____:

## PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS, OR FOR SUMMARY JUDGMENT, FILED BY DEFENDANTS RAMSEY AND WILLIAMS

*September 27, 2002, from video interview[1] with Chief Charles Ramsey while at the scene of the Pershing Park mass arrests as they are occurring.*

Reporter:      But they're saying that certain people tried to just leave the park earlier - -

Ramsey:       [cutting off question] We'll that's why we - -

Reporter:      they were ready to leave the protests and - -

Ramsey:       [overspeaking reporter] That's why we have - -

Reporter:      They weren't permitted to leave.

Ramsey:       Ma'am that's why we have courts. They got their day in court. We'll be there too.

Expressing his deliberate indifference to, and intentional disregard of, the constitutional rights of the 400+ member plaintiff class, D.C. MPD Chief Charles H. Ramsey thereby dismissed questions about his and his department's then-ongoing mass violations of civil rights by saying that instead of having a day of political assembly and demonstration, protestors would someday have their day in court[2]

---

[1] Available at http://www.washingtonpost.com/wp-srv/mmedia/metro/092702-5v.htm (Attachment 36, video on CD-ROM to be filed separately).

[2] This interchange is notable, among other reasons, because it reflects on video the fact that practically *everyone* who was involved in these arrests was aware of the fact that there was no cogent factual basis for the arrests. Here, *even before the last individual had been placed on a mass arrest bus*, District policy makers knew or should have known, had actual or constructive knowledge, that the Pershing Park arrestees had never been ordered or provided opportunity to

Now, comes Chief Ramsey and moves this Honorable Court to <u>not</u> be in court, and to dismiss all claims against him in his individual capacity on the utterly unbelievable basis that he did not "participate" in this mass deprivation of civil rights.

With Chief Ramsey comes also Mayor Anthony Williams who participated alongside the Chief at a press conference held at 5:00 p.m. on September 27, 2002 - - while hundreds languished under mass arrest in his custody - - so that the Mayor could benefit politically and exploit the mass arrests for his political gain. At that conference, Williams did not announce that he was causing the cessation of the then-ongoing arrests as was within his authority, but instead expressly approved and ratified the actions challenged as unconstitutional by the plaintiff class herein.

As discussed below, plaintiffs have sufficiently alleged and established that they suffered violations of clearly established constitutional rights. Neither the Mayor nor the Chief have carried his burden of proving, under any conceivable set of facts given the allegations and admissions in this litigation, that his conduct was as a matter of law objectively reasonable. Consequently neither is entitled to the privilege of qualified immunity.

The pending motion to dismiss filed by Ramsey and Williams should be denied for the reasons set forth below.

## I.      Standards of Review and Burdens of Proof

Evaluating a motion to dismiss filed pursuant to Rule 12(b)(6), the Court is to presume that all well-pleaded allegations are true, <u>see</u> <u>Leatherman v. Tarrant County Narcotics & Intelligence Unit</u>, 507 U.S. 163 (1993) and resolve all doubts and inferences in the plaintiffs'

_____

disperse.

2

favor in the light most favorable to plaintiffs, see Kowal v. MCI Communications Corp., 16 F.3d

1271, 1276 (D.C. Cir. 1994). See, also Atchinson v. District of Columbia, 73 F.3d 418, 442

(D.C. Cir. 1996). The legal framework for evaluating a Rule 12(b)(6) motion to dismiss

prescribes that a complaint "should not be dismissed for failure to state a claim unless it appears

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him for relief." Atchinson at 422, citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Evaluating the pending motion insofar as it is a motion for summary judgment, the Court

may take into consideration the pleadings, discovery materials, affidavits and other evidence. See

Fed.R.Civ.P. 56(c). Summary judgment should be granted pursuant to Fed.R.Civ.P 56 only if the

moving party has demonstrated that there is no genuine issue of material fact and that it is

entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

When ruling upon a motion for summary judgment, the Court must view the evidence in the light

most favorable to the nonmoving party and draw all reasonable inferences in favor of the non-

moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986);

Bayer v. United States Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992).

With respect to the issue of qualified immunity, the burden of proof is upon the

defendants to establish that the mass arrests were privileged. See, Dellums v. Powell, 566 F.2d

167, 175-76 (D.C. Cir. 1977). It is undisputed that plaintiffs were arrested without a warrant, and

therefore the unlawfulness of the plaintiffs' arrest and subsequent imprisonment is presumed as a

matter of law. Id. At 176. The burden is therefore upon Mayor Williams and Chief Ramsey to

demonstrate that the facts on *each element* of the immunity defense, taken in the light most

favorable to plaintiffs, are nonetheless so clearly in their favor that reasonable persons "could

entertain no doubt with regard thereto." Id. at 183; See also, id. at 176 (evaluation of reasonableness must take into account the totality of the circumstances).

The plaintiffs have substantially exceeded their pleading obligations, and particularly in light of the admissions and evidence to date even in the absence of discovery, have sufficiently demonstrated and alleged a violation of clearly established constitutional rights to survive this very early dispositive motion.

The defendants have failed to satisfy their burden of proof for recognition of a privilege of qualified immunity, nor could such immunity be recognized in light of the allegations, evidence and pleadings to date.

For the reasons stated below, the motion should be denied.

## II.     Summary of the Facts

On September 27, 2002, MPD Chief Charles Ramsey, on the scene at Pershing Park, oversaw the arrest of 400+ demonstrators, legal observers, politically interested passers by, bystanders and onlookers for "failure to obey" an order that was not given. There was no notice, no warning, no opportunity to disperse, just a relatively swift mass arrest as the D.C. Metropolitan Police and U.S. Park Police surrounded, trapped and arrested all within the park - preventing those who sought to leave or disperse from doing so. The arrestees were kept overnight in harsh conditions with their wrists cuffed to their ankles. Hundreds of others were arrested under similar circumstances at mass arrests at Vermont and K Streets. Within hours, brushing aside questions about the arbitrary and unlawful nature of these sweeping false arrests, Mayor Anthony Williams and Chief Ramsey convened a press conference to exploit for these events for their political and personal benefit. They have each, since, time and time again ratified

4

and approved the fact of these arrests. Notwithstanding an internal MPD investigation that confirmed the unlawful nature of these arrests, no serious disciplinary action has been taken, and no responsibility assumed by either Williams or Ramsey. According to one press account, faced with more anti-globalization protests, Ramsey says he'll do it again.[3]

In the interests of brevity, the complete recitation of facts is not set forth herein, but can be found in the accompanying statement of material facts.

## III.    The Plaintiffs Sufficiently Allege Violation of Clearly Established Law

Defendants represent that, upon invocation of the qualified immunity doctrine, in order to protect defendants from the burden of suit, the Court is to foreclose discovery until the qualified immunity issue is resolved upon summary judgment.[4]  In support, defendants rely upon, and cite with favor, the case of Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) as well as Harlow v. Fitzgerald, 457 U.S. 800 (1982). However, Mitchell and Harlow clearly establish that, unless the constitutional right was not clearly established at the time of its violation, plaintiffs *are* entitled to discovery where plaintiffs present a substantial complaint alleging violation of clearly established law.

> "[T]he *Harlow* Court refashioned the qualified immunity doctrine in such a way as to 'permit the resolution of many insubstantial claims on summary judgment' and to avoid 'subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery' in cases where the legal norms the officials are alleged

---

[3] Jason Cherkis, "Boss Hogtie," *The Washington City Paper*, January 17 - 23, 2003 (Attachment 5).

[4] "[Q]ualified immunity protects the official not only from liability, but from suit as well . . . . To that end, the immunity is intended to apply to permit the issue to be determined upon summary judgment with discovery foreclosed until the issue is resolved. [citations omitted]" Defendants' Memorandum of Law at 25 - 26, citing, Mitchell v. Forsyth, 471 U.S. 511, 526 (1985).

to have violated were not clearly established at the time. [citation omitted]

Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. See *id.*, at 818. Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts. *Harlow* thus recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law." Mitchell at 526, citing Harlow at 817.

According to Mitchell, dismissal on qualified immunity grounds prior to discovery is not appropriate where the plaintiff's allegations state a claim of violation of clearly established law.

In the instant case, plaintiffs' allegations state a claim of violation of clearly established law to be free "from the unreasonable seizure of one's person"[5] and to be free "from government disruption of, interference with, or retaliation for, engagement in free speech, assembly, association, petition and free press activities."[6]

The rights alleged to have been violated in this complaint are clearly established, both in principle and in the particular circumstance of mass arrests of political demonstrators.

The D.C. Circuit, entertaining litigation related to the government political disruption operations of the 1960s and 1970s, explicitly addressed the issue of police actions calculated to disrupt First Amendment protected expression or protest, holding by no later than 1967 that "the existence of a First Amendment right of association for lawful purposes was beyond dispute and its broad contours were quite clear." Hobson v. Wilson, 737 F.2d 1, 27 (D.C. Cir. 1984).

---

[5] Plaintiffs' First Amended Complaint ¶ 171.

[6] Id.

6

There need not be a prior case with factual circumstances precisely on point in order for a right to be clearly established. See, e.g., Hobson v. Wilson, 737 F.2d 1, 26 (D.C. Cir. 1984) (disruptive counterintelligence actions taken by law enforcement against black political activists violated clearly established First Amendment Rights even though the exact conduct at issue had never been proscribed).

"The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The type of mass arrests at issue in the instant case have, in particular, been clearly established as unconstitutional and unlawful. The case now before the Court is virtually identical to that before the D.C. Circuit in Dellums v. Powell, which arose in the context of mass arrests in Washington, D.C. in connection with a May 5, 1971 protest on the Capitol steps against the Vietnam War. The Dellums arrestees advanced claims pursuant to the First, Fourth, Fifth and Sixth Amendment as well as claims arising under 42 U.S.C. § 1981 et seq. and D.C. law. See, Dellums v. Powell, 56 F.2d 167, 173 (D.C. Cir. 1977).

In Dellums, the Court of Appeals upheld jury findings of liability under the First and Fourth Amendments against District of Columbia Police Chief Jerry V. Wilson and against U.S. Capitol Police Chief James M. Powell, where those police chiefs were sufficiently responsible for the mass arrest of protestors for liability to attach. See, Dellums v. Powell, 566 F.2d 167 (D.C. Cir. 1977) ("Dellums I"); Dellums v. Powell, 566 F.2d 216 (D.C. Cir. 1977) ("Dellums

II").

The rulings in <u>Dellums</u> are confirmed and complemented by reference to the D.C.

Circuit's holdings in <u>Washington Mobilization Committee v. Cullinane</u>, 566 F.2d 107 (D.C. Cir

1977), in which plaintiffs challenged as unconstitutional the tactics of the MPD's Civil

Disturbance Units in conducting mass false arrests in connection with a series of mass

demonstrations during the turbulent Vietnam War era.

The <u>Dellums</u>/<u>Cullinane</u> rulings articulate very clear guidelines and restrictions upon law

enforcement's use of police lines, its authority to order demonstrators to move on, or to arrest

demonstrators for failure to obey a police order to move on, its authority to disperse mass

demonstration activity, and its authority to conduct sweeping mass arrests.

**A.      Under Clearly Established Law, Police Are Constitutionally Prohibited From Mass Arresting a Demonstration Absent A Dispersal Order to the Group (or to Each Demonstrator Individually) and Opportunity to Disperse**

"It is the tenor of the demonstration as a whole that determines whether the police may

intervene; and if it is substantially infected with violence or obstruction the police may act to

control it as a unit." <u>Cullinane</u>, 56 F.2d 107, 120.

In other words, police cannot act to control a demonstration as a whole just because some

subset of individuals are alleged to, or in fact, have acted with violence or obstruction. To

authorize police to act to control a demonstration as a unit, the demonstration as a whole must be

"substantially infected with violence or obstruction." Otherwise, the police must act against

violent or obstructive individuals as individuals, and are restrained by the constitutional rights of

8

others from acting against the demonstration as a group.[7]

*The authority to intervene, however, cannot be equated with the authority to arrest,* which has the obvious adverse effect of forcing the cessation of free speech activity of the arrestee, as well as depriving the arrestee of her liberty.

The limited authority of the police to intervene against a demonstration as a group is an authority borne of practicality. "Confronted with a mob the police cannot be expected to single out individuals; they may deal with the unit as a crowd." Cullinane, 566 F.2d 107, 120. This authority is necessarily overbroad, as it authorizes the police to intervene against persons who have not been violent or obstructive in the interest of maintaining or restoring order overall.

It is axiomatic under the Fourth Amendment that "one who has violated no law may [not] be arrested for the offenses of those who have been violent or obstructive." Cullinane, 566 F.2d 107, 120. The First Amendment, likewise, restricts the ability of the state to punish a person because of her political association with others who may engage in prohibited conduct including violence.[8]

---

[7] See, Cullinane, 566 F.2d 107, 128 n.7 (Statement of Chief Judge Bazelon regarding vote to deny rehearing *en banc*).

[8] The U.S. Supreme Court has held, "The First Amendment similarly restricts the ability of the State to impose liability on an individual solely because of his association with another. In Scales v. United States, 367 U.S. 203, 229, the Court noted that a 'blanket prohibition of association with a group having both legal and illegal aims' would present 'a real danger that legitimate political expression or association would be impaired.' The Court suggested that to punish association with such a group, there must be 'clear proof that a defendant 'specifically intend[s] to accomplish [the aims of the organization] by resort to violence.' Ibid. (quoting Noto v. United States, 367 U.S. 290, 299). Moreover, in Noto v. United States, the Court emphasized that this intent must be judged 'according to the strictest law' for 'otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not

Consequently, while the police are authorized to intervene to control a demonstration as a unit through, for example, dispersal orders or directives to move on, the police are <u>not</u> authorized as an initial matter to arrest a demonstration as a group even if there is substantial infection of violence or obstruction. Otherwise, the police would be (unconstitutionally) arresting the law-abiding group members and/or bystanders for the alleged offenses of some others.

To avoid this, <u>Cullinane</u> requires "notice and an opportunity to disperse before arrests of the crowd 'as a unit' would be constitutionally permissible. Moreover, the 'fair notice' required by the <u>Cullinane</u> court is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." <u>Dellums</u>, 566 F.2d 167, 181 n.31, <u>citing</u> <u>Cullinane</u> at 120.

This is a bright line rule established clearly under well settled law: Where a group contains persons who have not been violent or obstructive, police may <u>not</u> mass arrest the demonstration as a group without first providing the group *as a group* with fair warning or notice and the opportunity to come into compliance or disperse.[9]

Where police have the authority to issue a warning or order to disperse, but lack the

_____

necessarily share.' <u>Id</u>., at 299-300." <u>N.A.A.C.P. v. Claiborne Hardware</u>, 458 U.S. 886, 918-19 (1982).

[9] Such was the case in <u>Cullinane</u>, where the Court held, "The record here indicates that not all of the arrestees were violent or obstructive or noisy indeed, plaintiffs introduced testimony that only a small minority of the demonstrators were involved in any mischief. Thus not everyone arrested was violating the Capitol Grounds statute even as that statute is interpreted by Chief Powell. Accordingly, <u>Cullinane</u> would require notice and an opportunity to disperse before arrests of the crowd 'as a unit' would be constitutionally permissible. Moreover, the 'fair notice' required by the <u>Cullinane</u> court is notice reasonably likely to have reached all of the crowd despite any noise the demonstrators may have been making." <u>Dellums</u>, 566 F.2d 167, 181 n.31, <u>citing</u>, <u>Cullinane</u> at 120 n.4.

ability to communicate that warning to the group as a whole, the police are constitutionally

required to warn each demonstrator *individually*, with opportunity to comply or disperse, before

arresting that demonstrator. See, Dellums, 566 F.2d 167, 184 n. 42.

The D.C. Circuit has cautioned law enforcement, with clarity and particularity:

> "We do not suggest of course that one who has violated no law may be arrested for
> the offenses of those who have been violent or obstructive. As we have seen however
> the police may validly order violent or obstructive demonstrators to disperse or clear
> the streets. If any demonstrator or bystander refuses to obey such an order after fair
> notice and opportunity to comply, his arrest does not violate the Constitution even
> though he has not previously been violent or obstructive." Cullinane, 566 F.2d 107,
> 120.

This is a constitutional standard that is consistent with District of Columbia law on

disorderly conduct, which requires police to first order to move on persons who congregate on

the street in a disorderly manner.[10] Police cannot, as an initial matter, arrest a demonstration for

"parading without a permit."[11]

---

[10] "Whoever, with intent to provoke a breach of the peace, or under circumstances such
that a breach of the peace may be occasioned thereby . . . congregates with others on a public
street and refuses to move on when ordered by the police. . . shall be fined not more than $250 or
imprisoned not more than 90 days, or both." D.C. Code § 22-1321.

[11] Contrary to the claims or suggestion of defendants, the police cannot as an initial matter
arrest protesters for "parading without a permit" in the context of mass demonstration activity.
Under Dellums and Cullinane, and in light of the constitutionally protected nature of mass
demonstration activity, absent some other independent basis or probable cause to arrest, it is clear
that warnings must first be given. The violation of "parading without a permit" is not an
arrestable criminal offense under D.C. law, as it is not a misdemeanor or even a minor criminal
offense, but is merely a minor civil regulatory traffic infraction, see 18 DCMR 2603.1, which the
Council of the District of Columbia has expressly "decriminalized." See D.C. Code § 50-
2301.01; District of Columbia v. Sullivan, 436 A.2d 364, 365-66 (D.C. 1981)(D.C. Council
authorized to decriminalize traffic violations). The enforcement mechanism is through a ticket or
"notice of infraction," which is subject to administrative review. D.C. Code § 50-2301.56; 18
DCMR § 3003. Police are hardly powerless in the face of an unpermitted demonstration, as they
are under the law authorized to arrest after notice and opportunity to comply where
demonstrators fail to obey a lawful police order, or remain congregated in the street in a

This is a constitutional standard that is consistent with the police procedures in the applicable MPD Manual for Mass Demonstrations and Responding to Civil Disturbances, the 1996 revision[12] of which Chief Ramsey admits dictated the policies and procedures to be used on September 27, 2002.[13]

According to the 1996 MPD Manual for Mass Demonstrations, crowd dispersal (as distinguished from mass arrest) is allowed under the following conditions only, and require warnings to disperse:

> "When the intensity level of a crowd arises and unlawful disruption, either through violent or passive means, is occurring to the extent that the Field Commander determines that there is a need to make a positive police response, *he will instruct the affected unit commanders*, where time and circumstances permit, *to issue warnings to the crowd to disperse. . . .*"[14] (emphasis added).

> Mass arrest is authorized only as follows:
> "(1)  If, after a reasonable amount of time following the <u>initial</u> warnings, the crowd refuses to disperse, the unit commander shall issue a final warning ordering the participants to disperse or to be subject to arrest.

---

disorderly manner after fair warning has been given. On the other hand, police are also allowed to simply exercise their discretion and permit demonstration activity to occur which, absent some truly compelling reason to disrupt an assembly, is the best course as a policy matter.

[12] Plaintiffs note, to avoid confusion, that defendants submitted with their motion, a 119 page attachment entitled "Metropolitan Police Department Standard Operating Procedures for Mass Demonstrations, Response to Civil Disturbances and Prisoner Processing," which is the **May, 2003 revision** of the mass demonstration manual. That revision was *not* the applicable revision on November 27, 2002. Defendants also submit a 4 page attachment entitled "Metropolitan Police Department Manual for Mass Demonstrations and Responding to Civil Disturbances," which are excerpted from the **January, 1996** revision. Plaintiffs have submitted as an attachment herein, a full copy (*without* the appendices) of the January, 1996 version (Attachment 1).

[13] Ramsey Decl. at 3, ¶ 11 (Attachment 2).

[14] MPD Manual on Mass Demonstrations (1996 rev'n) at 20 (Attachment 1).

(2)      If, after a reasonable amount of time following the <u>final</u> warning, the crowd continues in its refusal to disperse, the unit commander shall direct that the violators be arrested."[15]

Warnings are required by the MPD manual, and the Constitution, to be audible to every person who is subject to arrest for failure to obey or disperse. The 1996 MPD Manual for Mass Demonstrations provides, in this respect, as follows:

"a.    <u>Issuance of Warnings</u>

(1)      The issuance of warnings shall be of such amplification and repetition as to be heard by the entire assemblage.

(2)      Issuances shall be made by the unit commander from stationary vantage points that are observable to the crowd, or to a large number of participants.

(3)      Additional warnings, where necessary, shall be given from police vehicles, equipped with public address systems, moving around the crowd.

(4)      The warning shall consist of an announcement citing the offenses or violations that are being committed by the participants, and a request for order, which ever is applicable, that the crowd disperse. Whenever possible, this warning shall be written out prior to the announcement, to ensure clarity and accuracy, and consistency, if the warning is repeated.

(5)      the entire warning process shall be documented by means of an audio-visual recording, if available."[16]

This is the manual that Chief Ramsey is referring to when he stressed on September 27, 2002 in response to press inquiries that "We gave warnings" and "followed everything by the book."[17]

---

[15] MPD Manual on Mass Demonstrations (1996 rev'n) at 21 (Attachment 1).

[16] MPD Manual on Mass Demonstrations (1996 rev'n) at 21 (Attachment 1).

[17] David Ho, "Police Arrest 649 During Capital Demonstrations Against Globalization, Other Causes," *Associated Press*, September 27, 2002 (Attachment 3); <u>see</u>, <u>also</u>, Lehrer Online Newshour, September 27, 2002 (Ramsey: "We gave warnings. I mean, when you've got large

Since the obligations of "the book" are clearly established, as are the consistent

obligations under the U.S. Constitution, there is no excusing the District of Columbia's

deliberate indifference to, and willful violation of, the constitutional rights of plaintiffs.

**IV.  Chief Ramsey and Mayor Williams May Be Held Individually Liable for Their Wrongful Actions In Causing and/or Ratifying the Mass Arrests Under 42 U.S.C. §1983**

The Supreme Court has directed that Section 1983 "should be read against the

background of tort liability which makes a [person] responsible for the natural consequences of

his actions." Monroe v. Pape, 365 U.S. 167, 187 (1961).

The legal standard for constitutional responsibility under § 1983 is proximate causation.

> "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that causes the deprivation of which complaint is made . . . Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Johnson v. Duffy, 588 F.2d 740 (9th Cir. 1978).

The D.C. Circuit distinguished in Haynesworth v. Miller between supervisory liability

that attaches due to non-feasance or lack of attentiveness from that which attaches due to

malfeasance or affirmative misconduct by supervisors.  Haynesworth, 820 F.2d 1245,1260-61

(D.C. Cir. 1987).

In the instant complaint, it is conceivable given the allegations, established facts,

admissions to date, and other evidence, that Chief Ramsey and Mayor Williams could be found

---

groups - a lot of noise and things like that - but we gave warnings - we followed everything by the book.") (Attachment 4).

legally responsible and individually liable under either the non-feasance or deliberate

indifference framework *and/or* under the malfeasance or affirmative participation framework.

A.      **Chief Ramsey Participated in the Mass Arrest Decision**

Chief Ramsey's contention that he lacked sufficient involvement to be held legally

responsible for the mass political arrests can be dispensed with most directly with reference to

Dellums v. Powell, 566 F.2d 216 (D.C. Cir. 1977), in which the D.C. Police Chief Jerry V.

Wilson contended he was insufficiently involved with the mass arrests in connection with anti-

Vietnam War protests for liability to attach. There, the D.C. Circuit upheld the jury finding of

liability, where the Chief retained personal operational control at the scene and could have

withdrawn officers had he so desired, and had  "collaborated on the charge upon which arrests

were to be made," and advised against taking additional steps to ensure the effectiveness of

dispersal orders when there was "some doubt" that the orders had been heard. Dellums, 566 F.2d

at 219.

In the instant case, according to Chief Ramsey's affidavit he "was in overall command of

the department" for the events at issue,[18] he consulted with Assistant Chiefs Newsham and

Fitzgerald regarding the charges, Newsham informed Ramsey that believed he could arrest the

group of demonstrators without first ordering them to disperse and providing an opportunity to

comply,[19] Ramsey arrived at the scene after mass arrest busses had been summoned but before

---

[18] Ramsey Affidavit at 2, ¶ 2 (Attachment 2).

[19] "Accordingly, as he explained [to Chief Ramsey at the scene], Assistant Chief Newsham believed that he had probable cause to arrest persons who had entered the park, based upon offenses they had committed before entering Pershing Park, without ordering them to disperse and awaiting their response." Id. at 5, ¶ 18.

they had arrived,[20] and remained at the scene of Pershing Park for perhaps "less than an hour"[21] with apparent approval of the mass arrest operation and during which time he could have withdrawn the officers had he so desired.

Chief Ramsey concedes in his affidavit that, at the time, he knew that no orders to disperse had been given.[22] Nevertheless, the plaintiffs were charged with a failure to obey. There is no allegation in his affidavit that the demonstration group was substantially infected with violence or obstruction. See, Dellums, Cullinane.

Measured against Dellums, it is clear that Chief Ramsey acted with sufficient involvement or participation as to preclude dismissal or summary judgment.

## B.    Chief Ramsey Ratified The Mass Arrests

The District defendants concede that an official can be held individually liable for the ratification of an unconstitutional act" Def's Memorandum at 23, citing, Williams v. Smith, 781 F.2d 319, 324-25 (2d Cir. 1986).

Chief Ramsey ratified the mass arrests at the scene through: 1) his direct participation on the scene; 2) his summary rejection of complaints that persons were arrested even though they

---

[20] Id. at 6, ¶ 22 (Attachment 2).

[21] Id. at 6, ¶ 23.

[22] According to published reports of the Chief and Mayor's afternoon press conference called to publicize their mass arrests, the Chief stated at the time that "We gave warnings." Jason Cherkis, "Boss Hogtie," *The Washington City Paper*, January 17 - 23, 2003 (Attachment 5); See, also David A. Fahrenthold and David Nakamura, "Doubt Cast on Arrests of IMF Protesters," *The Washington Post*, February 27, 2003, B1 ("Police Chief Charles H . Ramsey . . . acknowledged for the first time yesterday that it was unclear whether the crowd was given an order to disperse from the park, at 15th Street and Pennsylvania Avenue NW. But he said that issue was irrelevant, because the protesters had no permit and ignored police orders to clear the streets earlier in the day.") (Attachment 6).

sought to leave;[23] 3) at his September 27, 2002 press conference to express approval of the mass arrests, including where he explained that protesters "put themselves in a position to be arrested"[24]; 4) on September 29, 2002 when he ratified the arrests again explaining that he was happy with the way his department handled the protests, adding that "a lot of wind was taken out of their sails Friday";[25] 5) on September 30, 2002 when he ratified the arrests, explaining that police "gave them all the warning we felt we needed to give them,"[26] and stated "I offer no excuses, and no apologies" and rated his department's actions as an "A+," among other statements;[27] 6) in January, 2003 when he told the *Washington City Paper* that "we probably will" do more mass arrests in the future;[28] 7) on February 26, 2003 after admitting that it was "unclear" whether warnings were given, when Ramsey again stated "I certainly offer no apologies"[29]; 8) on April 29, 2003, when in the context of a D.C. Council investigation into the mass arrests, Ramsey explained that the MPD does "a very good job in dealing with" mass

---

[23] Video available at http://www.washingtonpost.com/wp-srv/mmedia/metro/092702-5v.htm (Attachment 36, video on CD-ROM to be filed separately).

[24] Jason Cherkis, "Boss Hogtie," *The Washington City Paper*, January 17 - 23, 2003 (Attachment 5).

[25] Manny Fernandez and Monte Reel, "Against War, a Peaceful March," *The Washington Post*, September 30, 2002 (Attachment 7).

[26] By a Washington Post Staff Writer, "Did D.C. Police Go Too Far? Legal Experts Debate Legality of Mass Arrests," *The Washington Post*, October 1, 2002, B1 (Attachment 8).

[27] "USA: Activists Decry Police Tactics in Anti-Globalization Protests," *Agence France Press*, October 1, 2002 (Attachment 9).

[28] Jason Cherkis, "Boss Hogtie," *The Washington City Paper*, January 17 - 23, 2003 (Attachment 5).

[29] David A. Fahrenthold and David Nakamura, "Doubt Cast on Arrests of Protestors," *The Washington Post*, February 27, 2003, B1 (Attachment 6).

demonstrations; 9) In his recommendation that no person be given any disciplinary action whatsoever for the mass arrests[30]; 10) in his sworn statement to this motion where he ratifies the arrest of the bicyclists;[31] and in the final review, where there is insufficient disciplinary action or reforms taken to preclude future recurrence.

## C.   Mayor Williams Participated In the Arrests

Mayor Williams, although not on the scene,[32] subjected plaintiffs to an ongoing period of incarceration when on September 27, 2002, he held a press conference to reap political benefit from the Chief's mass false arrests. The Mayor, at that time, *could* have taken measures to intervene, to cease the incarceration or to limit the damage done by demanding arrests cease and persons be released immediately. He had the authority as Mayor. Instead, he exercised his authority to make this an example to others, and to heap praise upon Chief Ramsey for his actions in carrying out the mass arrests. As Mayor Williams evidently knew enough of the details to call a press conference, then he knew[33] or should have known that no order to disperse had

---

[30] Carol D. Leonnig, "IMF Arrests Improper, Police Found," *The Washington Post*, September 13, 2003, B2 (Attachment 10).

[31] Ramsey Decl. at 7, ¶ 27 (Attachment 2).

[32] See, Hampton v. Hanrahan, 600 F.2d 600 (7th Cir. 1979) (reversing directed verdict in favor of supervisors, holding that supervisory liability was a jury issue where supervisors who were not present at the scene, had approved the selection of men and weapons for a raid on the Black Panther Party headquarters, and had directed the early morning hour for the execution of the raid)

[33] It is a reasonable inference that Williams had actual knowledge at the time that no warning and notice to disperse had been given, given Chief Ramsey's admission that he knew this information at the time, and given the fact that the Mayor and Ramsey were engaged in a sufficiently advanced level of communication as to facilitate the convening of a press conference, and given further the Mayor's ongoing unwillingness, even to date, to issue serious discipline.

been given and that there was no probable cause to arrest an entire political assembly including

all bystanders.

**D.     Mayor Williams Ratified The Mass Arrests**

Mayor Williams ratified the mass arrests when on September 27, 2002  he called a 5 p.m.

press conference with Chief Ramsey for the purpose of ratifying the arrests, at which he praised

the execution of the mass arrests as a proper balance between open expression and public

safety[34].

The Mayor has consistently affirmed his approval for the mass arrests of September 27,

2002. *The Washington Post* reported on February 26, 2003,

> "As he has in recent months, the mayor said yesterday that he stood by Ramsey and
> the police actions. 'We're balancing an open society with a safe city,' Williams said
> at his weekly news conference. 'It's important to evaluate and review what [police]
> have done but also to recognize that when they are on the spot and making very, very
> difficult decisions, *it's important to back them up.*" (emphasis added)

He has additionally ratified the mass arrests as evidenced by his failure to discipline those

responsible for the September 27, 2002 mass arrests and by failing to take substantive action to

prevent recurrences.[35]

**E.     Chief Ramsey Violated His Duty to Supervise**

Setting aside their participation, refusal to intervene to cause the cessation of ongoing

injury, and concurrent and subsequent ratification, liability can be established based on the

failure of each to supervise his subordinates. Under Haynesworth, the duty to supervise arises

---

[34] Manny Fernandez and David A. Fahrenthold, "Police Arrest Hundreds in Protests," *The Washington Post*, September 28, 2002 at A1 (Attachment 11)

[35] See, Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).

where harm is highly likely given the circumstances of the case. "The duty to supervise is triggered by proof that, absent effective supervision, harm was not merely foreseeable, but was highly likely, given the circumstances of the case. When inaction in the face of a substantial threat of harm is shown, it can be said that the supervisor acquiesced in the resulting constitutional violation, thereby 'linking' the non-feasance with the injury in the manner required. . ." Haynesworth, 820 F.2d at 1261.

The MPD in its Manual for Mass Demonstrations, acknowledges the substantial and likely threat of constitutional violations being committed by its officers in the absence of adequate supervision and adherence to written standards and procedures applicable specifically in the context of mass arrests of demonstrations.[36] In the context of police interventions against demonstration activity, it is highly likely that constitutional violations will occur absent supervision.[37]

The degree of fault needed to implicate a supervisor in the constitutional wrongs of his

---

[36] One of the identified purposes for the MPD Manual on Mass Demonstrations is to "avoid any possible recurrences of these problems" that had previously led to court findings that the MPD was violating the constitutional rights of demonstrators and others. MPD Manual for Mass Demonstrations and Responding to Civil Disturbances at 22 (1996 rev'n) (Attachment 1).

[37] D.C. Circuit Chief Judge Bazelon has related that, "in this situation [mass demonstration situations] more than any other, police misconduct should be minimized to the greatest extent possible. The best ways to do that are through proper training and on-the-spot supervision." Cullinane, 400 F. 2d 107, 128 (D.C. Cir. 1977) (statement of Chief Judge Bazelon regarding vote to deny rehearing en banc). This reflects the sensitivity of First and Fourth Amendment rights to violations by police in this context. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." NAACP v. Button, 371 U.S. 415, 433 (1963). Consequently, police interventions are strictly limited. "[T]he police must of course direct and control demonstrators only to an extent sufficient to protect legitimate state interests." Washington Mobilization Committee v. Cullinane, 566 F.2d 107, 116 (D.C. Cir. 1977).

20

subordinates has been alternately described as being "grossly negligent" or "deliberately indifferent." <u>Haynesworth</u> at 1261.

Here, to the extent that Chief Ramsey seriously advances the excuse that it was all Assistant Chief Newsham's fault, he is directly establishing his own liability for his evident and grossly negligent failure to supervise Newsham. Failure to supervise and exercise appropriate command functions where the individual defendant was aware of how plaintiffs were being treated and acquiesced in such treatment is a basis for liability under section 1983.[38]

There can be no dispute that Chief Ramsey was aware of how plaintiffs were being treated, given his presence at the scene, decision making role, command authority, and the fact that he was fielding reporters' questions about how the MPD could justify arresting people who were not even protesting or were seeking to leave the area.

The applicable three part test under <u>Haynesworth</u> provides that "in order to find a supervisory official personally liable for damages for the unconstitutional acts of his subordinates, it must be shown [1] that he was responsible for supervising the wrongdoer; [2] that a duty to instruct the subordinate to prevent constitutional harm arose from the surrounding circumstances; and [3] that, as a result of the official's failure to instruct, the plaintiff was harmed in the manner threatened." <u>Haynesworth</u>, 820 F.2d at 1262.

_____

[38] <u>See</u>, <u>Baker v. Monroe Township</u>, 50 F.3d 1186, 1193-94 (3d Cir. 1995) (summary judgment for defendants denied where plaintiffs demonstrated sufficient facts from which a jury could infer that the supervisor, who was in the same apartment but not in the same room as where the violations occurred, was aware of how plaintiffs were being treated and acquiesced in such conduct); <u>Burton v. Waller</u>, 502 F.2d 1261 (5th Cir. 1974) (failure to exercise command functions at the scene of the Jackson State shootings was held to be an issue for the jury).

Here, Ramsey admits that he had overall command of the department for these protests,[39] that he delegated to Assistant Chief Newsham responsibilities for the Pershing Park area,[40] that he provided direction and instruction to his command staff regarding these protests;[41] that he was in consultation with Chief Newsham on the scene;[42] that he evaluated the factual and tactical analysis of Newsham's to be consistent with his own observations;[43] that Ramsey was directly working directly with Newsham and discussing the basis for the mass arrest;[44] that Ramsey formed a belief as to whether probable cause existed to mass arrest the whole group;[45] and took no affirmative steps to instruct Newsham not to make the false arrests when Ramsey had the opportunity and authority to do so.

Chief Ramsey, to the extent he claims to have not participated or intervened to stop the false mass arrests, conducted himself in this manner in the face of overwhelming evidence and notice of mass constitutional violations. As reflected in the opening excerpt to this opposition memorandum, when asked at the scene by reporters about the fact that people were being arrested who were not even protesters and who were prevented by police from leaving the park, Ramsey was dismissive. These were factors which he deliberately decided to not take into

---

[39] Ramsey Decl. at 2, ¶ 3.

[40] Ramsey Decl. at 2, ¶ 3.

[41] Ramsey Decl. at 2 - 3, ¶¶ 6 -7.

[42] Ramsey Decl. at 4 - 6, ¶¶ 14 - 23.

[43] Ramsey Decl. at 5, ¶ 16.

[44] Ramsey Decl. at 4 - 6, ¶¶ 14 - 23.

[45] Ramsey Decl. at 6, ¶ 23.

consideration, and that he decided would be left to a judicial fact-finder on another day. It is hard to find a circumstance where affirmative misconduct and deliberate indifference are so plainly evident.

**F.       Mayor Williams Violated his Duty to Supervise**

At the time of the events, Williams had a duty to instruct Ramsey to not engage in mass unconstitutional arrests. The circumstances giving rise to the need to intervene include the remarkable breadth of the arrests, every person in the park.

Like Ramsey, Williams was also deliberately indifferent to the representations of those arrested that they had done nothing wrong. Williams, asked how he feels about nurses who say they were on their way to a conference when they were arrested, dismissed their allegations. "Any allegation always troubles you," the Mayor said, "I happen to believe there isn't a basis. Everybody comes into a situation with their own views and beliefs. That's my view. I'll let you know if there's a change."[46]

Williams has failed his ongoing duty to intervene or supervise. Now that Chief Ramsey has admitted that, contrary to earlier public statements, he did in fact know at the time that there had been no warnings given before the mass arrest of everyone in a public park, Williams still has issued no disciplinary action against Ramsey.

Generally, as an evidentiary matter, an omission or failure can act sometimes be difficult to document. However, the public outcry at Williams' steadfast refusal to take appropriate action

---

[46] Jason Cherkis, "Boss Hogtie," *The Washington City Paper*, January 17 - 23, 2003 (Attachment 5).

has led *The Washington Post* to issue <u>three</u> editorials[47] imploring the Mayor to supervise or to do

something. Similarly, D.C. Council Member Kathy Patterson has been compelled by Williams'

steadfast inaction to publicly implore[48] the Mayor to supervise or cause an end to these

unconstitutional tactics.

**G.     Chief Ramsey and Mayor Williams Can Be Individually Liable For Creating or Allowing the Unconstitutional Policy or Custom of Using Mass Arrests to Terminate Protest**

Defendants concede that a government official may be liable, under § 1983, by creating or

allowing the continuance of a policy or custom giving rise to constitutional violations.

Defendant's Motion at 23, <u>citing</u>, <u>Williams v. Smith</u>, 781 F.2d 319, 324-25 (2d. Cir. 1986).

Defendants, in moving for dismissal, state that Mayor Williams is alleged to be liable for

merely speaking "approvingly" of the MPD having taken "proactive" and "preventative" actions

against persons engaged in mass demonstration activity. This is not a fair statement of the claim,

and to be clear, it is plaintiffs' claim that *both* Chief Ramsey and Mayor Williams can be held

liable pursuant to § 1983 for creating or allowing the surround-trap-and-arrest tactic to be used

by the MPD.

The IMF/World Bank demonstrations in April, 2000 were subjected to almost identical

---

[47] Editorial, "Mishandled Mass Arrests," *The Washington Post*, March 4, 2003 (Attachment 23); Editorial, "A Bust in Pershing Park," *The Washington Post*, April 26, 2003, A24 (Attachment 24);  Editorial, "It Takes a Judge," *The Washington Post*, September 13, 2003, A20 (Attachment 25).

[48] <u>See,</u>  By a Washington Post Staff Writer, "Did D.C. Police Go Too Far? Legal Experts Debate Legality of Mass Arrests," October 1, 2002, B1 (Attachment 8); Manny Fernandez and David A. Fahrenthold, "Protesters and Others Arrested File Suit Against Police, District," *The Washington Post*, November 20, 2002 (Attachment 26); Statement released by Council member Kathy Patterson, February 26, 2003 (Attachment 27).

mass false arrest as the September 27, 2002 IMF/WB protests were. Carol Guzy, Pulitzer Prize

winning photojournalist for *The Washington Post* described the surround-trap-and-arrest tactic as

it was used against her and over 600 demonstrators and bystanders - - just as happened in the

instant case:

> "I've never thought of myself as a threat to society. I seek to document, not damage. But three weeks ago, I found myself handcuffed and arrested, armed only with my camera. . . .
>
> I wasn't alone. Some 600 protesters were arrested on the Saturday before the April 16 World Bank and IMF protests, along with a few tourists, shoppers and anyone else who had the bad luck to be on 20th Street between K and I at about 6 that evening. . . .
>
> There's a delicate dance between the power of authority and the power of the people, with journalists square in the middle. And, in a sense, we dance along. I need the police to give me access, and they know I have a right to it. So we generally come to some sort of working arrangement. But that day, things were different. We stepped on each other's toes during the waltz and I ended up in the slammer. Still, that doesn't explain the 600 other arrests; why the police were so confrontational; why the protesters weren't given an out, as I've seen before. It looked like some kind of preemptive strike. I wonder how it got to that point.
>
> The demonstration began at the Justice Department, and it went pretty typically at first. I photographed a few hundred people--mostly young, mostly peaceful--heading toward the IMF headquarters, which the police had cordoned off. I moved in and out of the crowd, making pictures of dancers in festive red dresses and men beating buckets like drums and chanting, "Is this what democracy looks like?" Mostly, I remember a sense of cooperation, with police leading the way and urging the protesters to remain on the sidewalks. I was simply doing my job. But at about 20th and K streets, we came face-to-visor with a line of riot police.
>
> I turned to see another line of police bringing up the rear. It felt very much as if we had all been led into a trap.
>
> What happened next was chaotic. I was with a group of journalists. At one point I was allowed out of the police lines, then ordered back in. When all the journalists were asked to leave, I headed back out--until I realized that other photographers were still freely shooting inside. When I tried to join them, an officer grabbed me. Another cop twisted my hand behind my back--with a look that matched the pretzel that was my arm. I wanted an explanation. Where was she taking me? Why was she getting rough? I was properly credentialed media, after all. That's when they put the cuffs on.

All I could think then was how unfair it was, but, looking back, it's clear that I'd gotten caught up in a bigger sweep. I never heard police ask the crowd to disperse. What I did hear was the demonstration leaders volunteering over a bullhorn: 'We are nonviolent. We will disperse two by two.' But to no avail. They were simply handcuffed, loaded into buses and trucked away."[49]

There is no denial on the part of the defendants that their tactics with respect to IMF/WB demonstrations in April 2000 were just as they were for the September, 2002 protests.[50] The circumstances of the two mass arrests, as alleged and evidenced, are strikingly similar:

• In April, 2000 and September, 2002, there were anticipated to be a week or weekend of protests against the policies of the IMF / WB;

• In April 2000 and September, 2002, the police mass arrested hundreds of demonstrators and bystanders in the absence of probable cause, and held them overnight in order to keep them off the streets;

• In April, 2000 and September, 2002, demonstrators were lawfully engaged in political free speech activity;

• In April, 2000 and September, 2002, without prior notice the police surrounded the entirety of that demonstration;

• In April, 2000 and September, 2002, police prevented demonstrators from leaving notwithstanding requests to do so;

• In April, 2000 and September, 2002, police mass arrested all those demonstrators and bystanders whom they had surrounded;

• In April, 2000 and September, 2002, owing to claimed "technical difficulties" in processing, demonstrators were held overnight, some for as long as 30 hours, denying them sleep, liberty and the opportunity to demonstrate during that period or during the subsequent period of exhaustion.

---

[49] Carol Guzy, "I'll Tell You What's Wrong With This Picture," *The Washington Post*, May 7, 2000, B2 (Attachment 12).

[50] Defendant's Memorandum in support of Motion to Dismiss at 7 ("MPD made preparations for the September 2002 IMF / WB meetings as it had for each IMF / WB meeting starting with the April 2000 events.").

A confidential document signed by Steven Gaffigan, a high level MPD official, was produced in other protest related discovery and is consistent with an intentional policy, practice or custom of mass arresting demonstrators just before or on the first day of anticipated demonstrations and keeping them locked up and deprived of sleep overnight.

The document, which is a planning document for an MPD police training video, has the following entry:

> "**Police Tactics and Issues**
> [material excerpted for brevity]
> •      Tactics - Sleep deprivation tactics
> •      Tactics - Locking up the troublemakers on the first night."[51]

At the Inauguration of George W. Bush, the police are alleged to have the same surround-trap-and-arrest tactic, detaining demonstrators for upwards of an hour until the sheer number of demonstrators made the continuation of the tactic impracticable.

In addition to the references of Mayor Williams to the IMF/WB mass arrests as "proactive" and "preventive" policing, the MPD has specifically defended these tactics. Their ongoing practice is evidenced by these instances and the instant claims.

These practices violate both the U.S. Constitution and the MPD Manual on Mass Demonstrations. There is no evidence that these practices have been or will be discontinued. Therefore injunctive relief, upon proof with the benefit of a complete record and discovery, is appropriate and Lyons is not a bar, as these are ongoing tactics applied against targeted demonstrators in the District of Columbia and are likely to recur. Furthermore, declaratory and injunctive relief is necessary to limit the ongoing chilling effect on free speech activities that

_____

[51] Confidential training document, "Video Treatment - MPD Training Tools - 6/18/01" (Attachment 13).

exists from these arrests.

**V.     Neither Chief Ramsey Nor Mayor Williams Are Immune from Responsibility for These Mass Arrests**

With respect to the issue of qualified immunity, the burden of proof is upon the defendants to establish that the mass arrests were privileged. See, Dellums v. Powell, 566 F.2d 167, 175-76 (D.C. Cir. 1977). It is undisputed that plaintiffs were arrested without a warrant, and therefore the unlawfulness of the plaintiffs' arrest and subsequent imprisonment is presumed as a matter of law. Id. At 176.

The burden is therefore upon Mayor Williams and Chief Ramsey to demonstrate that the facts on *each element* of the immunity defense, taken in the light most favorable to plaintiffs, are nonetheless so clearly in their favor that reasonable persons "could entertain no doubt with regard thereto." Id. at 183.

They have failed to make this showing. It was clearly objectively unreasonable for any person to believe that there was probable cause to arrest the demonstrators *as a group*.

It is fatal to the Mayor's claim of qualified immunity, in light of the Mayor's burden of proof, that he has declined to submit an affidavit attesting to the circumstances by which he claims his approval and repeated ratification of these mass arrests is objectively reasonable.

Neither the Mayor nor the Chief have made the requisite showing for dismissal, nor is it likely for them to be able to do so where the MPD's own internal report has found that "There is no evidence to support the claim that every person in the park had been involved in an unlawful advancement toward the park – either on foot or on bicycle."[52] That same report also finds that

---

[52] Final Report Relative to Complaints of Alleged Misconduct at 7 (Attachment 14).

"The decision to arrest *everyone* in Pershing Park was not sound."[53]

With respect to Chief Ramsey, he admits that at the time he knew that no warnings to disperse, or opportunity to disperse had been given (setting aside that there is no evidence of the necessary predicates of substantial infection of violence or obstruction to justify even the dispersal of the assembly in the park). Yet, he participated in, failed to halt, approved and ratified the mass arrests.

It is objectively unreasonable for the Chief to have arrested everyone in Pershing Park as a unit where he was advised by Assistant Chief Newsham that demonstrators who had allegedly been ordered by the MPD to move from the street had, in fact, moved from the street and entered Pershing Park.[54]

Even assuming *arguendo* the truth of every single basis cited by Chief Ramsey in his affidavit, it is objectively unreasonable to have believed (or arrested on the basis) that there was probable cause that the group as a group was subject to arrest. *None* of the bases cited by Ramsey encompass, individually or collectively, all of the individuals in the park and none relate to the group in the Park as a group. At best, it is a hodge podge of allegations regarding alleged misconduct of persons who are identified with no greater specificity than political affiliation, the fact that they are demonstrators, and in most instances the allegations are of misconduct at a different time and location and are not criminal in nature but are, in fact, minor civil infractions

---

[53] Final Report Relative to Complaints of Alleged Misconduct at 8 (Attachment 14).

[54] Ramsey Decl. at 4-5, ¶ 15 (Attachment 2).

of traffic regulations,[55] such as jaywalking, for which arrest is not appropriate and which do not

constitute obstructive conduct meriting arrest any more than a stream of people leaving the MCI

Center after a sporting event can be arrested for parading without a permit. Even upon

investigation, the MPD claims only that "it is likely" that "several" officers may have "shouted"

something at unspecified demonstrators, but this is hardly sufficient.

It is objectively unreasonable for Chief Ramsey to mass arrest on the basis of the

representation of Assistant Chief Newsham that "he believed that persons who had not been

involved in unlawful activity had been provided an opportunity to leave the park," when the issue

is whether the persons in the park had been provided *notice and fair opportunity to leave*.[56] Chief

Newsham's explanation for why the MPD gave no warning, that an order to disperse is

constituted implicitly by "the visible presence of the police,"[57] is clearly vacuous.

It is objectively unreasonable for Chief Ramsey to have arrested every single person in

---

[55] According to Newsham, as demonstrators flowed into the park, some allegedly "disobeyed traffic signs" and there "were a number of officers that monitored this, as the people came from different directions the collected in the park." Statement of Assistant Chief Newsham at 2. "[T]he groups that I observed, they would get to an intersection, and they would go straight across the street even against the, the traffic signals, and they would, it was causing traffic to have to stop avoiding them." Id. at 3 (Attachment 15).

[56] Chief Newsham does not state that he provided *demonstrators* with the opportunity to leave, nor does he apparently feel that that opportunity was needed because he has, in essence, criminalized their dissent by imputing an unlawful intention upon all those who would demonstrate. See, Statement of Newsham at 6 (There weren't that many people in the park when I first got there, before the protestors got into the park, but there were some people and a number of those people were allowed to leave.")(Attachment 15).

[57] Statement of Assistant Chief Newsham at 4 (Attachment 15).

the park on the basis that some individuals[58] at some time had threatened to "shut down" the city

or "disrupt" business as usual to draw attention to matters of political and public concern.

Throughout his public statements, made with Mayor Williams' apparent approval, Chief

Ramsey explains that he and the MPD were entitled to engage in these sweeping mass arrests

because some unidentified individuals (who the government elected to <u>not</u> attempt to take legal

action against, even though such action was considered) threatened to shut the city down or

disrupt business as usual in order to focus attention on matters of public concern.

Even without knowing the exact threat that the Chief[59] is referencing about shutting down

the city, it remains clear that the constitutional right to free speech is broad, particularly where

political speech or hyperbole[60] is concerned.

---

[58] Organizers for the Anti-Capitalist Convergence (ACC) issued a public statement condemning police " 'for spreading lies about the nature of the demonstrations and the actions planned. Thus far, the ACC has mainly been planning and publicizing marches on K Street and bike rides and anti-war leafleting and theatrical production.' The statement said accusations that the group is planning violence are 'reckless and unfounded.'" Referencing a web site identified by police as promoting an unlawful "scavenger hunt," ACC members disclaimed the site, explaining that they did not endorse the scavenger hunt or the web site, which was run by an individual who was <u>not</u> organizing with their group. Manny Fernandez and David A. Fahrenthold, "Police Consider Legal Action in Effort to Disrupt Protests," *The Washington Post*, September 21, 2002, at B2 (Attachment 28).

[59] The Chief sets the tone at the MPD. His statements imputing criminal intent to all those who would demonstrate on September 27, 2002 was adopted by his subordinates, including Assistant Chief Newsham, who justifies the mass arrests as in the "best interests of the city." Newsham explains, "I think [we] saved the city a lot of damage because of the, you know, there was a lot of intention that was indicated prior to these demonstrations that these people wanted to disrupt the city." Statement of Newsham at 6 (Attachment 15).

[60] There is nothing in the record to even suggest statements by protesters that are even similar to the following political statements that have been held by the U.S. Supreme Court to be protected speech. In <u>Rankin v. McPherson</u>, 483 U.S. 378 (1987), the U.S. Supreme Court ruled that a probationary government employee's First Amendment rights had been violated after the government fired her for having stated while on the job, upon hearing of an assassination attempt

Even *if* statements of wrongful intent made by some as-yet-unidentified individuals at some point in time at some other location were indeed criminal, it was objectively unreasonable for Chief Ramsey or Mayor Williams to have believed that all 400+ arrested in Pershing Park held such an intent.[61] That is the criminalization of dissent, to impute unlawful intent onto a group merely because they engage or associate in political dissent.

It is objectively unreasonable for Chief Ramsey and Mayor Williams to have participated or ratified the mass arrest of everyone in Pershing Park where the record clearly indicates that law abiding persons were arrested without cause and without notice and an opportunity to disperse.[62] These mass arrests were so sweeping that, according to the MPD, they may have arrested three undercover police officers from Chicago.[63]

According to Ramsey, he has no recollection that the Park was even sealed off or surrounded when he arrived,[64] so it was evident that with any movement of persons in or out of the park, the composition of the park was changing and it would be objectively unreasonable to

---

on President Ronald Reagan, "Shoot, if they go for him again, I hope they get him."

In Watts v. United States, 394 U.S. 705 (1969), the U.S. Supreme Court, citing the First Amendment, protection of political hyperbole, and a "profound national commitment to the principle on public issues should be uninhibited, robust, and wide-open," reversed a conviction for making a threat upon the life of the President where at a public rally at the Washington Monument, Mr. Watts stated "I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."

[61] Dellums v. Powell, 566 F.2d 167, 180 n.30 (D.C. Cir. 1977) (objectively unreasonable for Chief to act as if all arrestees held unlawful intent).

[62] Washington Mobilization Committee v. Cullinane, 566 F.2d at 120 n.4.

[63] Statement of Herrold at 8 (Attachment 16).

[64] Ramsey Decl. at 4, ¶ 2 (Attachment 2).

believe that all persons in the park had either violated any law, or disobeyed an order given at an earlier time at another location.

With respect to the "Bike Strike," which is described in some greater focus, below, according to Chief Ramsey he knew at the time that the MPD had "permitted"[65] bicyclists to ride in the street as a form of expression. It was, therefore, objectively unreasonable to arrest either the bicyclists or the park as a unit, with knowledge that the bikers were contained therein, absent warning and opportunity to disperse.

Neither the Chief of Police nor the Mayor can prevail on their claim of qualified immunity, unless he can prove that he had reason to believe 1) that the Pershing Park class could lawfully have been ordered from the park or were subject to arrest, 2) that orders to disperse had been given which apprised the crowd as a whole that it was under an obligation to leave; and 3) that a reasonable opportunity had been given to plaintiffs to leave.[66] As the D.C. Circuit has stated under similar circumstances, this is "well settled law which Chief [Ramsey and Mayor Williams were each] obliged to know on pain of losing his qualified immunity."[67]

There is no merit to the implication that Chief Ramsey had an entitlement or an absolute privilege to defer to whatever Assistant Chief Newsham said because Chief Newsham is a

---

[65] "[T]he officers riding along with them were merely keeping them safe *and permitting them to express themselves as they had chosen to do*."Id. at 7, ¶ 27.

[66] Dellums v. Powell, 566 F.2d 167, 183.

[67] Dellums v. Powell, 566 F.2d 167, 183 citing, Wood v. Strickland, 420 U.S. 308, 321-22 (1975).

lawyer.[68]

Where both Chief Ramsey and Mayor Williams have repeatedly ratified, over and over again, these mass arrests, in order for either to prevail on a claim of qualified immunity, they would have to prove that at each instance of approval and ratification, that each had objective reason to believe that these sweeping mass arrests were lawful. They have not even attempted such proof.

**The "Bike Strike"**

With respect to the "Bike Strike," plaintiffs allege that: on September 27, 2003 at about 8:30 a.m., they began a bike ride from Union Station;[69] police were there at the start and all throughout the ride;[70] none of the police directed plaintiffs not to ride their bicycles;[71] as soon as the ride began police on bikes and other vehicles formed a ring around the bicyclists with the front line of police controlling the forward movement of the ride, at times waving bikers onward, and at times waving them to stop for traffic or other reasons;[72] and the bicyclists obeyed all traffic laws during the ride, including all directives from police.[73] Near Pershing Park the bicyclists were

---

[68] In <u>Dellums v. Powell</u>, the D.C. Circuit rejected Chief Powell's defense that he relied on counsel present at the scene and was therefore immune from liability. <u>Dellums v. Powell</u>, 566 F.2d 167, 185 (D.C. Cir. 1977). Among other reasons, the Circuit noted that "Chief Powell, the officer in charge of the Capitol and a man of long experience, was obviously as expert as any counsel who might give him advice."

[69] First Amended Complaint at 23, ¶ 90.

[70] First Amended Complaint at 23 - 24.

[71] First Amended Complaint at 23, ¶ 90.

[72] First Amended Complaint at 23 - 24, ¶ 92.

[73] First Amended Complaint at 24, ¶ 93.

forced into the Park,[74] surrounded by the U.S. Park Police and the MPD and arrested.[75]

Captain Andrew Solberg was assigned to the Bike Strike and "was right with all the bicyclists"[76] from its start at Union Station to its termination with the mass arrest. Captain Solberg describes the bike ride as follows: "the bicycle protestors, although they were bicycling fairly slowly along the streets, at no point near Pershing Park, ever stopped and blocked an intersection or created a mass demonstration, focal point, and they were never that I heard, addressed as a group and told that they were infringing any laws." According to Solberg, "*I think they followed all applicable bike regulations for the city.*"[77] (emphasis added)

Under D.C. law, the violation of parading without a permit occurs only where a combination of persons or vehicles travel in unison "in a manner that would normally be in violation of any provision of DCMR Title 18 'Vehicles and Traffic,' or any other applicable law or regulation."[78] By the terms of the allegations, and the statement of Captain Solberg, the

---

[74] According to the observations of *The Washington Post* reporters on the scene, "Riders from the 'Bike Strike' appeared to be directed by police into Pershing Park, but Ramsey said the bikers chose this destination on their own." By a Washington Post Staff Writer, "Did D.C. Police Go Too Far? Legal Experts Debate Legality of Mass Arrests," October 1, 2002, page B (Attachment 8).

[75] First Amended Complaint at 24, ¶¶ 95 - 98.

[76] Statement of Andrew Solberg at 4 (Attachment 17).

[77] Statement of Andrew Solberg at 7 (Attachment 17).

[78] "[A] 'parade' is any formation, march, or procession consisting of persons, animals, vehicles, or a combination of persons, animals, and vehicles traveling in unison and with a common purpose upon any public street, highway, alley, sidewalk, or other public way, within the territorial jurisdiction of the Metropolitan Police Department, in a manner that would normally be in violation of any provision of DCMR Title 18 'Vehicles and Traffic,' or any other applicable law or regulation." 24 DCMR 705.1 (Attachment 22).

bicyclists did not violate the traffic laws, and did not constitute a parade, and were no more unlawful than a family of five traveling by bike on the roadway to a picnic.

Chief Ramsey additionally admits that "the officers riding along with them were merely keeping them safe *and permitting them to express themselves as they had chosen to do*."[79]

Setting aside for the moment the fact that the bike ride was neither unlawful nor a parade, even if we assume *arguendo* that the bicyclists constituted a parade, the MPD admittedly issued them an unwritten permit. See, Dellums v. Powell, 566 F.2d 167, 182 - 83 n. 34 (D.C. Cir. 1977) (demonstrators granted an unwritten permit where their intentions were widely known, where despite initially stopping demonstrators police stepped aside and no efforts were made by police to keep protestors from assembling).

It is clearly established that where the police permitted the bicyclists to ride as they did, that it was constitutionally impermissible to thereafter arrest them for having engaged in permitted activity, unless there had been a lawfully given order to cease or disperse. [80]

Chief Ramsey, by virtue of his participation in the mass arrest, could not reasonably have mass arrested a group inside the park that included the bicyclists without a *lawfully justified* order to cease or disperse.

## VI.    The Defendants Motion Misses the Point With Plaintiffs' Claims Related to the

---

[79] Ramsey Decl. at 7, ¶ 27 (Attachment 2).

[80] In similar circumstances, the D.C. Circuit has ruled that where police allowed protestors to assemble as they did, "'to sustain [their] later conviction for demonstrating where they told (them they) could would be to sanction an indefensible sort of entrapment by the State convicting a citizen for exercising a privilege which the State had clearly told him was available to him.' In these circumstances, no constitutionally valid arrest could have been made until an order to disperse had been given which was itself based on permissible considerations."Dellums v. Powell at 182 - 83, citing Cox v. Louisiana, 379 U.S. 559 (1965).

**Denial of the Ability to Post-and-Trial**

Plaintiffs allege that persons arrested in connection with mass political arrests are denied the right to *post and trial*. The applicable description from paragraph 10 of the First Amended Complaint is excerpted below, in order to provide clarity and avoid confusion owing to defendants' misstatement of this aspect of plaintiffs' claims.

> **"The District of Columbia maintains a policy, practice and/or custom of denying to those arrested in targeted mass political round-ups the option to be released and 'post and trial.' This option allows an arrestee to be quickly released from jail or custody by posting collateral and receiving a trial date on which to challenge the legality of the arrest.** The MPD is advising persons caught in targeted mass political sweeps that they must remain in jail or police custody for an extended period of time or may secure release only by 'post and *forfeit*,' which means the arrestee forfeits the collateral and does not receive the opportunity to challenge the legality of the arrest. This disparate treatment, disallowing the post and trial option in the case of political round-ups, denies those arrestees equal protection under the law, and also subjects those who wish to challenge the legality of their arrest to greater pre-arraignment jail or police custody simply because they seek to exercise their constitutional right to defend against an unlawful arrest." (First Amended Complaint, ¶ 10) (emphasis added).

The opposition speaks in terms of citation release, which a relatively small number of individuals were allowed, and the *post-and-forfeit* option. The claims asserted relate to the denial of access to the *post-and-trial* option, which is referred to in the D.C. manuals as a "bond case" or "bond release."

In the prisoner control manual submitted by defendants, in the section "Release of Prisoners," the first three enumerated mechanisms of release are: 1) Citation Release, 2) Elect to Forfeit Collateral, and 3) Bond Cases.

Persons who choose to either post-and-forfeit ("Elect to Forfeit Collateral") or post-and-trial ("Bond Cases") are given a P.D. 67 (Collateral Receipt). The functional difference between these two options is described as follows:

"**Elect to Forfeit Collateral Station** - Defendants charges with offenses that can be adjudicated through the payment of a fine may elect to forfeit collateral in lieu of requesting citation release or a court date. . . .

**Bond Cases** – (Bond mst be written **BOLDLY** across the top of collateral receipt). Defendants charged with offenses that can be adjudicated through the payment of a fine may elect to pay a bond and appear in court on a specified date. Prisoners that do not wish to forfeit collateral, and do not wish to remain in custody while waiting their court date may pay a bond.

For bond cases all steps are the same [as for those who post-and-forfeit] except:

•   You would <u>NOT</u> check the elect to forfeit collateral box [on the P.D. 67, Collateral Receipt]. Instead you would check the "Stand Trial" box. This is because the prisoner wishes to appear in front of a judge. The prisoner is paying money <u>NOT</u> to spend the night or weekend in jail.

•   Advise the prisoner that he/she is to appear in court on the next court scheduled bond date. . . The date and time of the prisoner's court appearance is placed in "date and Time" section [of the P.D. 67]." (Prisoner Control Plan at 64-65, Attachment 18).

The complaint advanced by plaintiffs is that, for the vast majority of arrestees who are not offered citation release, they are told that they must choose between either posting-and-forfeiting or remaining in jail for the weekend or until a judge is available.

This situation is confirmed by the MPD internal investigation, in which Captain Sharkey was asked whether there was any way for arrestees to secure their release quickly by paying a bond.

"Q:   Are you aware if anyone was coached to a specific avenue of release at the Institute of Police Science, specifically where people were told that they would be much quicker if they payout, than if they saw a judge or a citation release?
A:    Not to my knowledge."[81]

Julie Abatte, an attorney who was an arrested bystander, described in her statement that

_____

[81] Statement of Captain Sharkey at 8 (Attachment 19).

38

she knew she qualified for a citation release, she had positive I.D. and was local, and she had

$50. When she asked for a citation release, she was told that she had a choice. She "can post

[and] forfeit [or she] could wait in custody" until a judge would see her. Further, arrestees were

consistently told that if they would post-and-forfeit, that they would be processed first, before the

citation releases.[82] Abatte was not offered to post-and-trial. She was not released until 9:00 p.m.

on Saturday night.[83]

The 1986 version of the MPD Manual for the Management of Mass Demonstrations,

which refers to the post-and-trial option as "collateral release," states that it is by operation of a

court order that mandates collateral release be offered to arrestees.

> "Prisoner Release: Collateral / Citation
>    Without exception, all prisoners will be funneled through the collateral and
> citation release teams since, by court order, every person arrested and detained by the
> police must be afforded the opportunity to qualify for release on collateral, citation,
> or unsecured bond whether or not court is in session. Prisoners who are otherwise
> qualified for release shall not be detained for refusal to furnish information not
> required for booking and release." (MPD Manual for the Management of Mass
>
> Demonstrations) (1986 rev'n) (Attachment 21).

It is unclear why this has been removed from the manual.

## VII.    Negligent Supervision is a Recognized Tort

The District of Columbia recognizes the tort of negligent supervision, which has been

adequately pled by plaintiffs. This is not *respondeat superior* liability, but rather a tort than runs

directly against an individual for his failure to supervise. Phelan v. City of Mount Rainier, 805 A.2d

930, 936 - 41 (D.C. 2002).

---

[82] Statement of Julie Abbate at 5, 12 (Attachment 20).

[83] Statement of Jule Abbate at 6 (Attachment 20).

**VIII.    The Vermont & K Arrests Are No More Lawful Than the Pershing Park Arrests**

There was no probable cause for any of the arrests in connection with Vermont & K. It is an oversimplification to compare allegations of parading without a permit with driving under the influence, as DUI is a serious criminal offense as opposed to a civil infraction and, further, does not arise in the context of constitutionally protected activity.

**IX.    Defendants' False and Gratuitous Allegations of Violence**

Throughout defendants' brief are references to alleged violence at anti-globalization protests in other places, at other times, and even on other continents. This is gratuitously injected into this litigation by defendants in order to falsely suggest that there is a risk or threat of ongoing violence on the part of demonstrators.

There is no such record of violence here in Washington, D.C. and the ongoing litigation and investigations to date have revealed, in fact, a steady stream of police violations.

Setting the factual circumstances aside, however, as a legal matter even if one assumes *arguendo* a prior history of violence, such history cannot justify police repression or constitutional infringements on another day.

The Ninth Circuit has addressed the issue squarely, rejecting in the aftermath of the Rodney King verdicts that police could preemptively disperse assemblies based on the "inference of a continuing threat of past misconduct" where, the very day prior, in the same location, demonstrations had become violent. The Court ruled,

> "The law is clear that First Amendment activity may not be banned [through dispersal or arrest] simply because prior similar activity led to or involved instances of violence. There are sound reasons for this rule. Demonstrations can be expected when the government acts in highly controversial ways, or other events occur that excite or arouse the passions of the citizenry. The more controversial the occurrence,

40

the more likely people are to demonstrate. Some of these demonstrations may become violent. The courts have held that the proper response to potential and actual violence is for the government to ensure an adequate police presence, see, e.g., Cox v. Louisiana, 379 U.S. 536, 551 (1965), and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure. Kunz, 340 U.S. at 294-95." Collins v. Jordan, 102 F.3d 406, 415 (9th Cir. 1996).

_____Similarly, police may not engage in Fourth Amendment violations even where there is a record of prior violence by the same group[84] (which is decidedly not the case in this litigation).

## X.    Use Of Excessively Harsh and Painful Handcuffs

In litigation arising from the mass false arrests at the April, 2000 IMF/WB demonstrations, over 600 plaintiffs filed a class complaint alleging that the same painful method of handcuffing that is at issue in this case was used there.  In that case, damages are sought where protestors "were restrained in plastic handcuffs that inflicted pain, discomfort and distress."[85]

That the defendants assert that the use of these handcuffing techniques "has not been a source of complaints brought to Chief Ramsey's attention" reflects the fact that the Chief doesn't pay the slightest attention and is deliberately indifferent to the constitutional harm, and physical pain, that he and the Mayor cause. As reflected in the quote that was excerpted at the opening of this memorandum, he is not going to stop until a court orders him to.

The purpose of this complaint is to vindicate the plaintiffs' rights and to cause an end to

_____

[84] See, e.g., Wilkinson v. Forst, 832 F.2s 1330 (2nd Cir. 1987) (individualized searches and seizures in the absence of particularized reasonable suspicion or probable cause are prohibited under the Fourth Amendment, even where there had been past violence at events, demonstration participants had stated an intention to engage either in violence and/or self-defense, and where the practice in the past was that firearms were, in fact, widely brought).

[85] First Amended Complaint, ¶10, Alliance for Global Justice v. District of Columbia, 01-cv-00811 (PLF)(JMF).

these ongoing and systemic constitutional violations, disruptive police tactics and the effective

criminalization of dissent for those who have been targeted.

**Conclusion**

Wherefore, for the foregoing reasons, the defendants' motion should be denied.

Respectfully submitted,


November 20, 2003                    _____

Carl Messineo (#450033)
Mara Verheyden-Hilliard (#430031)
PARTNERSHIP FOR CIVIL JUSTICE, INC.
NATIONAL LAWYERS GUILD
      MASS DEFENSE COMMITTEE
1901 Pennsylvania Avenue, NW
Suite 607
Washington, DC 20006
(202) 530-5630
(202) 530-5634 - facsimile

*Counsel for Plaintiffs*