**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JEFFREY BARHAM | ) | |
|     et al., | ) | |
| | ) | |
|       Plaintiffs, | ) | Case No.: 02-CV-2283 (EGS)(JMF) |
| | ) | |
|   v. | ) | |
| | ) | |
| CHARLES RAMSEY, | ) | |
|     et al., | ) | |
| | ) | |
|       Defendants. | ) | |
| | ) | |

**JOINT MOTION FOR FINAL APPROVAL OF**
**PROPOSED CLASS SETTLEMENT AND PAYMENT DISTRIBUTION**

The class representatives, and defendants District of Columbia, Charles H. Ramsey in his

official and individual capacities and Peter J. Newsham in his official and individual capacities,

respectfully move the Court for an order granting final approval of the proposed Class Settlement

Agreement and distribution of payment.

The parties, in support, rely on the accompanying memorandum.

Respectfully submitted,

PETER J. NICKLES                              _/s/_
Attorney General for the District of Columbia    Carl Messineo, [450033]
                                          Mara Verheyden-Hilliard [450031]
GEORGE C. VALENTINE              PARTNERSHIP FOR CIVIL
Deputy Attorney General               JUSTICE FUND
Civil Litigation Division              617 Florida Avenue, NW
                                          Washington, D.C. 20001
ELLEN A. EFROS [250746]           (202) 232-1180
Assistant Deputy                      (202) 747-7747 fax
Litigation Division

MONIQUE A. PRESSLEY [464432]     *Attorneys for Plaintiffs*
Senior Assistant Attorney General

1

Equity Section I
441 4th Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6610
Fax: (202) 741-0424
monique.pressley@dc.gov

SHANA L. FROST [458021]
Assistant Attorney General

/s/ Monique A. Pressley
MONIQUE A. PRESSLEY
Assistant Attorney General
Equity Section I

*Attorneys for Defendants District of Columbia,
Charles H. Ramsey and Terrance W. Gainer*

DATED:        September 7, 2010

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JEFFREY BARHAM | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 02-CV-2283 (EGS)(JMF) |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES RAMSEY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF
PROPOSED CLASS SETTLEMENT AND PAYMENT DISTRIBUTION**

For the reasons stated below, the motions and relief requested herein should be granted.

**I.      Motion for Final Approval of Class Settlement and Payment Distribution**

The parties jointly presented the Court with the Settlement Agreement and basis

demonstrating that the proposed settlement, relief and payments therein are "fair, reasonable, and

adequate," and which detailed the substantial equitable relief that has issued changing police

practices and policies as pertains to conduct during mass demonstration activities. See Joint

Motion for Prel. App., Supporting Memo. at 2 – 16 (Dkt. No. 595) (also attached as Exhibit 1).

There are no facts or circumstances that have developed since that detailed submission

that would counsel otherwise.

Since that filing, Judge Paul L. Friedman has granted final approval to the class action in

Becker v. District of Columbia, Civil Action 01-0811, which arose from a predecessor mass

arrest in connection with the April 2000 IMF / World Bank protests and which was structured

nearly identically to the relief proposed herein for the benefit of the Barham class, which was

subject to a mass arrest in connection with the September 2002 IMF / World Bank protests. The

1

Barham plaintiffs, in their complaint, alleged the September 2002 Barham mass arrest to be a perpetuation of ongoing challenged police tactics that were manifest in connection with the April 2000 mass arrest, as well as during the January 2001 Presidential Inaugural protests, among other instances. Barham First Amended Complaint (Dkt. No. 16) ¶¶ 3 – 5.

Reflecting on the historic and substantial nature of the equitable relief and reforms, secured through litigation, settlement, and legislation which Judge Friedman observed to be the "direct result" of the protest class actions and related work, the Court at the Becker Fairness Hearing found that

> "There are First Amendment protections through this lawsuit and through the impact of this and the other lawsuits have had on the legislative arm of the District of Columbia government, the council of the District of Columbia. The equitable relief has effectively changed the landscape, both practically on the streets and legally, in the courts of the District of Columbia and under law as pertains to police conduct during mass demonstrations."

Transcript of June 30, 2010 Fairness Hearing Before the Honorable Paul L. Friedman at 31 (Exhibit 2).

The parties concur with this assessment, jointly reaffirm their representations in the Barham Joint Motion for Preliminary Approval and jointly move the Court to grant final approval of the Settlement and payment distribution therein.

On March 30, 2010, this Court granted preliminary approval of the Settlement Agreement. (Dkt. No. 599). The Court approved and directed the form and manner of notice to the class. Id. As detailed herein, those procedures have been implemented.

As referenced below, the Administrator received 321 timely claim forms and zero late-filed claims. Declaration of Ryanne Cozzi, attached as Exhibit 3, (hereinafter "Cozzi Decl.") ¶15. As of September 1, 2010, the Class Administrator has resolved all but four of the claims filed and, to date, has "determined that 299 are filed by claimants who have been determined to be eligible Class Members." First Supplemental Declaration of Ryanne Cozzi, attached as Exhibit 4

(hereinafter "Cozzi First Supp. Decl.") ¶2.The Class Administrator is diligently working towards final resolution of the four pending claims and will file an additional supplement to report when resolved. Id. ¶3. One claim was denied because the claimant had previously entered into a settlement agreement with the District for the same underlying events. Cozzi Decl. ¶16 (Exhibit 3). The remainder of the claims have been denied based on the fact that the individuals were arrested at locations outside of Pershing Park such that they are conclusively not Class Members or based on the failure to evidence class membership. Id. ¶¶16-17.

Reflecting the overwhelmingly positive support by the class of the Settlement, the participation rate is an astounding 85%.

Aside from a rambling unfocused submission from counsel in Chang v. US, Civil Action No. 02-2010, there has been received only one timely letter of objection. The merits of those objections have been addressed in filings by the parties at Barham Dkt. Nos.623, 624, 625. This very low level of objection itself weighs in favor of approval of the settlement. See Thomas v. Albright, 139 F.3d 227, 232 (D.C. Cir. 1998) ("[A] settlement can be fair even though a significant portion of the class and some of the named plaintiffs object to it."); Radosti v. Envision, 2010 U.S. Dist. LEXIS 56373, at *57 (D.D.C. June 8, 2010) (same); In re Lorazepam & Clorazepate Antitrust Litig. (Lorazepam II), 2003 WL 22037741, at *6 (D.D.C. June 16, 2003) (the "existence of even a relatively few objections certainly counsels in favor of approval").

Each of the seventeen class representatives supports the settlement. Collectively and individually the class representatives reflect a broad and diverse spectrum of persons arrested including demonstrators, media, legal observers, bystanders or interested persons who had

3

approached to witness and observe, or associate with, the free speech activities occurring within Pershing Park.

In light of the record, the extraordinary equitable reforms and relief, the sufficiency of the monetary relief, and for reasons stated herein, the Court should issue final approval of the proposed settlement and payment terms. As presented in the motion for preliminary approval, (Dkt. No. 595), and herein, the Settlement and payment distribution are "fair, reasonable, and adequate" and should be approved. Fed. R. Civ. P. 23(e).

A.    Form and Manner of Notice to the Class

As approved by the Court in its March 30, 2010 Order, Gilardi & Co., LLC ("Gilardi"), served as Claims Administrator for the Settlement and oversaw the dissemination of Notice to the identifiable Class Members. Cozzi Decl. ¶1 (Exhibit 3).

Gilardi reports receipt of 321 timely Claim Forms. Id. ¶15. Of those 321, a total of 299 Claims have been deemed submitted by eligible class members, and four (4) claims remain pending as of September 1, 2010. Cozzi First Supp. Decl. ¶¶1, 2 (Exhibit 4).

The Settlement Class' reaction to the Settlement has been overwhelmingly positive.

Apart from the Chang plaintiffs, not a single Class Member has requested exclusion during the claims period, Cozzi Decl. ¶14 (Exhibit 3). The Chang plaintiffs did send a letter to the Administrator in which they advised that "The *Chang* Plaintiffs have previously opted out of any participation in the *Barham* class action. . ." Id.

As required by the Court's March 30, 2010 Order, the Notice distributed to the Class set forth the rights of Class Members under the Settlement, including their rights to (a) exclude themselves from the Class and the Settlement, see Cozzi Decl., Exhibit A (Notice) at 1, 2, 4, 10, 11 (pages each referencing exclusion, providing specific procedures on page 10); (b) object to the Settlement, id. at 1, 2, 3, 9, 11 (pages each referencing right to object, providing specific

4

procedures on pages 11); and (c) attend the Fairness Hearing, <u>id.</u> at 1, 2, 9, 10, 11, 12 (pages each referencing Fairness Hearing, providing specific procedures to appear on pages 11 – 12).

The deadline for exclusion was specified in the Notice to be July 15, 2010. <u>Id.</u> at 1, 10.

The deadline for objections was specified in the Notice to be July 15, 2010. <u>Id.</u> at 1, 11.

The deadline for sending a letter stating one's "Notice of Intent to Appear at a Fairness Hearing in <u>Barham, et al. v. Ramsey, et al.</u>" was specified in the Notice to be July 15, 2010. <u>Id.</u> at 1, 12.

Thus, the deadlines for requesting exclusion, presenting objections or stating the intent to appear at the Fairness Hearing have all passed.

The <u>Chang</u> plaintiffs sent a letter through counsel advising that they consider themselves to have been previously excluded. Cozzi Decl. ¶14. Even if the <u>Chang</u> plaintiffs are deemed to be members of the class, no other class member has asked to be excluded during the claims period.

No request to appear at the Fairness Hearing has been received, except for the request from <u>Chang</u> counsel. Declaration of Carl Messineo, attached as Exhibit 5, (hereinafter "Messineo Decl.") at ¶6.

Aside from the objections from <u>Chang</u> counsel, one timely letter of objection has been received from a class member and one untimely letter has been received. <u>Id.</u> ¶5.

On or before, April 15, 2010, using all available arrest related records, Gilardi sent Notice and Claim Forms (a "Notice Packet") to the last known address of all identifiable Class Members. Cozzi Decl. ¶2 (Exhibit 3). In order to ascertain the last known address of all identifiable Class Members, Gilardi reviewed and aggregated records from a multitude of sources. <u>Id.</u>

5

Using these sources, Gilardi was able to identify ostensible or last known addresses for 362 persons. Id. ¶5. Gilardi used the U.S. Postal Service National Change Of Address (NCOA) database to attempt to update these addresses. Id. ¶2.

Gilardi thereafter additionally fulfilled 103 requests for notice packages from individuals who learned of the settlement through other means, such as Publication Notices, e-mail announcements, website or toll free telephone inquiries, or whose names had been brought to Gilardi's attention by Class Counsel. Id. ¶7.

The address information from law enforcement records was originally assembled contemporaneous with the arrest on September 27, 2002, which meant that many addresses were no longer current. Over the course of the notice period, Gilardi received 109 Notice Packets returned by the USPS with undeliverable addresses. Id. ¶12. Five were returned by the U.S. Postal Service with updated addresses, to which the Notice Packet was promptly remailed. Id. ¶8.

Gilardi used a commercial third-party provider locator service, the Accurint Service, provided by Lexis-Nexis, (which drew upon a broader set of information than the NCOA database including public records searches and credit report header information) as an additional source to secure updated addresses information for potential Class Members who had not filed a claim in response to the initial mailing and other efforts. Id. ¶9.

On or before April 14, 2010 and throughought the claims period, Gilardi posted the Notice and Proof of Claim form on a website associated with the class settlement administration, www.PershingParkSettlement.com. Id. ¶3. That website also made available the Joint Motion for Preliminary Approval, the supporting memorandum, the Court's preliminary approval order and the executed Settlement Agreement. See www.PershingParkSettlement.com/casedocs.html. The District of Columbia published a link to the Notice and Proof of Claim form on the front page of

the MPD's website and that of the D.C. Office of the Attorney General, as did Class Counsel on the front page of the website of the Partnership for Civil Justice Fund. Messineo Decl. ¶8 (Exhibit 5).

Gilardi published a shortened form of the Class Notice in the *Washington Post* once a week for two weeks, including in one Sunday edition; in two consecutive weekly editions of the *Washington City Paper*; and in no less than three regional or national periodicals/media outlets selected based on the expectation that the subject matter of said periodicals was either of general interest or corresponded to perceived subject matter interests of the protest groups whose constituents participated in the protest underlying the mass arrest. A full page notice was run twice in *The Nation* magazine and twice in *The Progressive* magazine and was posted online at the website of the *Huffington Post* during the period of June 28, 2010 through July 12, 2010. Cozzi Decl. ¶6 (Exhibit 3).

Gilardi established a toll free telephone number from which Class Members could receive claims information and documents. Id. ¶4.

Recognizing that telephone numbers might be current even if address information was unavailable or out of date, on June 25, 2010, at the request of Class Counsel, the Administrator used the third party locator service, Accurint, to try and recover phone numbers for identified class members who had not yet filed a claim form. Gilardi engaged in phone banking to contact these persons to advise or remind them of the Settlement and upcoming filing deadlines. Id. ¶11.

On April 30, 2010, Class Counsel independently sent e-mail announcements of the Barham settlement, with links to the proof of claim form and the Notice, by e-mail to thousands of persons who have signed up for updates on the Partnership for Civil Justice Fund's work generally or specifically regarding the Barham class action. The e-mail requested recipients

redistribute the announcement widely and post on appropriate website and social networking media. Links or "widgets" were available to click on in the e-mail that would enable the user to re-transmit the e-mail on to their friends, post to Facebook pages or circulate on Twitter. Messineo Decl. ¶9 (Exhibit 5).

Class Counsel observed the announcement re-posted on many additional email lists, websites, blogs or social media pages. The PCJF also communicated with groups or persons believed to have been involved with the underlying September 2002 protest and requested they disseminate the announcement to their constituents and, in turn, request their constituents to re-post it broadly. Class Counsel understands that multiple tens of thousands of additional e-mails or electronic announcements were sent as a result of these requests. Id. ¶10.

Midway through the claims period, Gilardi sent a total of 322 postcard reminder notices to known or potential Class Members who had not yet filed a Proof of Claim. Cozzi Decl. ¶¶10, 13 (Exhibit 3).

On June 15, 2010, with about one month left in the claims period, Class Counsel undertook a second e-mail based campaign of the same scope and dimension as the first. This announcement was focused on the fact that time was running out to file claims and encouraging recipients to file claims if they themselves were arrested, or to send the announcement on to those who they believed were Class Members. Wide reposting and distribution was, again, requested of recipients. Messineo Decl. ¶11 (Exhibit 5).

Class Counsel set up an internet based "E-Card" facility whereby Class Members or anyone could enter lists of e-mail addresses of persons who may have been arrested, to cause an electronic mail notice and announcement of the settlement and claims process to be transmitted. Id. ¶12. The E-Card facility was promoted by e-mail and on the PCJF web site. Id.

Class Counsel also republicized the settlement through news interviews where the Class Administrator's settlement website, phone number, and other information was given. Id. ¶13.

**B.      Class Administration and Determination of Eligibility**

Class Counsel has closely monitored the Class Member eligibility process. Class Counsel attests and affirms that, throughout this process, the representatives of Gilardi have been responsive to all requests for information or action, and have diligently and with care applied the standards for Class Member eligibility. Class Counsel has reviewed the basis for, and concurs with, each of the eligibility determinations made to date. Id. ¶4.

At the onset of the administration process, Gilardi received arrest data from multiple sources provided by Class Counsel. Cozzi Decl. ¶2 (Exhibit 3). This was a substantial joint undertaking between Class Counsel and the Administrator because records were incomplete and fragmented. There was no single source of arrest data from which to authoritatively establish even the identification of all persons who were class members. Gilardi was provided files from multiple sources, each of which contained partial information. The types of source files included handwritten field arrest forms and computer generated field arrest forms, citations to appear, citation to release determination reports, arrestee information forms, notices of infraction, property and collateral receipts, printouts from the MPD Criminal Justice Information System, printouts from queries to the FBI National Crime Information Center, and speadsheets containing additional data produced by law enforcement during the course of litigation, among other materials. Gilardi established a database, entering the names, addresses and arrest information from the source files, utilizing procedures to eliminate duplicate entries. Id. ¶2.

This database was used as the initial method for confirming class eligibility. When Proof of Claim forms were received, the identification information was checked against the database to determine whether there was a "match."

For each Claimant that Gilardi was unable to "match" against the arrest data in the Gilardi compiled database, Gilardi has sent the Proof of Claim Forms to Class Counsel for the purposes of conducting a broader review of litigation-related materials to determine whether government records of the Claimant's arrest can be located. Id. ¶15; Messineo Decl. ¶14 (Exhibit 5).

Class Counsel has placed all documents and spreadsheets or printouts that were produced in the course of litigation into a computer-based document management system. These materials have been processed through Optical Character Recognition (OCR) processing, with each word (including all name and address references) indexed within a searchable database. For each Claimant whose name was not initially "matched" against the Gilardi-compiled database, Class Counsel has searched the database encompassing all materials produced in discovery using the first name and last name of the Claimant. Searches also included partial name searches, using wildcards and partial names, in order to determine whether records could be found evidencing the arrest of the Claimant. This process has returned, for example, arrest documentation for persons whose names were misspelled in the formal arrest data printouts and, therefore, not initially or exactly "matched" in the Gilardi database. Messineo Decl. ¶15 (Exhibit 5).

For those Claimants who are not initially "matched" against the Gilardi-compiled database, Class Counsel has conducted a name and records search through records at the D.C. Superior Court, Criminal Division, to ascertain if related court records exist or confirm class membership. Cozzi Decl. ¶15 (Exhibit 3); Messineo Decl. ¶16 (Exhibit 5).

These efforts of Class Counsel have resulted in the location of government or court records for a significant portion of the initially unmatched claimants that either confirmed or precluded the Claimant's eligibility. Cozzi Decl. ¶15 (Exhibit 3); Messineo Decl. ¶22 (Exhibit 5).

For those Claimants who were unmatched, they were sent a letter requesting they provide any additional information or documentation of their arrest. Cozzi Decl. ¶15 (Exhibit 3). Each "unmatched" Claimant was also provided information about procedures for qualifying through the submission of sworn affidavits. Id. ¶17. The Settlement Agreement, for example, provides that Claimants can establish eligibility through alternate non-records based means including through submission of affidavits from two Class Members (whose eligibility was manifest in government records) who attest that the Claimant was a Class Member.

Having monitored the administration process actively and closely, Class Counsel attests and submits that the eligibility determination and claims process has been handled conscientiously and carefully by Gilardi. Messineo Decl. ¶4 (Exhibit 5).

### C.   The Settlement Merits Final Approval of this Court

Pursuant to Rule 23(e), the Court "may approve [the proposed settlement] only after a hearing and on finding that it is fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and that it "is not the product of collusion between the parties." Thomas v. Albright, 139 F.3d 227, 231 (D.C. Cir. 1998).

Approval of a proposed class action settlement lies within the sound discretion of the District Court. In re Vitamins Antitrust Litig., 305 F. Supp. 2d 100, 103 (D.D.C. 2004).

"Furthermore, there is a long-standing judicial attitude favoring class action settlements, and the court's 'discretion is constrained by the "principle of preference" favoring and encouraging settlement in appropriate cases.'" Radosti v. Envision, 2010 U.S. Dist. LEXIS

11

56373, at *25 (D.D.C. June 8, 2010) (citing In re Vitamins Antitrust Litig., 305 F. Supp. 2d at

103); Pigford v. Glickman, 185 F.R.D. 82, 103 (D.D.C. 1999); Mayfield v. Barr, 985 F.2d 1090,

1092 (D.C. Cir. 1993).

Courts in this Circuit have considered the following factors, among others: (1) whether

the settlement is the result of arm's-length negotiations; (2) the terms of the settlement in relation

to the strength of plaintiffs' case; (3) the status of the litigation at the time of the settlement; (4)

the reaction of the class; and (5) the opinion of experienced counsel. In re Vitamins Antitrust

Litig., 305 F. Supp. 2d 100, 103 (D.D.C. 2004) (collecting cases).

*Arm's-Length Negotiations and the Opinion of Experienced Counsel*

"A presumption of fairness, adequacy, and reasonableness may attach to a class

settlement reached in arm's-length negotiations between experienced, capable counsel after

meaningful discovery." In re Vitamins Antitrust Litig., 305 F. Supp. 2d 100, 104 (D.D.C. 2004).

There is ample evidence, as reflected in the record of almost eight years of litigation and

the 100+ page docket sheet, and the substance of the proposed settlement, that the litigation and

negotiated resolution of the litigation are at arm's length.

Counsel for the respective parties jointly submit that the litigation including "[d]iscovery,

which has extended over a period of years, has been voluminous, protracted, contentious and the

subject of many contested motions." See Joint Motion for Prel. App., Supporting Memo. at 27

(Dkt. No. 595-1) (Exhibit 1).

Multiple attempts at settlement, including with the assistance of well experienced and

talented mediators, have failed. On October 5, 2006, this Court referred the case to mediation

and stayed proceedings. (Dkt. No. 294). Two experienced mediators, George Cohen and Richard

Hotvedt, were appointed through the mediation program run by the U.S. Court of Appeals,

District of Columbia Circuit. Intense efforts, involving repeated meetings and communications were undertaken. The three-month mediation period, which had been extended to allow diligent efforts to continue and which ended on January 9, 2007, resulted in failure. In their joint status report to the Court, counsel for the parties represented that they would continue in the following months (even after the 3 month stay for mediation talks had terminated) to try and reach agreement. (Dkt. No. 297, Post-Mediation Joint Status Report). Those efforts failed.

In January, 2008, the Court proposed the parties enter into mediation with a private mediator. On January 30, 2008, the Court ordered the new round of mediation, and stayed proceedings. On April 30, 2008, the parties' agreed-upon mediator, the Honorable Richard A. Levie (Ret.) informed the Court that the process had ended unsuccessfully. The mediation itself, and issues over who would be responsible for the mediator's fees, became the subject of litigation and motions practice. (Dkt. Nos. 410, 411, 412, 413, 414, 415, 417, 418, 421, 422, 423, 424, 425, 426).

Throughout this process, and the litigation, the Court has repeatedly offered the parties its resources and all necessary periods of time or accommodations to fully explore settlement. This Court did not allow the repeated failures at negotiated resolution to be an excuse for not exhausting all possibilities.

At the July 29, 2009 motions hearing, the Court urged the District of Columbia that this case should be settled and specifically urged the involvement of officials at the top level of government.

> You know what, this case should be settled. That's what should happen. This case should be settled as soon as it possibly can to spare the citizens of the District of Columbia additional expenses, additional embarrassment and bring some finality to this case. That's what should happen. . . . This case has been crying out for settlement for a long time.

Transcript of July 29, 2009 Motion Hearing before the Honorable Emmet G. Sullivan, gen'ly at 14:19 – 16:6; Id. at 33:19 – 23 (similar exhortation).

The Court directed the involvement of Attorney General Peter J. Nickles, "the man at the top," in the litigation. Id. 28:24 – 29:4. Mr. Nickles, in filings and oral representations, represented to the Court that his "primary objective is to see if I can settle these cases." Transcript of September 29, 2009 Status Hearing Before the Honorable Emmet G. Sullivan at 33:23 – 24.

Mr. Nickles, on behalf of the District, and Carl Messineo and Mara Verheyden-Hilliard, on behalf of the Barham class, engaged in a series of meetings to explore settlement possibilities. Through these negotiations this agreement has been forged.

The opinion of experienced counsel "should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement." Cohen v. Chilcott, 522 F. Supp. 2d 105, 121 (D.D.C. 2007).

Counsels for the respective parties have jointly submitted that "The terms that have been reached are, indeed, historic. They are substantial for plaintiffs *and* are a fair deal for the District." See Joint Motion for Prel. App., Supporting Memo. at 34 (Dkt. No. 595-1) (Exhibit 1); Id. (respective counsels jointly submit that "The Settlement Agreement is fair, reasonable and adequate, in the best interests of the class as a whole, and in satisfaction of Fed. R. Civ. P. 23 and due process requirements."); Messineo Decl. ¶2 (Exhibit 5).

### *The Terms of the Settlement Are Fair, Adequate and Reasonable*

The monetary relief in this settlement is substantial. Also, each Class Member will have his or her arrest records expunged and the arrest declared null and void.

14

The most truly unique and broadly-reaching consequence of this litigation and related work, however, is the change in the protections for First Amendment activities in the Nation's Capital.

*Monetary Recovery*

Each participating class member will receive approximately $16,000 in compensation. Messineo Decl. ¶18 (Exhibit 5). This is over two-and-a-half times the per-claimant amount that was recovered by absent class members in Burgin v. District of Columbia, Civil Action No. 03-2005 (EGS) (Burgin Dkt No. 65, final approval order).[1] The Burgin arrestees were arrested on the same day as the Barham arrestees and the majority merged together for the purposes of the confinement. In other words, as a class, the Burgin arrestees from Vermont and K suffered identical injuries and identical conditions of confinement as the Barham arrestees. The Burgin class member recovery of no more than $6,000 was deemed fair, reasonable and adequate for the same injuries as experienced by the Barham class members.

The monetary award framework in Barham is structured identically to the framework in the class action of Becker v. District of Columbia, Civil Action No. 01-0811 (PLF) (JMF), which was negotiated by the same attorneys in advance of the agreement that was reached in Barham. The Honorable Paul L. Friedman has granted final approval of that settlement as fair, reasonable and adequate. (Becker Dkt. No. 362, Order Granting Joint Motion for Final Approval). The

---

[1]     The settlement of claims in Burgin v. District of Columbia, Civil Action No. 03-02005 (EGS) (Burgin Dkt. No. 65) (final approval order) established a fund of $720,000 to be divided on an equal basis between claimants. See also Consent Motion for Preliminary Approval of Proposed Judgment and Distribution, Notice to Class, Fairness Hearing, and Schedule, Burgin v. District of Columbia (Burgin Dkt. No. 60) at 4. The Burgin counsel estimated there to be between 158 to 190 class members. At the time of the motion for preliminary approval, the Burgin counsel projected the participation of 100 claimants, which would have led to a recovery of $7,200 each. Id. at 6. The Court Docket reflects there to have been 120 claimant expungement orders entered under seal on August 17, 2007, from which the undersigned infers there to have been no less than 120 claimants (it is unclear whether the 16 class representatives are in addition to the figure of 120). Accordingly, in Burgin, the recovery per claimant was no more than $6,000, which was deemed fair, adequate and sufficient for the identical injury as experienced by Barham class members. See also Id. at 7 (Burgin counsel preliminarily projected "each Class Member who timely submits a claim [will receive] an amount ranging from about $3,500 to about $7,000").

Barham absent class members will each receive approximately $16,000 (as compared to the $18,000 for each Becker absent class member) due to the astoundingly high class participation rate of approximately 85% of the Barham class members. See, e.g., June 30, 1010 Transcript of Fairness Hearing before the Honorable Paul L. Friedman (Exhibit 2) (observing that the 70% participation rate in Becker is "a huge response rate").

The Settlement Agreement provides that the payments to class members are to be spread over two municipal fiscal years. Accordingly the first payment, which will be no less than sixty percent of that due to each class member, is to be funded by the end of September 2010. The remainder is to be funded by September 1, 2011.

Class Representatives shall share equally in a fund that will provide each $50,000 in compensation for their services on behalf of the class. This has been lengthy and hard fought litigation, and the class representatives have engaged in extensive and repeated discovery, returned to the area for deposition, and been available and have actively participated in the advance of this lengthy litigation and negotiations. The amount of $50,000 is commensurate with the most recent recoveries by individuals who have actively brought and advanced claims as individuals for the same injuries. Class counsel views it as imperative that Class Representatives receive compensation that is at least commensurate with that which they would likely have recovered if they had advanced claims actively as individual plaintiffs over these past years. In the absence of such commensurate recovery, there would be a severe disincentive for persons to serve as class representatives, a role which entails the same or greater activity as an individual plaintiff along with the additional fiduciary responsibilities and obligations in service to the class as a whole. Class Counsel represents that the Class Representatives have each served as stalwart

advocates on behalf of the class as a whole and have been essential to securing the exceptional results for the benefit of the class overall.

The award of attorneys' fees, between approximately twenty-six percent (26%) to twenty-nine percent (29%) as a percentage of the total settlement resolution,[2] is well within the range of reasonable fees in percentage of the fund cases. See Joint Motion for Prel. App., Supporting Memo. at 23 − 26 (Dkt. No. 595-1) (Exhibit 1) (collecting cases).

The fees were negotiated and determined separately from, and after the negotiation of the amount of monetary recovery to the Claimants. The attorneys' fees are borne separately by the District and do not decrease the amount of Claimants' Funds awarded or available. Id. at 23. It is undisputed, as well as manifest by the record, that this case was litigated for over seven years, involved complex and factually detailed issues, resulted in multiple dispositive motion briefings,[3] which led to the interlocutory appeals of the denial of qualified immunity by Peter

---

[2]     The Settlement Agreement provides an award of $2,462,333 to Class Counsel as attorneys' fees and costs. The Class Settlement Fund, i.e., the gross settlement fund inclusive of administrative costs and attorneys' fees is $8,251,333 *plus* unspecified additional monies as may be paid from the D.C. Judgment and Settlement Fund as needed to create a new document management system and to train staff.
        If one excludes completely consideration of the additional monies to create and implement the document management system, the attorneys' fees and costs are 29% of the total settlement value ($8,251,333 divided by $2,462,333).
        If one estimates the costs for procurement, implementation, training and operation of the new document management system to be $1 million, the attorneys' fees and costs are 26% of the total settlement value ($9,251,333 divided by $2,462,333).

[3]     See Motion to Dismiss, or in the Alternative for Summary Judgment, filed by Charles Ramsey, et al. (Dkt. No. 67); Motion to Dismiss Portions of the Complaint, filed by District of Columbia (Dkt. No. 69); Plaintiffs' Memorandum in Opposition to Motion to Dismiss Portions of Complaint (Dkt. No. 77); Plaintiffs' Memorandum in Opposition to Motion to Dismiss, or in the Alternative for Summary Judgment filed by Chief Ramsey and Mayor Williams (Dkt. No. 76) (including 37 exhibits); Motion to Dismiss or in the Alternative for Summary Judgment filed by Peter J. Newsham (Dkt. No. 89); Plaintiffs' Memorandum in Opposition to Motion to Dismiss filed by Newsham (Dkt. No. 95); Motion for Partial Summary Judgment on Grounds of Qualified Immunity filed by Charles Ramsey and Anthony Williams (Dkt. No. 99, 102); Plaintiffs' Memorandum in Opposition to Motion to Dismiss or in the Alternative for Summary Judgment filed by Ramsey and Williams (Dkt. No. 103); Plaintiffs' Supplemental Memorandum Regarding Applicability of Groh v. Ramirez to the Motions to Dismiss Based on Qualified Immunity (Dkt. No. 112); Plaintiffs' Supplemental Memorandum Of Materials Received That Relate to Qualified Immunity Defenses (Dkt. No. 118); Plaintiffs' Supplemental Memorandum Regarding Applicability of International Action Center v. United States, Including Submission of Supplementary Material Related to Qualified Immunity (Dkt. No. 126); Motion for Partial Summary Judgment on Plaintiffs' Common Law Claims by Anthony Williams (Dkt. No. 228); Plaintiffs' Memorandum in Opposition to the Motion for Partial Summary Judgment filed by the District of Columbia (Dkt. No. 257).

Newsham and Charles Ramsey to the U.S. Court of Appeals. See Barham v. Ramsey, 434 F.3d

565 (D.C. 2006). The Class Plaintiffs filed two motions for preliminary injunctions, and

eventually secured the relief sought in each.[4] Discovery, which has extended over a period of

years, has been voluminous,[5] protracted, contentious and the subject of many contested motions.[6]

Ultimately, the loss and destruction of evidence itself became the subject of extensive

investigation, motions to compel, briefings, and voluminous motions for sanctions.[7]

---

[4]     Motion for Preliminary Injunction Enjoining the District of Columbia from Arresting or Prosecuting
Persons for Parading without a Permit (Dkt. No. 144); Motion for Preliminary Injunction Mandating That the
Defendants Expunge the Arrest Records of Plaintiffs, and grant additional related relief (Dkt. No. 145).

[5]     Over 40,000 documents have been produced. There have been well in excess of 100 hours of radio runs
produced, often multiple versions (not copies) encompassing the same periods of time. Class Counsel estimates it
required an average of 5 hours to closely review one hour of recorded radio communication, due to the poor quality,
the fading in and out of transmissions, the fact that overlapping or sequential transmissions can be initiated by any
source and (unlike a deposition) not sources easily identifiable or even known in advance, etc. There is a substantial
volume of video, as well. The extremely close examination of the radio runs conducted by Barham plaintiffs'
counsel, which resulted in the identification of critical - - but latent and non-immediately apparent - - deficiencies or
loss of data was exceedingly time consuming. There have, to date, been over 120 depositions in this case. Counsel
has also reviewed the 5,000+ pages of documents released by the D.C. Council upon conclusion of its investigation,
reviewed the additional 11 depositions taken by the Council in executive session, as well as the multiple days of
related public hearings, including those occurring on October 24, 2002, October 24, 2003, December 17 - 18, 2003
and October 7, 2004.

[6]     Plaintiffs' Motion to Compel Against Peter Newsham (Dkt. Nos. 248, 249, 251); Plaintiffs' Memorandum
in Opposition to Motion to Stay Discovery Pending Resolution of Motion to Disqualify the Office of the Attorney
General, filed in Chang case (Dkt. No. 258); Motion for Protective Order filed by District of Columbia (Dkt. No.
263); Plaintiffs' Motion to Compel Production of Properly Prepared Rule 30(b)(6) Deponent to Testify With the
Collective Knowledge of the District of Columbia Municipality (Dkt. Nos. 264, 273, 300); Plaintiffs' Motion to Lift
Stay of Discovery (Dkt. No. 311); Motion by District of Columbia and Individual Defendants to Propound
Discovery to the Class Members (Dkt. No. 326); Motion to Compel the Production of Running Resumes and
Recorded Police Channel Communications (Dkt. No. 338, 339); Plaintiffs' Opposition to District of Columbia's
Motion for Discovery Against Class Members (Dkt. No. 341); Motion for Protective Order by District of Columbia
(Dkt. No. 354), and Plaintiffs' Opposition thereto (Dkt. No. 362); Plaintiffs' Motion to Compel Production of Field
Arrest Forms and Related Arrest Records from the District of Columbia (Dkt. No. 363); Plaintiffs' Opposition to
Motion to Compel filed by District of Columbia against Plaintiffs (Dkt. No. 380); Plaintiffs' Motion to Lift Stay of
Proceedings (Dkt. No. 427, 429, 431, 432, 434).

[7]     Motion to Compel the Production of Running Resumes and Recorded Police Channel Communications
(Dkt. No. 338, 339); Plaintiffs' Motion to Compel Production of Field Arrest Forms and Related Arrest Records
from the District of Columbia (Dkt. No. 363); Motion for Sanctions for Discovery Abuse Perpetrated by the District
of Columbia (Dkt. No. 439, 447, 448, 449, 450, 452, 459, 460, 462, 466, 467, 468, 469, 470, 481, 482); Barham
Plaintiffs' Response to the Court's Request for a Proposal for Further Discovery in Light of the Sanctionable
Conduct by the District of Columbia (Dkt. No. 502); Barham Class' Response to the Representations of Kathy
Patterson as They Pertain to the Loss and Destruction of the J.O.C.C. Running Resume Database (Dkt. No. 514);
The Barham Class' Response to the Declaration of Attorney General Peter J. Nickles (Dkt. No. 515); The Barham
Class' Renewed Motion for Sanctions, and Memorandum in Support, Against the District of Columbia and Against
Charles H. Ramsey (Dkt. No. 520; 522; 524; 534; 538; 539; 540; 544).

Class Counsel discovered and brought to the fore the issues of evidence loss that became the focus of the Special Master referral (Dkt. No. 608) and the report of the Honorable Judge Stanley Sporkin (Ret.) (Dkt. No. 575). This occurred through Class Counsel's thorough and focused examination of the evidence, including of the many police channels of radio runs, and was facilitated by Class Counsel's familiarity and expertise with the internal operations of the MPD during mass demonstrations and the evidence obtained in discovery in other protest cases.

In addition, Class Counsel has continued to perform substantial work during the claims process to ensure widespread and targeted dissemination of the Notice of Settlement as well as in undertaking painstaking review of a wide a variety of records, including accessing courthouse criminal records, to assist in ensuring persons who are properly part of the class and entitled to participate in the settlement can be matched. As a result, the participation rate of class members, has reached an extraordinary level of approximately 85%, despite the fact that arrest records are incomplete and outdated, and the class is geographically diverse and not a cohesive singular group.

The attorneys' fees are reasonable as a percentage of the recovery, measured strictly in monetary terms. The benefit to the class of counsels' services is far greater than simply the monetary relief as is evidenced by the substantial advancement of key constitutional rights issues and matters of public integrity in this litigation and the securing of meaningful and important equitable relief.

*Expungement Relief*

Class Counsel has, throughout the litigation, sought to secure reforms and equitable relief. By Order dated January 28, 2008, the Court entered an order providing the class the benefit of expungement and annulment relief (Dkt. No. 405). Among other relief set forth in that

Order, the Court did declare that "The arrests of the *Barham* Plaintiffs and the absent class members are hereby declared null and void. Each of the *Barham* plaintiffs and the individual absent class members is authorized to deny the occurrence of his or her arrest that day without being subject to any penalty of perjury, fraud or other offense premised upon misrepresentation or deception in response to any inquiry, whether posed orally or in writing. These rights accrue to the full benefit of any absent class member regardless of whether an individualized entry of a nullification order [see below] is entered."

With the collection of identification information through the claims process, and in accordance with the proposed <u>Barham</u> Settlement Agreement, each class member will be issued an Order declaring his or her arrest to be null and void. <u>See</u>, Ex. 6, Settlement Agreement at 8.

*The Resolution of Claims for Equitable Relief*

The <u>Barham</u> litigation was conducted to ensure that there would not be a recurrence of the trap-and-arrest tactics and other harmful police practices identified in the complaint.

If one were to "flash back" to the mass demonstrations of 2000 through 2003 under then Chief of Police Charles H. Ramsey, they were characterized by conditions that led to the repeated allegations that the MPD was engaged in a pattern and practice of trapping and detaining protest groups, including in each of the following circumstances:

- April 15, 2000, claim of trap and detain mass arrests at protests timed to coincide with the Spring annual meeting of the International Monetary Fund and World Bank. <u>See</u> <u>Becker, et al. v. District of Columbia, et al.</u>, Civil Action 01-00811 (PLF)(JMF) (class action with Partnership for Civil Justice Fund (PCJF) as class counsel).

- January 20, 2001, allegedly targeting protestors at the first Inauguration of George W. Bush and engaging in trap and detention tactics. <u>See</u> <u>International Action Center, et al. v. United States, et al.</u>, Civil Action No. 01-00072 (GK) (plaintiffs represented by the PCJF attorneys).

- Saturday, September 29, 2001, in Murrow Park in front of IMF headquarters. Protestors claim that police lines allegedly appeared suddenly, trapping and detaining hundreds of

persons without notice.

- April 22, 2002, at a march organized to raise awareness about U.S. policies towards Latin America, District and federal police allegedly deployed police lines without warning and encircled, trapped and detained demonstrators.

- September 27, 2002, mass arrest at protests timed to coincide with the Fall annual meeting of the IMF and World Bank. Barham v. Ramsey, Civil Action 02-02283 (EGS)(JMF) (class action with Partnership for Civil Justice Fund as class counsel).

- March 22, 2003, at protests against the invasion of Iraq, marchers were allegedly trapped and detained by police lines suddenly deployed at the front and the rear of the march on a city block in downtown D.C.

The Partnership for Civil Justice filed the class complaint in Barham as the then most recent in a series of lawsuits it had filed to challenge the "trap-and-arrest" tactic. They had already filed the Becker class action in connection with the mass arrest during the April 2000 IMF/World Bank protests. They had filed International Action Center, et al. v. United States, et al. on behalf of protest groups and individuals in connection with the use of police lines to trap and surround protestors and others in connection with the January 2001 Presidential Inauguration. They had sought to raise public and media attention to the issue of police lines suddenly popping up to trap and surround protests. See, e.g., Petula Dvorak, Police Pop Up to Keep the Peace; Controversial Tactic Angers Protesters, Wash. Post, Oct. 11, 2001, at B5.

As reflected in the complaint in this class action:

This complaint is the most recent in a series of lawsuits with a shared factual allegation: That the D.C. Metropolitan Police Department's Civil Disturbance Units maintain and execute unconstitutional tactics to disrupt lawful protest and assembly including specifically the routine use of mobile police lines to interfere with freedom of association, assembly, speech and free movement; and the use of administrative detention, false imprisonment and false arrest tactics in which the CDUs will trap protesters (and others in physical proximity) on all sides, seize, detain and arrest those trapped/seized in the absence of probable cause.

First Amended Complaint at 3, ¶¶4 – 5 (Dkt. No. 16).

21

This Court recognized and described that "[t]he heart of [plaintiffs'] 'trap and arrest' charge is that police cordoned off the Pershing Park area, essentially 'trapping' the protestors within the park, and then initiated a mass arrest without first warning the protestors that they must disperse to avoid arrest." Barham v. Ramsey, 338 F. Supp. 2d 48, 54 (D.D.C. 2004).

The D.C. Circuit described the mass arrest tactic as effecting or "making arrests based on the plaintiffs' occupancy of a randomly selected zone, rather than participation in unlawful behavior." Barham, 434 F.3d at 574. Where the trap-and-arrest tactic led to custodial arrests, arrestees assert that they were held overnight in harsh conditions of confinement, bound wrist-to-ankle in a contorting and painful position that prevented extension of one's back, deprived access to food and water, and at times to bathroom facilities, and often required to sit painfully handcuffed on buses for hours.

The Partnership for Civil Justice Fund, whose attorneys were class counsel in both the Becker case and the Barham case, made a simultaneous demand for equitable relief in a settlement demand letter dated June 29, 2004 and issued in both the Barham and Becker cases. Because the alleged injuries and challenged tactics experienced in both cases were substantively similar if not identical in important respects, each class' demands for equitable relief to prevent recurrence were advanced in the same correspondence.

Plaintiffs presented not a minimal set of demands, but a comprehensive package of demands that intruded on police operations as plaintiffs deemed necessary to protect constitutional rights in light of alleged police misconduct and disruption to free speech activities.

The expansive set of demands sought to address the following alleged practices: the use of police lines to surround, trap-and-arrest protestors and others; arrests based on "demonstrating without a permit"; use of ineffective and/or unlawful protest dispersal orders; the conditions of

confinement and restraint imposed on persons arrested in protests; the practice of restraining

arrestees by using flexcuffs to bind wrist-to-ankle; to place objective limits on the lengthy

duration of confinement before release, the effect of which allegedly kept protestors off of the

streets and unable to engage in protected activities; to prevent the delivery of misinformation

regarding options for release, which plaintiffs assert appeared calculated to prevent protestors

from challenging the legality of their arrests by telling persons that unless they chose to "post

and forfeit" that they would be jailed for days before a Judge would see them. The demands also

sought to impose public record-keeping and report-issuance requirements.

As a consequence of this litigation, and other litigation and factors, the Council of the

District of Columbia enacted the First Amendment Rights and Police Standards Act of 2004.

The legislative history of this Act reflects that one of the expressly stated legislative

purposes was to eliminate the need for equitable relief to issue from this Court and to enact into

statutory law the reasonable equitable demands of plaintiffs to this litigation.

_Barham_ class counsel Mara Verheyden-Hilliard testified at the public hearing on the

legislation. Upon completion of Ms. Verheyden-Hilliard's testimony, Judiciary Committee

Chairperson Kathy Patterson stated, and asked, as follows:

> One of the things that we had looked at, **in doing this legislation, was trying to bring an end to the [protest] lawsuits here, from the standpoint of taking away all the injunctive relief sought, or taking away the need for injunctive relief**. Let me just ask you . . . if this legislation as proposed today were the law of the District of Columbia tomorrow, would there still be injunctive relief needed, that you needed to seek, in your view?

Media Exhibit A, Committee Chair Kathy Patterson, Council of the District of Columbia, Committee on the Judiciary, Public Hearing, Bill 15-968, "First Amendment Rights and Police Standards Act of 2004," (October 7, 2004) (emphasis added).

Ms. Verheyden-Hilliard responded with a qualified "Yes," acknowledging the breadth of

the Council's proposals as well as areas for modification and improvement.  Id.

23

The "First Amendment Rights and Police Standards Act of 2004" (Exhibit 7) became effective law on April 13, 2005. During the period from April, 2005 through September, 2010, there has been no recurrence of the use of police lines to engage in the mass trap-and-arrest of protestors.

In granting final approval to the Becker class action, Judge Friedman acknowledged that the substantial reforms of the FARPSA were the "direct result" of the class action litigation. June 30, 2010, Transcript of Fairness Hearing Before the Honorable Paul L. Friedman, at 33 – 34 (Exhibit 2).

A comparison of the comprehensive package of equitable relief demanded by the Barham plaintiffs in litigation, to that enacted by the Council is reflected in the following table:

| Equitable Demands by Barham Class (as reflected in June, 2004 demand letter) | Statutory Enactment Under the First Amendment Rights and Police Standards Act of 2004 (Ex. 7) |
|---|---|
| Restrictions on Use of Police lines. | Sec. 108, "Use of police lines," with identified exceptions, generally prohibits police from "using a police line to encircle, or substantially encircle, a demonstration" |
| Restrictions on Dispersal or Terminations of Demonstration Activity | Sec. 107(d), "The MPD shall not issue a general order to disperse to participants in a First Amendment assembly except" under three exceptional and defined circumstances. Establishes that "[a]n order to disperse or arrest assembly participants shall not be based solely on the fact that a plan has not been approved for assembly" or lacks a permit. |

| Equitable Demands by <u>Barham</u> Class (as reflected in June, 2004 demand letter) | Statutory Enactment Under the First Amendment Rights and Police Standards Act of 2004 (Ex. 7) |
|---|---|
| No Arrests for Parading or Demonstrating Without a Permit. | Sec. 105(a), declares "it shall not be an offense to assemble or parade on a District street, sidewalks, or other public way, or in a District park, without having provided notice" or receiving a permit[8] or an approved plan from the municipality.<br><br>Sec. 142, modifies the existing regulations pertaining to parade permits to explicitly exclude from its scope protests or First Amendment assemblies. |
| Prohibition of Wrist-to-Ankle "Hogtying" or Methods of Restraint Causing Inhumane Stress and Duress | Sec. 111, "Use of handcuffs, plastic cuffs, or other physical restraints on persons arrested in connection with a First Amendment assembly," provides that "no such person shall be restrained by connecting his or her wrist to his or her ankle, and no such person shall be restrained in any other manner that forces the person to remain in a physically painful position." |
| Limitations on Period of Detention and Arrest | Sec. 112, "Prompt release of persons arrested in connection with a First Amendment assembly," establishes a standard that persons eligible for release be released within 4 hours from the time of arrests and requires "that an officer holding a supervisory rank document and explain any instance in which a person arrested in connection with a First Amendment assembly who opts for release pursuant to any lawful release option or who is not charged with any offense is not released within 4 hours from the time of arrest." |
| Provision of Food and Water to Arrestees | Sec. 112, For persons not released within a reasonable period of time, requires provision of "food appropriate to the person's health." |

---

[8]        The Act struck from the D.C. Code and/or ceased the use of statutory references to demonstration "permits," in an effort to convey that prior permit or permission is <u>not</u> a requirement of law to engage in street protest.

| Equitable Demands by <u>Barham</u> Class (as reflected in June, 2004 demand letter) | Statutory Enactment Under the First Amendment Rights and Police Standards Act of 2004 (Ex. 7) |
|---|---|
| Written Statement of Rights to Release | Sec. 113, "Notice to persons arrested in connection with a First Amendment assembly of their release options," requires written notice clearly indicating the availability and alternatives for "obtaining a prompt release," which is required to be issued in English and Spanish and offered in any other languages as is reasonable to ensure notice for persons who are limited in English proficiency.<br><br>Sec. 302, established detailed requirements for the content of such written notice. |
| Expungement of all Arrest Records in Connection with the Class Action Mass Arrests | Not addressed in the Act. Expungement relief is secured through the class action litigations and settlements. |
| Record-Keeping Obligations | Sec. 112, requires the Chief to issue an annual public report addressing specific matters related to arrest and prompt release of persons in connection with First Amendment assemblies. |

Addressing other issues raised in various court cases, including other PCJF lawsuits, and in the public hearings regarding police conduct, the "First Amendment Rights and Police Standards Act of 2004," also:

- Requires that officers assigned to First Amendment assemblies are equipped with easily visible or "enhanced" badge or name identification that remains visible and allows identification even if officers are wearing riot gear. <u>See</u> Ex. 7, Sec. 109, Sec. 321.

- Requires specific arrest documentation to be completed at a time reasonably contemporaneous with arrest. <u>Id.</u> Sec. 110.

- Requires, in the limited circumstances where dispersal of a protest may be authorized under law, that the MPD shall issue one or more audible orders to those assembled using an amplification system or device, and shall provide persons with an adequate time to disperse and with a clear and safe route for dispersal. <u>Id.</u> Sec. 107.

- Prohibits the deployment of officers in riot gear to First Amendment assemblies, except in limited circumstances where there is a danger of violence and, further, requires the commander at the scene to issue a written report to the Chief which is to be made

available to the public following any deployment of officers in riot gear. Id. Sec. 116.

- Restricts and further regulates any use of chemical irritants, and requires written report issuance whenever such weapons are used. Id. Sec. 116.

- Removes reference and use of the term "permits" in connection with protests, establishing a policy that authorizes protest without prior notice to the police. Id. Sec. 106.

- Allows demonstration-related merchandise to be vended within a protest area without a Department of Consumer and Regulatory Affairs vending permit or license. Id. Sec. 105(h).

- Restricts police from interfering with the use of stands or structure ancillary to protest activity. Id. Sec. 105(g).

- Prohibits the imposition of user fees upon persons or groups organizing First Amendment assemblies or demonstrations. Id. Sec. 105(e).

- Affirms that resolution of a criminal charge through the "post-and-forfeit" procedure "shall not be equated to a criminal conviction" and cannot be relied upon by any D.C. court or agency to impose any sanction, penalty, enhanced sentence or civil disability. Id. Sec. 302.

The "First Amendment Rights and Police Standards Act of 2004" also addresses issues raised by student and professional journalists who cover protests. See Ex. 7, Sec. 114, "Police-media relations." The Act requires the issuance of new regulations to grant enhanced privileges of access to journalists. Id. The Act mandates that media not be denied the access that is available to members of the general public and be granted additional physical access to areas closed to the general public in order to assist their ability to report on the event. Id.; See also 24 D.C.M.R. § 2104 (regulations, as promulgated, which among other things establish the policy of the MPD is "that media representatives shall have maximum access to First Amendment assemblies. . . consistent with maintaining public safety. . . .").

The relief in the "First Amendment Rights and Police Standards Act of 2004" is not subject to police modification. It is not regulation or policy or procedure. It is statutory law.

Unlike MPD policies, which may be overridden within the authority of the Police Chief, statutory law binds the Department, including the Chief. It does not expire after three years, or at any time.

The relief in the FARPSA is tactically proscriptive, restricting police conduct within specific and detailed parameters in a manner the judicial branch is unlikely to itself order. It is within the authority and discretion of the D.C. Council to so proscribe. The Courts, however, have been historically disinclined to exercise their authority upon police operations in the manner which the statutory prohibitions and reforms do. In connection with the protest violations during the Vietnam-war era, the D.C. Circuit reversed the ruling of the U.S. District Court which had ordered equitable relief consisting of a directive that the MPD rewrite its policy manual to take into account violations reflected in the Court's Findings of Fact. The lower court had not been tactically proscriptive, but had ordered that the "MPD will be required to formulate a comprehensive, written plan (preferably in the form of a manual or handbook) which clearly states the policies and procedures to be followed by the department in mass demonstrations." Wash. Mobilization Comm. v. Cullinane, 400 F. Supp. 186, 217 (D.D.C. 1975). The D.C. Circuit reversed that order, holding such equitable relief to constitute "an unacceptable 'limitation on the department's latitude in the dispatch of its own internal affairs.'" Wash. Mobilization Comm. v. Cullinane, 566 F.2d 107, 123 (D.C. Cir. 1977) (quoting Rizzo v. Good, 423 U.S. 362, 379 (1976)).

With respect to enforceability, the Act itself provides that it may be used by plaintiffs in their private causes of action in litigation. Section 117, "Construction," provides that "[p]rovisions of this title are intended to protect persons who are exercising First Amendment rights in the District of Columbia, and the standards for police conduct set forth in this title may

28

be relied upon by such persons in any action alleging violations of statutory or common law rights." Ex. 7, Sec. 117.

The Act contained a section that generally required "all relevant MPD personnel" to be properly trained in the "handling of, and response to, First Amendment assemblies" including "instruction on the provisions of this [Act], and the regulations issued hereunder." Ex. 7, Sec. 115.

However, class counsel had received multiple reports from persons seeking to engage in protest activity about encounters with police officials who, notwithstanding this general training requirement, allegedly gave them misinformation or allegedly simply did not know the fundamental details established by the Act. Accordingly, recognizing this as an area of substantive deficiency, plaintiffs' counsel imposed through the Becker settlement terms – which were negotiated just prior to the Barham proposed settlement - a more specific regimen of training that is sufficiently specific to remedy these circumstances. See Settlement Agreement in Becker, attached hereto as Exhibit 8; See also, July 15, 2010 Order (Becker Docket No. 362) (granting final approval to Becker Settlement Agreement).

Supplementing and extending the Act's training requirements, in the class action settlement reached in Becker v. District of Columbia, the class has sought, and the District has agreed to mandate, that commencing not later than 120 days following the Court's final approval of settlement:

- "[E]ach District of Columbia Metropolitan Police Department ("MPD") officer will be required to take training on the Standard Operating Procedures for Handling First Amendment Assemblies and Mass Demonstrations. The training records for this course will be preserved for a minimum of three (3) years." See Ex. 8, Becker Settlement Agreement, at 8.

- "[T]he MPD shall refer each police officer currently assigned, or assigned in the future, to responsibilities encompassing or related to the handling of First Amendment 'mass

demonstration' activities to the provisions of the First Amendment Rights and Police Standards Act of 2004, D.C. Code §§ 5-331.01, *et seq.* and the implementing rules that are posted on the MPD's intranet site." Id. at 9.

- "[T]he MPD, shall, through the MPD's website, make available to all persons inquiring regarding demonstration permits or related activities a copy of the statute and the rules implementing the statute and any forms governing First Amendment assembly plans." Id.

The Becker class action settlement also includes terms calculated to address particular deficiencies that uniquely arise in Washington, D.C., because of the frequent deployment of officers from multiple and various jurisdictions to work jointly alongside the District of Columbia MPD in the context of mass demonstrations. Accordingly, the Becker class action settlement requires that

> In all situations in which, through mutual aid agreements or otherwise, the District of Columbia obtains the assistance of outside law enforcement agencies for demonstration related duties, the MPD shall brief outside agency commanders of the requirements of the MPD's Standard Operating Procedures for Handling First Amendment Assemblies and Mass Demonstrations and shall assign an MPD officer to each such outside agency unit.

Ex. 8, Becker Settlement Agreement at 9.

A number of the Barham plaintiffs, in particular those non-class plaintiffs arrested in the vicinity of Vermont & K on September 27, 2002, were each charged with the offense of "parading without a permit" and arrested without prior warning or notice. It had been a priority to ensure that this charge, which plaintiffs and Class Counsel have long asserted to be a non-arrestable civil infraction, no longer be used by police to arrest and jail protestors. The issue was advanced in the Barham litigation in 2004 in which plaintiffs sought a Motion for Preliminary Injunction to Enjoin the District of Columbia from Arresting or Prosecuting Persons for Parading Without a Permit. (Dkt. No. 144). At the hearing on the motion, the District of Columbia announced that as a matter of policy it would cease the practice of suddenly arresting protestors for parading without a permit. See Dkt. No. 168 (denying the motion for preliminary injunction as moot in light of District counsel's representations in open court).

30

To ensure that MPD officers know that parading without a permit is a non-arrestable offense, in an earlier (February 2007) settlement of the non-class Vermont & K plaintiffs' claims in the Barham matter, the following equitable relief was agreed to by the District of Columbia:

> The Metropolitan Police Department's Mass Demonstration Handbook and/or its successor publication, in the event of a change of title, shall, within 120 days of the entry of judgment upon these terms provide written notice that parading without a permit, demonstrating without a permit, and participating in a First Amendment assembly without a permit are not arrestable offenses. . .

Notice of Acceptance of Offer of Judgment (Dkt. No. 302-1).

Excessive use of force claims were not advanced by the plaintiff class in the Pershing Park litigation. Nevertheless, as affects the conduct of the Metropolitan Police Department's handling of mass demonstrations, the equitable relief that has issued since the time of the Pershing Park incident addresses what plaintiffs in other demonstration cases have alleged to have been one cause of use of excessive force by the Metropolitan Police Department during mass demonstrations.

Plaintiffs alleging police use of excessive force against demonstrators in the Becker case, as well as in the litigation over the January 2001 Presidential Inaugural Parade, asserted that the suspension by Chief Ramsey of use of force reporting requirements during mass demonstrations sent a message to officers that use of force need not be reported, and by logical extension, would not be investigated or disciplined. The District denies such allegations.

Accordingly, in the resolution of the 2001 Inaugural litigation, in November 2006, the plaintiffs represented by the Partnership for Civil Justice secured the following relief:

> The Metropolitan Police Department's Mass Demonstration Handbook and/or its successor publication, in the event of a change of title, shall be modified within 120 days to state, in substance, that the requirement that an officer reports use of force, as established in General Order 901.7, shall fully apply in the context of mass demonstration activity where the officer independently – rather than at the direction of a superior officer – determines to apply force and such modification shall be reflected in CDU refresher training as well as the 40-hour [training] course. Where officers utilize force at the direction of a superior officer the

current provisions of the Mass Demonstration Handbook [regarding use of force reporting] shall apply.

<u>See</u> Settlement Agreement between District of Columbia Defendants and all Plaintiffs, Collectively at 3, <u>International Action Center, et al. v. United States, et al.</u>, Civil Action No. 01-00072 (GK) (<u>International Action Center</u> Dkt. No. 340-1).

The alleged particular tactics that were in play and employed by the D.C. Metropolitan Police Department in April 2000 and September 2002 and which were sought to be challenged through this litigation have now been addressed through settlement terms and legislative action.

The legislation combined with nearly a decade of hard-fought litigation and close judicial oversight has worked successfully to protect the right to dissent and to engage in spirited and vigorous protest and free speech in public fora.

Class Counsel as well as District of Columbia Counsel are in agreement that, from the April 2005 effective date of the First Amendment Rights and Police Standards Act to date, there has been no use of these challenged practices.

*Judicial Declaration of the Unconstitutionality of the <u>Barham</u> Class Arrests*

The careful consideration and formal rulings of this Court, as affirmed by the D.C. Circuit, have established lasting judicial precedent that stands not only to protect the rights to free speech of protestors in Washington, D.C., but across the nation.

These declarations of constitutional rights and standards are, in and of themselves, a substantial form of equitable and declaratory relief that accrue widespread benefit beyond the immediate litigants.

This Court and the U.S. Court of Appeals for the District of Columbia Circuit provided a critical and detailed articulation of the standards to be followed by police in the context of mass demonstrations. "[W]here a group contains persons who have not been violent or obstructive, police may not mass arrest the demonstration as a group without fair warning or notice and the

32

opportunity to come into compliance." <u>Barham v. Ramsey</u>, 338 F. Supp.2d at 58. The D.C. Circuit affirmed and adopted the standards articulated by this Court, ruling that only "when compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protestors, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order." <u>Barham v. Ramsey</u>, 434 F.3d at 575.

The judicial articulations of constitutional standards have been relied upon by protestor-plaintiffs advancing claims of mass false arrest against police in other jurisdictions and have been cited and relied upon by courts applying these standards to protect constitutional and free speech rights. <u>See</u>, <u>e.g.</u>, <u>Fogarty v. Gallegos</u>, 523 F.3d 1147, 1158 (10th Cir. 2008) (affirming denial of qualified immunity to arresting officers in connection with anti-war protest and march in Albuquerque, New Mexico) (citing <u>Barham v. Ramsey</u>, 434 F.3d at 574); <u>Beal v. City of Chicago,</u> Civil Case No. 04-2039 (N.D. Ill March 30, 2007) at 10, 12 (citing <u>Barham v. Ramsey</u>, 338 F. Supp. 2d 48, 58 (D.D.C. 2004)) (denying defendants' motion for summary judgment on false arrest claims in connection with anti-war march and rally at the Federal Plaza in Chicago, Illinois resulting in mass arrest); <u>Hickey v. City of Seattle</u>, Civil Action No. 00-1672, at 10 (W.D. Washington, December 13, 2006) ("<u>Barham v. Ramsey</u>, 434 F.3d 565 (D.C. Cir. 2006) is instructive here" in the opinion granting plaintiffs' motion for summary judgment on the issue of probable cause in connection with December 1, 1999 anti-World Trade Organization protests in Seattle, Washington).

*Judicially Enforced Document Management, Retention and Preservation Obligations; Full Funding to Develop and Implement Document Management System*

The total monetary commitment the District of Columbia has made through the Settlement Agreement is potentially greater than just the $8,251,333 allocated for the Class

Settlement Fund and includes an additional commitment of monies to implement a document management system to prevent recurrence of evidence loss/destruction including by creating an audit trail.

The Settlement Agreement provides for funding for the Document Management, Retention, and Preservation Obligations for a period of three years, which may be extended by the District for an additional two one-year periods to ensure continued funding. In other words, funding as needed is established for up to a five-year period to ensure time for implementation and institutionalization.

These funds for this system are over and above the $8,251,333 allocated for the Class Settlement Fund and are authorized to be paid from the D.C. Judgment and Settlement Fund, which is a funding source within the District of Columbia municipal budget that provides fiscal resources to settle claims and lawsuits and pay judgments in most types of civil cases filed against the District of Columbia. It is an uncapped fund, and therefore this element of relief satisfies two important characteristics: it provides full funding for the document management system and does not affect the availability of funds for settlements or judgments regarding other lawsuits against the District.

The District has, in the resolution of other class action lawsuits seeking systemic change, previously funded systems needed to facilitate systemic equitable reforms by specifically providing for such funding in the class action settlement agreement. For example, in the class action resolution of Bynum v. District of Columbia, the agreement provided for three million dollars for prison processing facilities development, the existence of which was needed to prevent future instances of over-detention. Bynum v. District of Columbia, 412 F. Supp. 2d 73

34

(D.D.C. 2006). These commitments were properly considered in determining the total valuation of the settlement of claims. Id.

In the Barham resolution, the distinction is that there is no particular dollar amount maximum to the funding of the equitable relief, although the funding is obviously limited by the actual needs of the document management system and the terms of the Settlement Agreement. Within those needs, the parties recognize that the largest financial and technical hurdles will come in the first years of development and implementation of the document management system. There will be significant one-time start-up costs. Technical start-up costs will exist for the development and implementation, from a systems perspective. Other costs, associated with personnel training and the integration of the system into actual case operations, will be significantly greater during initial years of implementation. Once the use and benefits of the system become a part of operations, and personnel are properly trained, then of course the ongoing per-year maintenance costs will not be encumbered by these front-end expenses.

> The parties' intent is to fully fund, through this agreement, the acquisition, development and training costs for the Document Management System, which would be expected to be greater in the initial years of implementation than in subsequent periods, and to establish funding for three years, or as may be extended, a period of time believed to be amply sufficient for the use and benefits of the system to be well established.

Ex. 6, Settlement Agreement at 17 – 18.

The parties' intent is that, when the Settlement Agreement does eventually expire, the start-up costs will have all been covered within the Agreement, the operating expenses during the initial three- to five-year period will all have been covered, and the expected future financial costs will accordingly be limited to maintenance costs. At that time, the use of the system will be incorporated into certain case management procedures and the benefits will be well established. While budgeting will, of course, be needed to continue use of the system, the Agreement has been structured and funded to make the system long-standing, cost-effective and essential.

The Settlement Agreement provides for this Court to retain jurisdiction for three years for purposes of enforcement of the Document Management and Retention Requirements in the Agreement. See Ex. 6, Settlement Agreement at 18.

The District has also agreed to the series of requirements set forth below relating to the mandatory indexing, logging and preservation of evidence.

### 1.    Commitment of Funds to Implement New Document Management System

The District has agreed to fund, using additional monies from the District of Columbia Judgment and Settlement Fund, a document management protocol or system the function of which is to prevent the recurrence of the destruction of evidence issues that were discovered in the course of litigation.  Id. at 13.

### 2.    Indexing and Logging of Evidence

Under new policies mandated as terms of the Settlement Agreement, the District will now be required to maintain an index, and to log, any documents, items, things, recorded or electronic/computer/digitized material related to a complaint or litigation hold letter for matters arising from mass demonstrations and protests. Id. at 9 – 10.

This is relief calculated to enforce indexing of evidence, to create an internal audit trail that would alert the District to any missing records or evidence. Id. at 10.

### 3.    Evidence Preservation For Protest Related Claims

Under the Agreement, "the OAG shall issue policy statements mandating that upon written notice of likely litigation and/or request to preserve documents and records pertaining to alleged police misconduct involving or relating to mass demonstrations or protests, the OAG shall affirmatively direct in writing and ensure that all documents, records, items, videos or

computer files relating to the underlying incident be preserved and affirmatively protected from destruction for a period of no less than three (3) years." Id. at 11.

4.      **Preservation and Indexing of Radio Runs, Command Center Records, and Other Computer Based Recordings or Data Records**

Under the Agreement, upon any command or other system activation to assist in the management of mass demonstrations and protests, "all computer files, communications recordings / radio runs and documents reasonably related to the event shall be indexed and preserved for a period of no less than three (3) years." Id. at 11 – 12.

5.      **Preservation and Indexing of Photographic or Video Recordings**

Under the Agreement, "whenever any MPD officer is assigned to (or with the capability to) engage in photographic or video recording or surveillance of mass demonstration activity or protests; documentation shall be maintained reflecting the officer's name, assignment, the equipment and recording media issued; and indexing and logging the return of all media. Upon the return of any media, the officer shall document the dates, times, locations and events recorded and affix such information to the media itself or secure to the container that contains the media." Id. at 12.

The Agreement is explicit that it does not authorize such surveillance, but "is intended solely to focus on indexing and record-keeping" in the event such media is created. Id. at 12.

6.      **Office of the Attorney General Required to Provide a Report to the Partnership for Civil Justice Fund, and to Issue Public Report to the Court, Every Six Months During Enforcement Period**

At six month intervals, for a period of three years, the District of Columbia is required to submit a report to class counsel at the Partnership for Civil Justice Fund regarding measures taken to perform the above-referenced system development, records indexing and maintenance requirements. The Partnership for Civil Justice Fund will have opportunity for review and

comment. The District shall be afforded an opportunity to consider these comments, after which the final report will be submitted to the Court and published. The comments of the PCJF are required to be published within or as an attachment to the report. See Id. at 12 – 13.

This is an oversight and reporting function that is intended to assure plaintiffs, the Court, and the public that the Document Management, Retention and Preservation goals of the Settlement Agreement are, in fact, advanced and achieved.

With all of this in consideration, and in consideration of the specific monetary and non-monetary terms and conditions of the Becker proposed settlement, the parties jointly submit that the claims for equitable relief have been resolved, the terms reached in the resolution of this case are substantial and historic, and clearly satisfy the requirements of constituting a fair, reasonable and adequate settlement of claims under Fed. R. Civ. P. 23.

*Appointment of Special Master To Investigate Loss or Destruction of Evidence*

The Class and Class Counsel have steadfastly advanced issues pertaining to loss and destruction of evidence throughout these proceedings, including even after a proposed settlement was reached with the District defendants. It was Class Counsel which uncovered deficiencies and filed motions to compel relating to the existence, loss or destruction, of the Joint Operations Command Center running resume and the existence and condition of the recorded police channel communications, each of which were the focus of the investigation commissioned by Attorney General Peter J. Nickles which resulted in the written report of the Hon. Judge Stanley Sporkin (Ret.) (Dkt. No. 576-1).

This Court has appointed Magistrate Judge John M. Facciola as Special Master to investigate the circumstances surrounding the issues of evidence loss and destruction. (Dkt. No. 608, Special Master Appointment Order).

*The Status of the Litigation at the Time of the Settlement*

The settlement occurred after years of thorough discovery, as well as dispositive motions.

The parties were well-positioned to evaluate their claims and respective positions. See Meijer, Inc. v. Warner Chilcott Holdings Co. III, Ltd., 565 F. Supp. 2d 49, 57 (D.D.C. 2008) ("In determining whether a proposed class action settlement is fair, adequate, and reasonable, courts consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-à-vis the probability of success and range of recovery.")

*The Reaction of the Class*

Reflecting the overwhelmingly positive support by the class of the Settlement, apart from the Chang plaintiffs which are addressed at Dkt. Nos. 624, 625, not a single Class Member, among the hundreds, has requested exclusion or to "opt out" of the Settlement during this claims period.

The high level of active class member participation *of approximately 85% of the class as a whole*, and the near-complete absence of objection (setting aside the attorneys for the Chang case) weighs in favor of approval of the settlement. See Thomas v. Albright, 139 F.3d 227, 232 (D.C. Cir. 1998) ("[A] settlement can be fair even though a significant portion of the class and some of the named plaintiffs object to it."); Radosti v. Envision, 2010 U.S. Dist. LEXIS 56373, at *57 (D.D.C. June 8, 2010) (same); In re Lorazepam & Clorazepate Antitrust Litig. (Lorazepam II), 2003 WL 22037741, at *6 (D.D.C. June 16, 2003) (the "existence of even a relatively few objections certainly counsels in favor of approval").

**Conclusion**

For the reasons state herein, the settlement should be approved as a fair, adequate and reasonable resolution of the class claims against the District defendants in this matter.

Respectfully submitted,

PETER J. NICKLES                                       /s/
Attorney General for the District of Columbia          Carl Messineo, [450033]
                                                       Mara Verheyden-Hilliard [450031]
GEORGE C. VALENTINE                                    PARTNERSHIP FOR CIVIL
Deputy Attorney General                                JUSTICE FUND
Civil Litigation Division                              617 Florida Avenue, NW
                                                       Washington, D.C. 20001
ELLEN A. EFROS [250746]                                (202) 232-1180
Assistant Deputy                                       (202) 747-7747 fax
Litigation Division
                                                       *Attorneys for Plaintiffs*
MONIQUE A. PRESSLEY [464432]
Senior Assistant Attorney General
Equity Section I
441 4th Street, NW, 6th Floor South
Washington, DC 20001
(202) 724-6610
Fax: (202) 741-0424
monique.pressley@dc.gov

SHANA L. FROST [458021]
Assistant Attorney General

/s/ Monique A. Pressley
MONIQUE A. PRESSLEY
Assistant Attorney General
Equity Section I

*Attorneys for Defendants District of Columbia,*
*Charles H. Ramsey and Terrance W. Gainer*


DATED:          September 7, 2010

40